United States Bankruptcy Court
Northern District of Illinois
Eastern Division

In re:

Settlers' Housing Service, Inc., an
Illinois Non-Profit,

                  Debtor

Settlers' Housing Service, Inc., an
Illinois Non-Profit,

                  Plaintiff

        v.

Schaumburg Bank & Trust
Company, N.A.,

                  Defendant

Bankruptcy No. 13-bk-28022

Chapter 11

Adversary No. 13-ap-1328

## MEMORANDUM OPINION ON SCHAUMBURG BANK'S MOTION TO DISMISS

This Adversary proceeding arises out of and relates to the Chapter 11 case of Settlers' Housing Service Inc. ("Settlers'"). Debtor-Plaintiff Settlers' is an Illinois nonprofit dedicated to fulfilling the housing needs of recently arrived legal immigrants. Settlers' ran into financial trouble as a result of an allegedly fraudulent transaction wherein it acquired some distressed properties through the Bank of Commerce. Schaumburg Bank and Trust, ("Schaumburg Bank" or the "Bank"), the successor in interest to The Bank of Commerce, foreclosed. Settlers' filed for bankruptcy relief under chapter 11 of the Bankruptcy Code. The Bank moved for relief from the automatic stay under § 362(d), asserting (1) lack of adequate protection of its interest in certain property of Settlers', and (2) that Debtor has no equity in the property and it is not necessary to an effective reorganization because debtor does not have sufficient cashflow to propose a feasible plan. After taking evidence as to the financial viability of Debtor's plan, it was determined that Debtor will not have sufficient cashflow to support a feasible plan unless it can prevail on its objection and counterclaim to Bank's proof of claim. 505 B.R. 483 (Bankr. N.D. Ill. 2014). Settlers' has separately filed its objection and counterclaim to the Bank's claim as this adversary proceeding.

The Second Amended Complaint ("Complaint") alleges the following: At the closing of the sale of multiple properties from another bank customer to Settlers', the Bank of Commerce set a trap by surreptitiously burying a document providing for a line of credit secured by a mortgage on the Washington-Taylor Property, and cross-collateralizing of all

outstanding mortgages, into a thick stack of closing documents. An outright loan and doc-
uments for it at the time would have aroused suspicions of Settlers' president KJ Lodico
because she hadn't asked for any additional loan for Settlers'. The alleged trap was sprung
when Settlers' later found itself in need of money to pay property taxes, which the Bank of
Commerce allegedly knew would happen because the properties sold to Settlers' could not
generate enough income to pay necessary expenses. Once the need became manifest, Set-
tlers' drew upon the line of credit, and the equity Settlers' had held in the Washington-
Taylor Property became the Bank of Commerce's collateral securing the entire Settlers'
loan portfolio. The Bank of Commerce allegedly needed that collateral to help it fend off
being shut down by banking regulators.

The Second Amended Complaint is pleaded in seventeen Counts:

1. Equitable Subordination
2. Breach of Fiduciary Duty
3. Aiding and Abetting Breach of Fiduciary Duty
4. Fraudulent Misrepresentation
5. Fraudulent Concealment
6. Breach of Illinois Consumer Credit Act
7. Fraud in the Inducement
8. Fraud, Illegality and Unenforceability Regarding Washington-Taylor Mortgage
9. Constructive Fraud
10. Conspiracy to Defraud and Civil Conspiracy
11. Violation of Anti-Tying Provisions of the Bank Holding Company Act
12. Unconscionability
13. Tortious Interference With Contract
14. Conversion and Accounting
15. Setoff
16. Unjust Enrichment
17. Improper Post-Petition Interest and Receiver's Fees

Relief requested in the complaint seeks disallowance or equitable subordination of
the Bank's claim, avoidance or recision of the mortgage on the Washington-Taylor Property,
compensatory, statutory, and punitive damages, attorney's fees, and any other relief that
may be warranted.

The Bank filed an answer, and simultaneously filed a Motion to Dismiss Counts 1
through 16, seeking dismissal of all these Counts with prejudice. For reasons discussed
below, the Bank's motion will be granted in part and denied in part. Under precedent cited
below, it is held with regard to the conduct by the Bank of Commerce that Settlers' may
assert illegality of the loan, and "fraud in the execution" but not "fraud in the inducement,"
and that ruling affects how this case must be limited. With regard to more recent conduct

2

by the Bank of Schaumburg, Count 14 for conversion and accounting will be dismissed, with leave to amend.

## FACTS AS ALLEGED IN THE COMPLAINT

The following facts are as alleged in Settlers's Complaint. Because this is a motion to dismiss, all well-pleaded facts are taken as true. All inferences drawn from them are drawn in favor of Settlers'.

Settlers' is a non-profit organization under Illinois law that seeks to provide low-cost housing to refugees with resident alien status in the United States. Settlers' was originally organized in 1992 by KJ Lodico ("KJ") and Joe Lodico ("Joe"), who were married at the time. Settlers' acquired its properties through grants provided directly or indirectly through the Department for Housing and Urban Development ("HUD"). Debtor's mission included acclimating recently arrived immigrants to American life, including provision to its residents of training in how to own and care for property. Many of the properties originally acquired from HUD were rented to and eventually sold to the residents, with proceeds from the sales funding further work by Settlers'.

By July of 2008, KJ and Joe Lodico were no longer married, and KJ had replaced Joe as Settlers's executive director.

In July, 2008, Settlers' owned five properties in DuPage County and a thirteen-unit property in Oak Park ("the Washington Taylor Property"). In July, 2008, Setters' acquired additional properties ("the Faulkner Properties") through the Bank of Commerce in exchange for assuming a $3.4 million loan. Allegedly, the loans to Jan Faulkner secured by the Faulkner Properties were delinquent, and Bank of Commerce was at risk of being closed by the its banking regulators as a result of its portfolio of delinquent loans. It is further alleged that the Bank of Commerce could not avoid being closed by the banking authorities if it agreed to a short sale of the Faulkner Properties because a short sale to an outside party would have forced the bank to recognize the loss. The only way to avoid closure by the authorities would have been a transaction wherein some buyer would assume Faulkner's debt, such as the sale that eventually took place to Settlers'. Robert Markay ("Markay") and John Frale ("Frale"), two officers of Bank of Commerce, hired Joe Lodico (the same Joe Lodico who was formerly married to KJ, and formerly the executive director of Settlers') to arrange sale of the Faulkner Properties to Settlers' in exchange for an assumption of the loans, by having Joe show Settlers' stale appraisals that overstated

3

value of the properties. The allegedly stale appraisals shown to Settlers' reflected a valuation of the Faulkner Properties of approximately $4.3 million. The Bank of Commerce offered to transfer the properties to Settlers in exchange for Settlers' assuming approximately $3.4 million in debt.

The closing for the sale to Settlers' of the Faulkner Properties was held on August 1, 2008 in a Bank of Commerce's office, when KJ had only a few hours between her flight from California and her flight leaving the country. Pressed for time, KJ only reviewed the closing documents for one of the properties and signed the rest based on an oral representation at the time from Connie Saiger ("Saiger") that the remaining documents were the same, except that they covered the other properties included in the transaction. Unbeknownst to KJ, one of the documents in the stack was not the same as the others, but was a line of credit mortgage which cross-collateralized the Washington-Taylor Property and the Faulkner properties.

In October, 2008, when the second installment of 2007 real estate taxes came due, Settlers' lacked enough funds to pay those taxes, so KJ called The Bank of Commerce to arrange a loan. KJ was then told that Settlers' already had a line of credit which it could draw on – the one Settlers' now alleges had been surreptitiously slipped among the earlier closing documents. Settlers' drew upon that line of credit, thereby cross-collateralizing the Faulkner Properties and the Washington-Taylor Property. As a result, forty-nine rental units now owned by Setters' are encumbered by mortgages that were executed in favor of the Bank of Commerce ("the Bank of Commerce Properties").

This is alleged to have been planned by officers of the Bank of Commerce all along. The Bank of Commerce sold the underwater Faulkner Properties to Settlers' for an assumption of debt knowing that the properties would fail to generate enough cashflow to cover expenses such as real estate taxes. Once the taxes came due, Settlers' would need a loan to cover that expense, which would then be extended under the line of credit slipped into the closing documents. Drawing on that line of credit would have the effect of cross-collateralizing most of Settlers' properties, thus giving the Bank of Commerce valuable collateral.

In 2011, Schaumburg Bank acquired assets of the Bank of Commerce through a receivership of the Federal Deposit Insurance Company ("FDIC"). In 2012, the Bank of Schaumburg foreclosed on the Setters' properties. In the state court foreclosure proceedings, Stephen H. Baer was named receiver for the properties. Debtor filed an answer to

4

gether with counterclaims and third-party claims against individuals associated with Bank of Commerce, asserting an allegedly fraudulent scheme whereby Bank of Commerce sold Debtor the Faulkner properties and obtained a mortgage on the Washington-Taylor Property.

Settlers' also alleges in Count 14 that letters sent to Settlers' tenants by the Bank of Schaumburg instructing tenants to pay rents to the Bank instead of Settlers' amounted to tortious interference with contract and conversion.

Further details of the pleadings appear in the discussion below.

## DISCUSSION

### I. JURISDICTION & STERN ISSUES

#### A. Jurisdiction & Venue

Jurisdiction lies under 28 U.S.C. §§ 157(b)(2)(C), (G) and (K) 4 and 1334. Venue is proper in this District under 28 U.S.C. § 1409. The case and pleadings related to it are referred here by Internal Procedure 15(a) of the District Court for the Northern District of Illinois.

#### B. Application of *Stern v. Marshall and its Progeny*

Schaumburg Bank objects to entry of final judgment in several counts under *Stern v. Marshall*, 131 S.Ct. 2594 (2011).

Count 1 of the Complaint seeks equitable subordination. A request for equitable subordination under § 510(c) "stems from the bankruptcy itself," and may constitutionally be decided by a bankruptcy judge. *Stern*, 131 S.Ct. at 2618. In addition, the authority of a bankruptcy judge to rule on objections to a creditor's proof of claim where necessary to determine the valid amount of the claim was clearly affirmed in *Stern*. at 2616. A recent Seventh Circuit panel opinion affirmed the power of a bankruptcy judge to enter final judgment when a creditor submits a proof of claim and the trustee seeks to recover preferences and fraudulent transfers. *Peterson v. Somers Dublin Ltd.*, 729 F.3d 741 (7th Cir. 2013). If a creditors subject themselves to preference-recover and fraudulent-conveyance claims when they file proof of claim, then creditors certainly subject themselves to adjudication of the extent and validity of their claims. Counts 4-9, 11 & 12, in so far as they challenge the legal validity of a mortgage asserted by the Bank, must necessarily be decided in order to rule on validity of the Bank's Proofs of Claim because they challenge the extent and validity of the Bank's lien on the Washington-Taylor Property.

5

On the other hand, Count 2 for breach of fiduciary duty, Count 3 for aiding and abetting breach of fiduciary duty, Count 10 for civil conspiracy to defraud, Count 13 for tortious interference with contract, Count 14 for conversion and accounting, Count 15 for setoff, and Count 16 for unjust enrichment are counterclaims stating state-law causes of action. *Stern* itself involved a compulsory counterclaim under state law, concerning the some of the same common nucleus of operative facts as the proof of claim, but different issues of law – including a prayer for punitive damages. 131 S.Ct. at 2617. Here, the Bank's claims involve a series of notes and mortgages, and the counterclaims in the foregoing counts arise from conduct leading up to executing those notes and mortgages, and the damages allegedly involve state law questions separate from whether the notes and mortgages are valid and how much may be due thereon.

Since some Adversary Proceeding counts are counterclaims by the estate, the statute provides that they are core, § 157(b)(2)(C), but Article III of the Constitution may not allow entry of final judgment by a bankruptcy judge. *Stern*, at 2618. Recently, a Seventh Circuit panel ruled that the bankruptcy has no statutory authority to do anything in those cases. *Wellness Intern. Network, Ltd. v. Sharif*, 727 F.3d 751, 772 (7th Cir. 2013). In *Executive Benefits Insurance Agency v. Arkison*, the Supreme Court abrogated that result in *Wellness* when holding that when a matter is core, but there is no authority for a bankruptcy judge to enter final judgment (calling such matters "*Stern* claims"), that matter may be treated as non-core within the meaning of § 157(c). *Executive Benefits Ins. Agency v. Arkison*, 12-1200 at *9 (June 9, 2014). Here, the counts asserting counterclaims are "related to" the bankruptcy case because they seek to bring property into the estate for distribution to creditors. *Id.* at *11. Therefore, even though a bankruptcy may not enter a final judgment or order, a bankruptcy judge may "hear" such a proceeding. § 157(c)(1). A bankruptcy judge then has authority to enter an order denying a motion to dismiss because when a trial court "denies a motion under Rule 12(b)(6), it does not enter a judgment." *Goetz v. Cappelen*, 946 F.2d 511, 514 (7th Cir. 1991).

An order of dismissal may be a final judgment, even if dismissal is without prejudice when there is "no amendment a plaintiff could possibly be expected to offer to save the complaint." *E.g. Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014 (7th Cir. 2013). Rule 54(b), F.R.C.P. [as made applicable under Rule 7054(a) F.R. Bankr. P.] provides that a court may direct entry of final judgment as to fewer than all claims when there is no just reason for delay. "Otherwise, any order or other decision, however designated, that adjudicates fewer

than all the claims or rights and liabilities of fewer than all the parties" is not a final judgment. Rule 54(b). Here, since only some counts will be dismissed (and others must be repleaded for clarity), there is no final judgment unless the court expressly determines that there is no just reason for delay. Since the counts which will dismissed are intertwined factually with counts that will not be dismissed, the better course is to withhold any final judgment until all repleaded counts can be decided.

## II. SUFFICIENCY OF THE PLEADINGS

The Bank's Motion to Dismiss tests whether the Trustee's First Amended Complaint meets the pleading requirements to state a claim under Rule 12(b)(6). [F.R.C.P. made applicable by Rule 7012 F.R. Bankr.P.] A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the Complaint rather than the merits of the case. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.1990). "The consideration of a 12(b)(6) motion is restricted solely to the pleadings, which consist generally of the complaint, any exhibits attached thereto, and supporting briefs." *Thompson v. Illinois Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002); Rule 10(c) F.R.C.P.; Rule 7010 F.R. Bankr. P. All well-pleaded allegations of the complaint are assumed true and read in the light most favorable to the plaintiff. *United Indep. Flight Officers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1262, 1264 (7th Cir.1985). If the complaint contains allegations from which a trier of fact may reasonably infer evidence as to necessary elements of proof available for trial, dismissal is improper. *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund*, 25 F.3d 417, 421 (7th Cir.1994).[1]

Rule 8(a)(2) F.R.C.P. [Rule 7008 Fed. R. Bankr.P.] generally requires that the pleader provide "a short and plain statement of the claim showing that the plaintiff is entitled to relief," giving the defendant "fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint need not contain detailed factual allegations, but "the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964–65 (internal quotations omitted). Factual allega-

---

[1] Settlers' suggests that since the Bank has filed an answer, its motion should be considered as a motion for judgment on the pleadings under Rule 12(c) instead of Rule 12(b)(6). [F.R.C.P., Rule 7012 F.R. Bankr. P.] It might be so considered, but in any case the same standard applies under Rule 12(c) as Rule 12(b)(6). *Republic Steel Corp. v. Pennsylvania Engineering Corp.* 785 F.2d 174 (7th Cir. 1986).

tions must show that the right to relief is more than speculative and "state a claim to relief that is plausible on its face." *Id.* at 1965, 1974.

While most pleadings are bound by the Rule 8 standards, allegations of fraud must properly be pleaded in conformance to Rule 9(b) F.R.C.P. [Rule 7009 Fed. R. Bankr.P.]. *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir.2007). Under Rule 9(b), in "averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Id.* "This means the who, what, when, where, and how...." *DiLeo v. Ernst & Young*, 901 F.2d 624, 626 (7th Cir.1990). This requirement insures that defendants have fair notice of plaintiffs' claims and grounds, providing defendants an opportunity to frame their answers and defenses. *Reshal Assocs., Inc. v. Long Grove Trading Co.*, 754 F.Supp. 1226, 1230 (N.D.Ill.1990). This heightened pleading standard applies to all "averments of fraud," regardless of whether those averments pertain to a "cause of action" for fraud. *Borsellino*, 477 F.3d at 507. Allegations based on "information and belief" do not comply with the specificity requirement unless accompanied by a statement of fact providing the basis of the belief. *Interlease Aviation Investors II v. Vanguard Airlines, Inc.*, 254 F. Supp. 2d 1028, 1040 (N.D.Ill.2003).

It is also possible for a plaintiff to plead itself out of court. Although a trial court judge should not usually base dismissal under Rule 12(b)(6) on its assessment of an affirmative defense, that rule does not apply when a party has included in its complaint facts that establish an impenetrable defense to its claims. *Hecker v. Deere & Co.*, 556 F.3d 575, 588 (7th Cir. 2009) (citations omitted). In this case, Settlers' pleaded that the Bank of Schaumburg is the successor in interest to the FDIC, which was in turn succeeded to the assets of the Bank of Commerce as receiver after the Bank of Commerce was closed by the state authorities. (Complaint ¶¶ 6-7.) This is relevant to the defense under the *D'Oench, Duhme* doctrine as discussed below.

### III. *D'OENCH, DUHME* AND RELATED DOCTRINES

The *D'Oench, Duhme* doctrine arises from the Supreme Court case, *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447 (1942). ( *"D'Oench"* for the doctrine, *"D'Oench, Duhme"* for the case itself) In *D'Oench, Duhme*, the Court announced that, under federal common law, a counterparty to a failed bank is barred from raising any defense against the FDIC based on a secret agreement between the counter-party and the failed bank. *Id.* at 461. *D'Oench* has

8

since been codified, more or less, as 12 U.S.C. § 1823(e),[2] and as codified has been extended
to protect the FDIC in its capacity as receiver. *FDIC v. Wright*, 942 F.2d 1089, 1093 (7th
Cir. 1991). The purposes of *D'Oench* and § 1823(e) are:

> 1. to allow federal and state bank examiners to rely on a bank's
> records in evaluating the worth of a bank's assets,
>
> 2. to ensure mature consideration of unusual loan transactions by
> senior bank officials, and
>
> 3. to prevent fraudulent insertion of new terms, with the collusion of
> bank employees, when a bank appears headed for failure.

*John v. RTC.*, 39 F.3d 773, 778 (7th Cir. 1994) (citing *Langley v. FDIC*, 484 U.S. 86, 91-92
(1987)) (quotations omitted).

In *Langley v. FDIC*, 484 U.S. 86 (1987), the Supreme Court ruled that *D'Oench* and
§ 1823(e) "bars the defense that the note was procured by fraud in the inducement even
when the fraud did not take the form of an express promise." *Langley*, 484 U.S. at 90. This
is so because under *D'Oench*, an agreement may include any "scheme or arrangement
whereby the banking authority . . . was likely to be misled." *Langley*, 484 U.S. at 92 (quot-
ing *D'Oench, Duhme*, 315 U.S. at 460). Even though *D'Oench* provides broad protection to
the FDIC, it "is not a limitless, per se guarantee of victory by federal banking agencies and
their successors in interest." *John v. RTC.*, 39 F.3d at 779 (1994) (citing *Alexandria Associ-
ates, Ltd. v. Mitchell Co.*, 2 F.3d 598, 602 (5th Cir. 1993)).

Settlers' argues that *D'Oench* has been preempted by 12 U.S.C. § 1823(e), and that
protections in favor of the FDIC under § 1823(e) do not apply to successors and assignees of
the FDIC such as the Bank of Schaumburg here. No Seventh Circuit Court of Appeals panel

---

[2] 12 U.S.C.A. § 1823(e), with certain exceptions not relevant here, provides:
> No agreement which tends to diminish or defeat the interest of the Corporation in
> any asset acquired by it under this section or section 1821 of this title, either as
> security for a loan or by purchase or as receiver of any insured depository institution,
> shall be valid against the Corporation unless such agreement--
> (A) is in writing,
> (B) was executed by the depository institution and any person claiming an adverse
> interest thereunder, including the obligor, contemporaneously with the acquisition of
> the asset by the depository institution,
> (C) was approved by the board of directors of the depository institution or its loan
> committee, which approval shall be reflected in the minutes of said board or
> committee, and
> (D) has been, continuously, from the time of its execution, an official record of the
> depository institution.

has directly addressed the issue as to whether *D'Oench* has been pre-empted by § 1823(e).
However, one panel opinion did state that "Congress codified the *D'Oench* doctrine by en-
acting 12 U.S.C. § 1823(e). . ." *FDIC v. Wright*, 942 U.S. 1089, 1094 (7th Cir. 1991). An-
other opinion stated that the statute, § 1823(e), "makes the common law principle both
more encompassing and more precise." *FDIC v. O'Neil*, 809 F.2d 350, 353 (7th Cir. 1987).

Assuming arguendo that § 1823(e) preempts *D'Oench*, an assignee of assets by the
FDIC would still be protected. The Bank cites several Fifth Circuit opinions holding that
*D'Oench* applies with equal force to assignees of the FDIC, but none of these cases extends
the protections afforded the FDIC under § 1823(e). *Porras v. Petroplex Savings Ass'n*, 903
F.2d 379, 381 n.5 (5th Cir. 1990); *Bell & Murphy & Assocs. V. Interfirst Bank Gateway*, 894
F.2d 750, 754-55 (5th Cir. 1990). More recently, a Tenth Circuit opinion, *UMLIC-Nine
Corp. v. Lipan Springs Dev. Corp.*, 168 F.3d 1173, 1179 (10th Cir. 1999), held that *D'Oench,
Duhme*, as codified at § 1823(e), "applies to actions brought by the FDIC's assignees as well
as by FDIC itself." *Id.* (citing *Nat'l Eners., Inc. v. Smith*, 114 F.3d 561, 564 (6th Cir. 1997).)
"[T]he FDIC transfers its protected status to subsequent purchasers of notes it holds." *FDIC
v. Newhart*, 892 F.2d 47, 50 (8th Cir. 1989). This is because, "[o]ne of the purposes behind
§ 1823(e) is to facilitate the purchase and assumption of failed banks as opposed to their
liquidation." *Newhart*, 892 F.2d at 49. "If holder in due course status did not run with the
notes acquired by the FDIC in purchase and assumption transactions, the market for such
notes would be smaller, which would have a deleterious effect on the FDIC's ability to pro-
tect the assets of failed banks." *Id.* at 50. Thus, it is enough that the Bank holds the note as
an assignee of the FDIC for it to assert a defense under *D'Oench* and § 1823(e).

Debtor argues that *D'Oench* and § 1823(e) only applies when a bank is engaged in
conventional loan activities, not when the bank engages in brokering a sale between two of
its customers, citing *John v. RTC*, 39 F.3d at 776. The Bank counters that, as alleged in the
complaint, the Bank of Commerce did not sell any properties to Debtor because Jan
Faulkner was the seller of the properties, and that the loans made out to Settlers were
ordinary banking activities. The *John* opinion explains that the requirement of
conventional loan activity comes from § 1823(e), which "requires an identifiable 'asset'
which is acquired by the bank and then transferred to the regulatory agency, and to which
the unenforceable agreements must relate." *Id.* The *John* opinion declined to extend
§ 1823(e) protection to an allegedly fraudulent sale of a home by the bank to a customer
when the bank did not also make a loan because there was no identifiable bank asset

resulting from the sale. *Id.* This factual distinction matters because "§ 1823(e) cannot
sensibly be read to cover agreements relating to the sale of assets in a non-loan
transaction." *John*, 39 F.3d at 776. Other cases which have found no protection under
§ 1823(e) are similarly narrow. *Thigpen v. Sparks*, 983 F.2d 664, 668 (5th Cir. 1993) (where
the bank sold its asset, a trust company, for cash); *Alexandria Associates, Ltd. v. Mitchell
Co.*, 2 F.3d 598, 603 (5th Cir. 1993) (where the bank sold partnership interest in real estate
development ventures) (also limiting the common law *D'Oench* doctrine to conventional
banking activities).

   Settlers' also argues that *D'Oench* and § 1823(e) do not apply when the bank itself is
engaged in a scheme to defraud, and that may be the case even when the bank's own rec-
ords may show the scheme to defraud. However, *D'Oench* and § 1823(e) were crafted
precisely to protect the FDIC and its successors in interest from the bad acts of the failed
bank taken over by the FDIC. Indeed, the *D'Oench, Duhme* case itself involved an alleged
scheme to defraud regulators by the Belleville Bank & Trust Co., which eventually went
insolvent. In *Bell & Murphy and Associates, Inc. v. Interfirst Bank Gateway, N.A., D'Oench*
prevented a plaintiff from recovering even though the "unrecorded oral agreement" was an
alleged fraud practiced against the plaintiff. 894 F.2d 750, 752 (5th Cir. 1990). In any case,
neither section 1823(e) nor *D'Oench* can be overcome by piecing together writings in the
bank's records. *Cmty. Bank of Ozarks v. FDIC*, 984 F.2d 254, 257 (8th Cir. 1993). "It is the
actual, written agreement which the law requires to be an official record of the depository
institution." *Castleglen, Inc. v. RTC.*, 984 F.2d 1571, 1579 (10th Cir. 1993). "Scattered
evidence in corporate records from which one could infer the existence of an agreement does
not meet the requirements of the statute." *Id.* In *Langley v. FDIC*, the borrower was barred
by § 1823(e) from alleging a fraud perpetrated by the failed bank even though the FDIC had
actual knowledge of the alleged fraud. *Langley*, 484 U.S. at 94. Although the results seems
harsh, especially when, as here, the failed bank was itself the alleged wrongdoer, this was
the balance struck by the courts in *D'Oench* and by Congress in § 1823(e). When allocating
losses between an innocent defrauded borrower and innocent depositors and regulators, the
defrauded borrower should bear the loss as having been in the better position to avoid the
loss. Therefore, some otherwise-meritorious claims and defenses do not survive once a failed
bank has been taken over by the FDIC.

## IV. FRAUD IN THE EXECUTION

Debtor further argues that *D'Oench* and § 1823(e) do not apply because there is an exception in *D'Oench* and § 1823(e) for fraud in the *factum*, also known as fraud in the execution. By its terms, the holding in *Langley* only applied to fraud in the inducement, not fraud in the execution. Fraud in the execution is "the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents." *Langley*, 484 U.S. at 93 (citing U.C.C. § 3–305(2)(c), Comment 7, 2 U.L.A. 241 (1977)). "The former induces a party to assent to something he otherwise would not have [assented to]; the latter induces a party to believe the nature of his act is something entirely different than it actually is." *Sw. Administrators, Inc. v. Rozay's Transfer*, 791 F.2d 769, 774 (9th Cir. 1986). Fraud in the execution would take the instrument out of § 1823(e), because it would render the instrument void, rather than merely voidable. *Id.* As a Seventh Circuit opinion explained,

> The exception for fraud in the factum, illustrated by the case in which the borrower's signature is forged on the promissory note to the bank, does not make much sense from the standpoint of enabling the regulatory authorities to take the assets of the bank at face value; it rests on the fiction that a contract induced by fraud is an "agreement" within the meaning of section 1823(e) but that a forged contract is not.

*RTC. v. Ehrenhaus*, 34 F.3d 441, 442 (7th Cir. 1994). A later opinion elaborated:

> Where a person is fraudulently induced to sign or endorse a bill or note in the reasonable belief that he is signing something else, he cannot really be said to have made or indorsed the bill or note; hence the ancient plea of non est factum is applicable. He is in effect stating that this is not his contract; in fact, it is not a contract at all.

*Laborers' Pension Fund v. A & C Envt'l., Inc.*, 301 F.3d 768, 779 (7th Cir. 2002) (quoting 12 Williston on Contracts § 1488).[3] "Fraud in the execution arises when a party executes an agreement with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms." *Sw. Administrators, Inc. v. Rozay's Transfer*, 791 F.2d at 774 (citing Uniform Commercial Code § 3-305(2)(c) and Restatement (Second) of Contracts § 163, internal quotations omitted).

---

[3] As a defense to *D'Oench* and § 1823(e), the fraud in the execution defense is a matter of federal law. While many of these cited cases interpret collective bargaining agreements in the context of ERISA, none of the cases rely on ERISA-specific reasons for what counts as fraud in the execution. Indeed, to the extent ERISA-specific reasons are relevant at all, it is because in ERISA, Congress has limited the availability of normal contract law defenses to protect innocent third parties (pensioners under ERISA,) (*E.g. Sw. Administrators, Inc. v. Rozay's Transfer*, 791 F.2d at 773), much like *D'Oench* and § 1823(e) (depositors and taxpayers here).

In *A & C Envt'l*, the Seventh Circuit opinion found that there was no fraud in the execution when the company's representative signed a one page document captioned "collective bargaining agreement," —which was exactly what the document consisted of. *Id.* at 781. The *A & C Envt'l* opinion distinguished a Ninth Circuit opinion which found fraud in the execution where an owner-operator was given "several" documents to sign, which the union representative said were the standard forms for an owner-operator to become part of the union. *Id.* at 780 (citing *Operating Engineers Pension Trust v. Gilliam*, 737 F.2d 1501 (9th Cir. 1984)). The documents were of quite a different character, and they purported to subject the owner-operator to an obligation to pay $365,000 in fringe benefit contributions. *Gilliam*, 737 F.2d at 1503. The Restatement of Contracts provides the following illustrations of this issue:

> 2. A and B reach an understanding that they will execute a written contract containing terms on which they have agreed. It is properly prepared and is read by B, but A substitutes a writing containing essential terms that are different from those agreed upon and thereby induces B to sign it in the belief that it is the one he has read. B's apparent manifestation of assent is not effective.

> 3. A and B reach an understanding that they will execute a written contract containing terms on which they have agreed. A prepares a writing containing essential terms that are different from those agreed upon and induces B to sign it by telling him that it contains the terms agreed upon and that it is not necessary for him to read it. B's apparent manifestation of assent is effective if B had a reasonable opportunity to read the writing.

Restatement (Second) of Contracts § 163 Illus. 2 & 3 (1981).

Here, the facts and circumstances as alleged in the Complaint could demonstrate that one alleged act of fraud amounted to fraud in the execution, rather than fraud in the inducement. As alleged in the Complaint, the Bank of Commerce gave KJ Lodico a stack of documents to sign at a closing for multiple properties. After KJ went through the documents for closing one of the properties, and the Bank of Commerce's officer indicated that the remaining documents in the stack were the same as the first set. (Complaint ¶ 174.)

Even under the foregoing Illustration 3 from the Restatement, the allegations of the time crunch circumstance can support an inference that KJ did not have a reasonable opportunity to read the writing at the time of closing. KJ was only in the Chicagoland area on layover for an international flight. The facts as alleged can support an inference that the Bank of Commerce arranged for a fast closing that did not permit close reading of the doc-

13

uments, or at least knew of it, and took advantage by assuring KJ that all the documents were the same. The consequence here is that *D'Oench* and § 1823(e) do not apply to the mortgage cross-collateralizing the Washington-Taylor Properties because Settlers' has plausibly alleged that the Bank of Commerce obtained that mortgage by fraud in the execution.

### A. Reliance

The Bank argues that Settlers' cannot plead reasonable reliance, a necessary element of any fraud claim, because as alleged, KJ did not fully read the contracts. However, the inference from the pleading most favorable to the non-moving party is that KJ read and understood the documents she went over for the first property. (Complaint ¶ 174.) Further, she allegedly believed that all she would be signing that day were documents conveying properties to Settlers' in exchange for the assumption of loans just like the first set of documents. However, it turned out that one of them was not like the others – a mortgage that cross-collateralized the Faulkner Properties with a property already owned by Settlers'. Under the fraud in the execution theory, she was entitled to rely on that representation if she did not have a reasonable opportunity to read the document. As alleged, the KJ was not given a reasonable opportunity to read the documents, so reliance might have been reasonably proper even if she did not read every document in the stack.

### B. Ratification Does Not Follow Fraud in the Execution

The Bank argues that even if there had been fraud in the execution, Settlers' later ratified the grant of the mortgage at issue because it accepted a loan under the line of credit agreement in November 2008, and executed a note in 2010 acknowledging the mortgage on the properties. (Complaint ¶ 184-87.) However, fraud in the execution would give rise to a void contract; "a voidable contract can be ratified and enforced by the obligor, although not by the wrongdoer, while the void contract cannot be." *Illinois State Bar Ass'n Mut. Ins. Co. v. Coregis Ins. Co.*, 355 Ill. App. 3d 156, 164 (2004) (internal quotation omitted). The Bank's cases are inapposite. *Borsellino v. Putnam*, 2011 IL App (1st) 102242 involved fraud in the inducement. 2011 IL App (1st) 102242 ¶ 104. *Hofferkamp v. Brehm*, 273 Ill. App. 3d 263 (4th Dist. 1995) teaches that ratification is a form of waiver, which is "a purposeful relinquishment of a known right." 273 Ill. App. at 273. When a contract is void instead of merely voidable however, no such relinquishment is possible because the defrauded party does not hold a right to avoid the contract – instead, no contract exists.

14

The result may be different if the note executed in 2010 was accompanied by a new mortgage granting a security interest, but that was not alleged. The note executed in 2010 is alleged to have provided:

> Borrower acknowledges this Note is secured by Mortgage and Assignment of Rents dated 8/1/08 in the amount of $3,412,000.00 recorded on 9/3/08 in the office of Cook County Recorder of Deeds as Document 110824755016 & #0824765017 on property commonly known as Washington Taylor Village Apartments located at 409-41 1 S. Taylor Avenue and 101-103 Washington Blvd, Oak Park, IL 60402.

(Complaint Exh. X p. 2.)

As discussed above, the law treats contracts that are void (rather than merely voidable) as if they never existed in the first place because there was no agreement. Since, as alleged, there was no agreement to exchange a loan for a note and a mortgage in August of 2008, the 2008 mortgage that cross-collateralized the Washington-Taylor Property would be treated in the law as if it never existed. A recitation in the 2010 note that it is secured by a (legally nonexistent) 2008 mortgage does not bring the 2008 mortgage into existence. Therefore, if fraud in the execution is proven, ratification afterwards may not follow.

The complaint does not allege, nor do the attached exhibits show, the character of the transaction in November 2008 when Settlers' drew on the line of credit to pay property taxes. Nor is it alleged that the Bank of Commerce prevented someone from Settlers' from reading terms of the line of credit before Settlers' drew upon it in November 2008. Since the mortgage on the Washington-Taylor Property was not alleged to have attached until the line of credit was drawn upon at the earliest, there was an alleged act of deception in August 2008, but no alleged harm at that time, and alleged harm in November 2008, but no alleged deception at that time.

Settlers' treats this history as a single event, but at trial it must be determined whether there were really separate transactions. One issue at trial will be the nature of the transaction in November, 2008. If the Bank of Commerce advanced a loan based on a legally nonexistent line of credit mortgage, then it may have an unsecured claim for unjust enrichment rather than a secured claim based on a mortgage. *See Employers Ins. of Wausau v. Titan Intern. Inc.*, 400 F.3d 486 (7th Cir. 2005); Restatement (3d) of Restitution and Unjust Enrichment § 5. Another possibility is that the November 2008 transaction consisted of an altogether new loan, with an altogether new mortgage which would not have

been rendered legally nonexistent by the earlier alleged fraud in the execution in August 2008.

## V. ILLEGALITY

Even though a defense based on illegality is not barred by *D'Oench* and § 1823(e), Settlers' still has not yet pleaded a claim for illegality upon which relief may be granted. Settlers' alleges that the mortgage on the Washington-Taylor Properties are void for illegality under three theories. First, Settlers' alleges that it held the Washington-Taylor Property in trust for the Illinois Housing Development Authority; second, because KJ lacked authority under Illinois corporations law to grant the mortgage; and third, on general public policy grounds. As discussed below, none of these theories as pleaded entitle Settlers' to relief.

### A. Settlers' Has not Plausibly Alleged It Holds the Washington-Taylor Property in Trust

A contract is void if it is illegal. *ISBA Mut. Ins. Co. v. Coregis Ins. Co.*, 355 Ill. App. 3d 156, 164 (1st Dist. 2004). Settlers' alleges that the grant of the mortgage on the Washington-Taylor Property was illegal because the Washington-Taylor Property was held in trust for the Illinois Housing Development Authority ("IHDA").

Under Illinois state law, no lien may be placed upon property when the "the deed expressly provides that no contract creating a lien shall be made." *Franklin Sav. Bank v. Taylor*, 131 Ill. 376, 386 (1890). This is in keeping with generally recognized principals of the law of trusts:

> If the lender knows or is chargeable with the knowledge that the trustee has exceeded his powers in encumbering the trust property, ordinarily he is without remedy against the trust estate. Although the unauthorized trustee will be liable personally for the repayment of the sum borrowed, the lender will not be permitted to enforce a mortgage of the trust property to secure the same, and in the case of a pledge he must return the collateral to the estate.

Bogert, The Law Of Trusts And Trustees § 766;

Here, the Complaint alleges that under § 4(a) of the Land Use Agreement, Settlers' could not "[c]onvey, transfer or encumber the [Washington-Taylor Property] or any part thereof, or permit the conveyance, transfer or encumbrance of the [Washington-Taylor Property] or any part thereof" without "the prior written approval of" the IHDA, "which may be given or withheld [in the IHDA's] sole discretion." (Complaint ¶ 148 & Exh. 6.) Further, the Complaint alleges that the Bank of Commerce knew that Settlers' could not

pledge the Washington-Taylor Property without obtaining prior approval from IHDA. (Complaint ¶ 226.) The Complaint also alleges that Settlers' held the Washington-Taylor Property in trust for the IHDA. (Complaint ¶ 265.) However, the attached Regulatory and Land Use Restriction Agreement (Complaint Exh. 6) does not contain any language granting or creating a trust, so no trust was created by that instrument. Even assuming arguendo that Settlers' has pleaded that a trust arose in some other way, there has been no allegation as to how that supposed trust would be restricted by the anti-assignment provision of the Regulatory and Land Use Restriction Agreement, which by its terms contemplates Settlers' owning as the "fee owner" of the Washington-Taylor Properties. (Complaint Exh. 6.) However, Settlers' has not alleged in plausible detail how it came to hold the Washington-Taylor Properties in trust for IHDA, and has not pleaded how it is entitled to relief under this theory.

### B. It is Irrelevant That Settlers' May Have Had No Corporate Authority

Settlers' argues that Illinois corporate law provides that a corporation may only sell or otherwise dispose of all or substantially all of its assets outside the regular course of business with a board resolution and approval of the shareholders. 805 ILCS 5/11.60. Even so, that defense cannot be raised here by Settlers' because under Illinois law, "No act of a corporation and no conveyance or transfer of real or personal property to or by a corporation shall be invalid by reason of the fact that the corporation was without capacity or power to do such act..." 805 ILCS 5/3.15. Thus, even assuming arguendo a lack of corporate authority as alleged, Settlers' is not entitled to any relief on this theory as pleaded.

### C. No Other Illegality is Alleged

Finally, the pleadings as to illegality are inadequate because Settlers' has not demonstrated unenforceability with regard to public policy. The Bank argues that in Illinois, a contract may only be set aside as void for illegality when there is an express legislative declaration making such instruments void. *Kedzie & 103rd Currency Exch., Inc. v. Hodge*, 156 Ill. 2d 112 (1993). Settlers' argues that under Illinois law, when the statute is silent as to enforceability of a contract term, a court must balance public policy against enforcement. *K. Miller Const. Co., Inc. v. McGinnis*, 238 Ill.2d 284, 294 (2010). In *K. Miller Const.*, the statute forbade oral contracts for construction work totaling more than $1000 but did not specify whether such oral contracts should be unenforceable as against public policy. *Id.* at 296. Here, the complaint does not allege that any statute has been violated. Other than the supposed trust in favor of IHDA and the argument under Illinois corporate

17

law, Settlers' alleges that "The Bank of Commerce acted illegally and in violation of federal, state and or local law." (Complaint ¶ 267.) While short and plain, that does not put defendant on "fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This theory is inadequately pleaded, and Settlers' is not entitled to any relief based upon it, though it will have an opportunity to try again to plead illegality.

## VI. THE REACH OF *D'OENCH* HERE

The scope of protection afforded to the FDIC and its successors in interest by *D'Oench* and § 1823(e) is extremely broad. Not only does it cover the original subject of side-agreements between the bank and its customer, it also covers a possible fraud by a failed bank practiced upon a customer. *Langley v. FDIC*, 484 U.S. 86 (1987). In addition, "*D'Oench* bars defenses and affirmative claims whether cloaked in terms of contract or tort." *Timberland Design, Inc. v. First Serv. Bank for Sav.*, 932 F.2d 46, 50 (1st Cir.1991). It also covers fiduciary relationships that are not reduced to writing. *Motorcity of Jacksonville, Ltd. by and Through Motorcity of Jacksonville, Inc. v. Southeast Bank N.A.*, 83 F.3d 1317, 1337 (11th Cir. 1996).

Counts 4-9 of the Complaint allege various forms of fraud, and thus fall within the coverage of *D'Oench* and § 1823(e). So does Count 1 for equitable subordination under § 510(c) because equitable subordination as pleaded depends on a claim of fraud or breach of fiduciary duty. Even so, the scope of *D'Oench* does not reach agreements that are void *ab initio*, such as when there is fraud in the execution or illegality. "[I]f the subject matter of a contract is illegal, that contract is void *ab initio*." *Illinois State Bar Ass'n Mut. Ins. Co. v. Coregis Ins. Co.*, 355 Ill. App. 3d 156, 164 (2004). Therefore, the allegations asserting the secretly inserted Washington-Taylor Property mortgage and the theory of illegality are not barred. Pleaded causes of action sounding in fraud in the inducement are barred by *D'Oench* and § 1823(e). Settlers' has alleged that the Bank of Commerce gave it materially false appraisals, made representations that the Faulkner Properties had equity, and that generally the sale would benefit Settlers'. (Complaint ¶ 103-127.) The Bank argues that those allegations do not state a claim for fraud because they concern opinions, not facts. It is not necessary to decide that issue because if those allegations do state a claim of fraud they state a claim for fraud in the inducement, which may not be pursued here.

18

Accordingly, Counts 1 and 4-9 of the Complaint cannot be pursued except to the extent the facts pleaded therein could be relevant to an assertion of fraud in the execution or illegality.

A claim under Anti-Tying provisions of the Bank Holding Company Act, 12 U.S.C. § 1972, is also barred by *D'Oench. NCNB Texas Nat. Bank v. Johnson*, 11 F.3d 1260, 1268 (5th Cir. 1994). Accordingly, Count 11 must be dismissed. Assertedly unconscionable conduct by the failed bank is also "part of an agreement," under *D'Oench*, and is thus barred, *Clay v. FDIC*, 934 F.2d 69, 72-73 (5th Cir. 1991). Accordingly, Count 12 must also be dismissed. An allegation of civil conspiracy to defraud is also barred by *D'Oench*, because "the gravamen of an action in civil conspiracy is the underlying wrong which, absent the conspiracy, would give rise to a cause of action." *RTC v. Wilson*, 851 F. Supp. 141, 147 (D.N.J. 1994) (citing New Jersey state law on civil conspiracy); *see also Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 63 (1994), ("the gist of a conspiracy claim is not the agreement itself, but the tortious acts performed in furtherance of the agreement.") Likewise, Counts 2 and 3, the alleged breach of fiduciary duty and aiding and abetting of others' breach of fiduciary duties was in furtherance of the alleged fraudulent scheme to deceive regulators and defraud Settlers'. It would likewise be contrary to *D'Oench* and § 1823(e) to hold the FDIC and its successors liable for a scheme undertaken by the failed predecessor bank. *See RTC v. Wilson*, 851 F. Supp. 141, 147-48 (D.N.J. 1994.).

### A. Aiding and Abetting Breach of Fiduciary Duty

In Count 3, Settlers' alleges that the Bank of Commerce aided and abetted KPW's and Joe Lodico's breach of fiduciary duty. KPW allegedly breached its fiduciary duty of loyalty and confidentiality to Settlers' by disclosing financial information to the Bank of Commerce without Settlers' knowledge. (Complaint ¶ 51 & 56.) Joe allegedly breached his fiduciary duty to Settlers' by betraying the special trust Settlers' had put in Joe when he acted as agent for the Bank of Commerce in selling Settlers' the Faulkner Properties. Because the allegation of a breach of fiduciary duty may in part relate to the fraud in the execution, it would not necessarily be barred by *D'Oench*, § 1823(e), or the Illinois CAA, and must be separately considered with regard to allegations of fraud in the execution.

In Illinois, the a claim for aiding and abetting requires:

> (1) the party whom the defendant aids must perform a wrongful act which causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation.

19

*Thornwood, Inc. v. Jenner & Block*, 344 Ill. App. 3d 15, 27-28 (Ill. App. Ct. 2003).

### 1. KPW and Peterson

Illinois state law recognizes a fiduciary duty of an accountant to a client. *Miller v. Harris*, 2013 IL App (2d) 120512 ¶ 20. The duty arises out of not only a principal-agent relationship, but also the confidential information given to and the trust placed in the accountant. *Id.* at ¶ 22. Fiduciary duties include "honesty and loyalty to the interests of the principal. This duty prohibits an agent from not only acquiring personal interests adverse to those of the principal, but also from dealing independently of the interests of the principal to the agent's personal gain in the subject matter of the agency." *Id.*

Here, Settlers' has alleged a breach of fiduciary duty by KPW and Kenneth Peterson ("Peterson") when Peterson used confidential financial information he had obtained from accounting work that Peterson had done for Settlers'. (Complaint ¶¶ 51, 55.) Using Settlers' financial information to benefit the Bank of Commerce, where Peterson was a director and stood to gain personally, (Complaint ¶ 38.) was said to be a breach of the duties of honesty and loyalty. Further, Settlers' has alleged that the Bank of Commerce was regularly aware of its role as part of the overall or tortious activity at the time because the Bank of Commerce was acting, partly through Peterson, to sell underperforming properties to Settlers'. (Complaint ¶ 97.)

Even though Settlers' alleged a fiduciary duty, breach and knowledge, Settlers' did not allege that the Bank of Commerce knowingly and substantially assisted the breach of fiduciary duty. Peterson may have materially assisted the Bank of Commerce by supplying confidential financial information, but nothing is alleged about how the Bank of Commerce assisted Peterson or KPW in that undertaking, other than to use that knowledge in a broader scheme by the Bank of Commerce. Even though Settlers' may have alleged how Peterson aided and abetted the Bank of Commerce, it does not allege how the Bank of Commerce aided and abetted Peterson.

Settlers' also alleges that Peterson owed a fiduciary duty to Settlers' as a trusted financial advisor, and breached that duty by convincing Settlers' that the proposed purchase of the Faulkner Properties would be a sound financial decision. (Complaint ¶¶ 195, 212, 213 215, 239.) To the extent that a KPW and Peterson allegedly owed a fiduciary duty to Settlers' as a trusted advisor, any breach depended on whether purchase of the Faulkner Properties was a good investment. (Complaint ¶ 212-215.) Thus, if there was a breach of that fiduciary duty, it would be part of the scheme or arrangement of fraud in the

inducement, which, as discussed above, must be dismissed because of *D'Oench* and
§ 1823(e). Settlers' has not alleged that the Bank assisted KPW or Peterson in any alleged
breach of a fiduciary duty by surreptitiously slipping in the Washington-Taylor Mortgage
for signature.

Therefore, Settlers' has not adequately alleged that the Bank of Commerce aided
and abetted KPW or Peterson in breaching a fiduciary duty relating to the fraud in the
execution.

### 2. *Joe Lodico*

Likewise, Settlers' alleges that Joe Lodico owed a fiduciary duty to Settlers' because
of a relationship of special trust and confidence, and breached that duty by convincing
Settlers' that the proposed purchase of the Faulkner Properties would be a sound financial
decision. (Complaint ¶¶ 195, 212, 213, 215, 239.) To the extent that a fiduciary duty to
Settlers' arose because of that special trust and confidence, that alleged breach goes to
whether the purchase of the Faulkner Properties was a good idea. (Complaint ¶ 212-215.)
Thus, if there was a breach of that fiduciary duty, it would be part of the scheme or
arrangement of fraud in the inducement, which, as discussed above, must be dismissed
because of *D'Oench* and § 1823(e). The bank was not shown to have meaningfully assisted
Joe Lodico in any alleged breach of a fiduciary duty by surreptitiously slipping in the
Washington-Taylor Mortgage.

Therefore, Settlers' has not adequately alleged that the Bank of Commerce aided
and abetted Joe Lodico in breaching a fiduciary duty relating to the fraud in the execution.


Thus, Settlers' has not stated a claim upon which relief may be granted as to KPW
and Peterson, or as to Joe Lodico, and Count 3 will be dismissed as to Joe Lodico.

### B. Civil Conspiracy to DeFraud

Settlers' alleges in Count 10 that the Bank of Commerce engaged in a civil
conspiracy to defraud Settlers'. The alleged conspiracy consisted of agreements between
The Bank of Commerce and Bob Markay, John Frale, Connie Saiger, Joe Lodico, Ken
Peterson and KPW to artificially shore up the Bank of Commerce's balance sheet by
causing Settlers' to purchase the Faulkner Properties with a loan assumption and execute a
mortgage on the Washington-Taylor Property. (Complaint ¶ 282.)

21

Civil conspiracy is a recognized cause of action in Illinois:

> Civil conspiracy consists of a combination of two or more persons for
> the purpose of accomplishing by some concerted action either an
> unlawful purpose or a lawful purpose by unlawful means. The
> function of a conspiracy claim is to extend liability in tort beyond the
> active wrongdoer to those who have merely planned, assisted or
> encouraged the wrongdoer's acts.

*Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62 (1994). "An agreement to commit a wrongful
act is not a tort," but rather, "[i]t is only where means are employed, or purposes are
accomplished, which are themselves tortious, that the conspirators who have not acted but
have promoted the act will be held liable." *Id.*

### 1. Markay, Frale, Saiger, and Joe Lodico

As for Markay, Frale, Saiger and Joe Lodico, the Bank argues that a principal can-
not conspire with its own agents. *Salaymeh v. InterQual, Inc.*, 115 Ill. App. 3d 1040, 1043-
44 (5th Dist. 1987) ("The acts of an agent are considered in law to be the acts of the princi-
pal. Thus, a conspiracy does not exist between a principal and an agent or servant.")
Settlers' maintains that there is an exception when the interests of an agent diverges from
the interest of the principal, or when the agent acts for his own benefit rather than that of
the principal. *Bilut v. Northwestern Univ.*, 296 Ill. App. 3d (1st Div. 1998). The *Bilut*
opinion in turn cites *Pink Supply Corp. v. Hiebert, Inc.* 788 F.2d 1313 (8th Cir. 1986) and
*Morrison v. Murray Biscuit Co.* 797 F.2d 1430 (7th Cir. 1986), two federal antitrust cases.
The *Bilut* opinion held that the exception did not apply because the interests of a university
and its employee, Professor Canter, did not diverge, and it was never alleged that Professor
Canter was acting as a principal. In the *Pink Supply Corp.* opinion, the interests of a furni-
ture supplier and a sales representative were found to not diverge because there was "a
unity of economic interest and purpose." *Pink Supply Corp.* at 1316. The test in the *Murray
Biscuit Co.*, opinion asks "whether the agency relationship has a function other than to
circumvent the rule against price fixing." *Murray Biscuit Co.* at 1437. That is, whether the
agency relationship is a sham.

Here, Settlers' has alleged that Markay, Frale, Saiger and Joe Lodico were agents of
the Bank of Commerce. (Complaint ¶¶ 23, 33, 35, 58.) Moreover, the supposed personal
interests of these alleged co-conspirators were aligned with the interest of the principal.
Settlers' alleges that Markay, Frale and Saiger were interested in preserving their jobs and
the value of their shares in the parent corporation of the Bank of Commerce. (Complaint

22

¶¶ 23, 33, 35.) Joe Lodico is alleged to have a close personal connection to Markay, was engaged to help the Bank of Commerce sell distressed properties for payment or commission, and wanted to preserve the value of his own stock in the Bank of Commerce's parent corporation. (Complaint ¶¶ 24, 58, 61). There is no allegation that their interests diverged from the Bank of Commerce's, nor was there any disunity of economic interest and purpose, nor was the agency relationship any kind of sham. Therefore, no conspiracy was pleaded between the Bank of Commerce and Markay, Frale, Saiger, or Joe Lodico.

### 2. KPW and Peterson

The Bank does not advance any argument that the Bank of Commerce could not have conspired with KPW or Peterson. Rather, the Bank argues that Settlers' failed to set forth any facts that might state a claim for conspiracy. Even though conspiracy is not enumerated in Rule 9(b) (F.R.C.P.) as requiring pleading with particularity (*See Hoskins v. Poelstra*, 320 F.3d 761 (7th Cir. 2003)), a cause of action for civil conspiracy implicates Rule 9(b)'s requirement for pleading with particularity when the subject of the conspiracy is fraud because Rule 9(b) applies to "averments of fraud." *Borsellino v. Goldman Sachs Group, Inc.* 477 F.3d 502 (7th Cir. 2007). Thus, Settlers' was required to plead "the who, what, when, where, and how..." *DiLeo v. Ernst & Young,* 901 F.2d 624, 626 (7th Cir.1990).

Settlers' alleged: "At some point between July 18, 2008 and August 1, 2008 ... The Bank of Commerce, with the involvement of the Officers and Directors, including Peterson, [the who] created a Loan Summary report related to Settlers' acquisition of the Faulkner Properties and its assumption of the Faulkner Loans. [the what]" (Complaint ¶ 128.) Further, that loan summary contained information that the bank could only have gotten from Peterson because KPW was Settlers' accountant [the how]. (¶ 129.) The Bank of Commerce was a single-branch bank located in Wood Dale, Illinois [the where]. (¶ 7.) Thus, the facts as alleged can fairly lead to an inference that KPW and Peterson participated in a conspiracy with the Bank of Commerce to defraud Settlers' by revealing financial information about Settlers' that the Bank of Commerce would not otherwise have been privy to, and thus showing that Settlers' was an attractive target.

Therefore, to the extent that Count 10 alleges that the Bank of Commerce conspired with KPW and Peterson to defraud Settlers' by surreptitiously obtaining KJ's signature on the Washington-Taylor mortgage the allegations of Count 10 may stand. To the extent Count 10 alleges a conspiracy with Markay, Frale, Saiger, or Joe Lodico, or alleges a conspiracy to practice fraud in the inducement, however, these pleadings may not stand.

23

## C. Unjust Enrichment

Settlers' alleges in Count 16 that the Bank of Commerce was unjustly enriched when it obtained a mortgage on the Washington-Taylor Property. "To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160 (1989). The Bank does not discuss the unjust enrichment Count in its motion to dismiss. Settlers' argues in its response that the conduct giving rise to the fraud in the execution, as discussed above, amounts to unjust enrichment as well. As pleaded, the actions of the Bank of Commerce in slipping in the mortgage on the Washington-Taylor Properties could have resulted in unjust enrichment. In any case, the unjust enrichment prayer is pleaded in the alternative and it should not be dismissed.

## D. Setoff

Settlers' alleges in Count 15 that it may set off any recovery it obtains against any debt it owes the bank. "In general, the right of setoff allows parties that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *In re Clark Retail Enterprises, Inc.*, 308 B.R. 869, 895 (Bankr. N.D. Ill. 2004) (quoting *Citizen's Bank of Md. V. Strumpf*, 516 U.S. 16, 18 (1995).). The Bank argues that Settlers' is not entitled to setoff because its substantive claims lack merit. Because at least several other Counts of the Complaint will not be dismissed, it remains to be seen whether Settlers' will prevail on any Counts that will give rise to a setoff. Therefore, this Count should not be dismissed.

## VII. THE ILLINOIS CREDIT AGREEMENTS ACT

The Bank also argues that the Counts 4 through 9 sounding in fraud are barred by the Illinois Credit Agreements Act ("CAA"). The CAA provides:

> A debtor may not maintain an action on or in any way related to a
> credit agreement unless the credit agreement is in writing, expresses
> an agreement or commitment to lend money or extend credit or delay
> or forbear repayment of money, sets forth the relevant terms and
> conditions, and is signed by the creditor and the debtor.

815 ILCS 160/2.

The Illinois Supreme Court has not directly interpreted the CAA. "When a state supreme court has not spoken on an issue, the decisions of the state's intermediate

appellate courts are authoritative unless we have a compelling reason to doubt that they have stated the law correctly." *AAR Aircraft & Engine Grp., Inc. v. Edwards*, 272 F.3d 468, 470 (7th Cir. 2001).

Illinois appellate courts have been strict in enforcing the CAA's terms. "First, the Act clearly and unambiguously requires that all agreements be in writing. The plain language of the Act precludes debtors from maintaining an action that relates to a credit agreement unless that agreement is in writing. The Act does not permit any exceptions." *Mach. Transports of Illinois v. Morton Cmty. Bank*, 293 Ill. App. 3d 207, 209 (1997). "There is no justifiable reliance on an oral credit agreement as a matter of law in Illinois." *First Nat. Bank in Staunton v. McBride Chevrolet, Inc.*, 267 Ill. App. 3d 367, 373 (1994). An allegedly fraudulent misrepresentation has been held to be within the scope of what is barred by the CAA. *Westinghouse Elec. Corp. v. McLean*, 938 F. Supp. 487, 492 (N.D. Ill. 1996) (cited with approval in *Teacher's Ins. & Annuity Ass'n of America v. LaSalle Nat. Bank*, 295 Ill. App. 3d 61, 69-70 (2d Dist. 1998). The broad wording of the statute dictates such an interpretation, even though it may cause harsh consequences for bank customers in some circumstances. *McBride Chevrolet, Inc.*, 267 Ill. App. 3d at 372-73.

Illinois Courts have not addressed whether the CAA bars an affirmative defense that an agreement was void, rather than merely voidable. Even though the CAA is much broader than *D'Oench* and § 1823(e) in that the CAA extends protection to all lenders rather than just the FDIC and its assignees, nothing suggests that the CAA extends to contracts which are void. After all, the statute is named the Credit *Agreements* Act. As discussed above, "a contract that is void *ab initio* is treated as though it never existed." *Illinois State Bar Ass'n Mut. Ins. Co. v. Coregis Ins. Co.*, 355 Ill. App. 3d 156, 164 (2004). Under Illinois law, fraud in the execution renders the contract void. *George J. Cooke Co. v. Kaiser*, 163 Ill. App. 210 (1st Dist. 1911). Federal and state law are similar in this regard. *Blaylock v. Toledo, P. & W. R. Co.*, 34 Ill. App. 35, 37 (3d Dist. 1976). Under Illinois state law, fraud in the execution occurs where the instrument "is misread to the party signing it, or where there is a surreptitious substitution of one paper for another, or where by some other trick or device a party is made to sign an instrument which he did not intend to execute." *Belleville Nat. Bank v. Rose*, 119 Ill. App. 56, 59 (1983). Further, "if the subject matter of a contract is illegal, that contract is void *ab initio.*" *Illinois State Bar Ass'n Mut. Ins. Co. v. Coregis Ins. Co.*, 355 Ill. App. 3d 156, 164 (2004).

As discussed above, the Complaint factually alleges fraud in the execution with sufficient plausibility to go forward despite *D'Oench* and § 1823(e). Also, allegations of fraud in the execution are not barred by the Illinois CAA.

## VIII. ENFORCEMENT OF THE ASSIGNMENT OF RENTS

### A. Tortious Interference With Contract

Settlers' alleges in Count 13 that Schaumburg Bank tortuously interfered with Settlers' contracts with its tenants by sending the tenants letters directing them to pay rent to the Bank instead of to Settlers'. Under Illinois state law, tortious interference of contract consists of five elements:

> the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages.

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 154-55 (1989) (internal citations omitted).

The Bank argues that its actions are not "unjustified" under element (3) because it was entitled to a privilege in protecting its contractual rights to the rents upon default. Under Illinois state law, "where the conduct of a defendant in an interference with contract action was privileged, it is the plaintiff's burden to plead and prove that the defendant's conduct was unjustified or malicious." *Id.* at 156.

However, an assignment of rents does not entitle a mortgagor to collect rents unless and until the mortgagee acquires actual possession and control. *Marcon v. First Federal Sav. & Loan Ass'n*, 58 Ill. App. 3d 811, 814 (1st Dist. 1978); *see De Kalb Bank v. Purdy*, 166 Ill. App. 3d 709, 715-716 (2d Dist. 1988) (explaining the history of this rule). "Under well-established Illinois law, a clause in a real estate mortgage pledging rents and profits creates an equitable lien upon such rents and profits of the land, which may be enforced by the mortgagee upon default by taking possession of the mortgaged property." *Anna Nat. Bank v. Prater*, 154 Ill. App. 3d 6, 17 (1987). The appointment of a receiver or obtaining some form of injunction from a court are enough to amount to actual possession. *Comerica Bank-Illinois v. Harris Bank Hinsdale*, 284 Ill. App. 3d 1030, 1034 (1st Dist. 1996). Here, the Bank has not argued that it had taken possession or had a receiver appointed before the letters were sent. Therefore, the Bank was not entitled to collect rents until the date the receiver was appointed.

26

Settlers' has stated a claim upon which relief may be granted. Therefore, Count 13 for tortious interference with contract will not be dismissed.

### B. Conversion and Accounting

Settlers' alleges in Count 14 that the letters sent by the Bank to tenants directing them to pay rent directly to the Bank amounts to conversion, and that Settlers' is therefore entitled to an accounting. Under Illinois state law, conversion is defined as, "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *In re Thebus*, 108 Ill. 2d 255, 259 (1985) (quoting the Restatement (Second) of Torts § 222A). "One claiming conversion must show a tortious conversion of the chattel, a right to property in it, and a right to immediate possession which is absolute." *Id* at 260. (quoting *Jensen v. Chicago & Western R.R. Co.* 94 Ill. App. 3d 915, 932 (1st Dist. 1981). "Money may be the subject of conversion, but it must be capable of being described as a specific chattel, although it is not necessary for purposes of identification that money should be specifically earmarked." *Id.*

The Bank argues that no conversion took place because Settlers' did not have an undisputed right to possession of the rent as a result of the assignment of rents, and because Settlers' did not sufficiently allege a demand. Settlers' maintains that the assignment of rents did not give the Bank any entitlement to collect rent, and that no demand is required for conversion under Illinois state law.

As discussed above, the assignment of rents did not give the Bank any immediate entitlement to collect rents. Rather, the Bank merely had an equitable lien

However, a demand is ordinarily required to plead conversion under Illinois state law. Debtor cites *Landfield Finance Co. v. Feinerman* for the proposition that demand is not necessary. 3 Ill. App. 3d 487, 490 (1st Dist. 1972). But, *Landfield* did not decide whether express demand was necessary because "a sufficient demand" was seen to have been made in that case. *Id.* Further, the three Illinois Appellate Court cases citing *Landfield* required that the plaintiff make a demand for the property before proceeding with a suit for conversion. *Hoffman v. Allstate Ins. Co.*, 85 Ill. App. 3d 631, 634 (2d Dist. 1980); *A.T. Kearney, Inc. v. INCA Intern. Inc.*, 132 Ill. App. 3d 655, 664 (1st Dist. 1985); *Rybak v. Dressler*, 178 Ill. App. 3d 569, 588 (2d Dist. 1988). Futility might excuse the demand requirement. *A.T. Kearney,* 132 Ill. App. 3d at 664. However, futility under Illinois state law arises when it the demand would be "fruitless" or "useless" because "the defendant had

27

sold or otherwise disposed of the property in question and thus no longer had possession thereof" *Monroe Cnty. Water Co-op. v. City of Waterloo*, 107 Ill. App. 3d 477, 481 (5th Dist. 1982) (collecting cases). Settlers' complaint alleges that a demand would have been futile because the Bank would have refused to comply and insisted on a lawsuit, which would not have been "feasible." (Complaint ¶ 319.) Under Illinois state law, futility requires the demand be fruitless or useless, not merely infeasible, as has been alleged.

Settlers' has not sufficiently pleaded a claim for relief for conversion because it has not pleaded a demand or the futility of a demand. Thus, Count 14 will be dismissed. However, since conversion involves post-petition conduct that has not previously been pleaded in state court, it is not clear that amendment would be futile, and thus leave to amend will be granted.

## CONCLUSION

The attached Summary Chart shows the disposition of the motion to dismiss as to each count.

Even though ordinarily, the plaintiff will be granted leave to amend under Rule 15(a), F.R.C.P., *Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013), leave to amend need not be granted if it is clear any amendment would be futile. *Garcia v. City of Chicago*, 24 F.3d 966 (7th Cir. 1994). Here, to the extent that the Complaint in Counts 1, 2, 4-9, 11 & 12 alleges conduct by the Bank of Commerce that would be barred by *D'Oench*, § 1823(e) and the Illinois Credit Agreements Act, amendment would be futile unless linked to a pleading of fraud in the execution or illegality.

Therefore, leave to amend the Complaint will be granted to plead any counts on the theory of fraud in the execution and another attempt to plead a theory of illegality. Pleading the alleged civil conspiracy between the Bank of Commerce and KPW and Ken Peterson is also not futile because that alleged conspiracy may implicate the alleged fraud in the execution or illegality.

It is not clear that amending Count 14 for conversion and accounting would be futile. Therefore, leave to amend will be granted.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated June 30, 2014

28

## SUMMARY CHART OF EACH COUNT

| Count | | Disposition |
|---|---|---|
| 1. | Equitable Subordination | Dismissed, with leave to plead fraud in the execution |
| 2. | Breach of Fiduciary Duty | Dismissed, with no leave to amend |
| 3. | Aiding & Abetting Breach of Fiduciary Duty | Dismissed, with no leave to amend |
| 4. | Fraudulent Misrepresentation | Dismissed, with leave to plead fraud in the execution |
| 5. | Fraudulent Concealment | Dismissed, with leave to plead fraud in the execution |
| 6. | Breach of the Illinois Consumer Credit Act | Dismissed, with leave to plead fraud in the execution |
| 7. | Fraud in the Inducement | Dismissed, with no leave to amend |
| 8. | Fraud, Illegality and Unenforceability Regarding Washington-Taylor Mortgage | Dismissed, with leave to replead illegality |
| 9. | Constructive Fraud | Dismissed, with leave to plead fraud in the execution |
| 10. | Conspiracy to Defraud and Civil Conspiracy | Dismissed, with leave to plead a civil conspiracy with KPW and Peterson to commit fraud in the execution |
| 11. | Violation of Anti-Tying Provisions of the Bank Holding Companies Act | Dismissed, with no leave to amend |
| 12. | Unconscionability | Dismissed, with no leave to amend |
| 13. | Tortious Interference With Contract | Not Dismissed |
| 14. | Conversion and Accounting | Dismissed, with leave to amend |
| 15. | Setoff | Not Dismissed |
| 16. | Unjust Enrichment | Not Dismissed |
| 17. | Improper Post-Petition Interest and Receiver's Fees | Not Dismissed |

