## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IN RE: | Chapter 11 |
| SETTLERS' HOUSING SERVICE, INC., AN ILLINOIS NON-PROFIT, | Case No. 13-28022 |
| DEBTOR. | Honorable Jack B. Schmetterer |
| SETTLERS' HOUSING SERVICE, INC., AN ILLINOIS NON-PROFIT, | |
| PLAINTIFF, | |
| vs. | Adv. Pro. No. 13-01328 |
| SCHAUMBURG BANK & TRUST COMPANY, N.A., | |
| DEFENDANT. | |

## THIRD AMENDED COMPLAINT FOR EQUITABLE SUBORDINATION AND OTHER RELIEF AND OBJECTION TO CLAIMS 11 & 12

Settlers' Housing Service, Inc., an Illinois non-profit and the captioned Debtor (the "Debtor" or "Settlers'"), states as follows for its Third Amended (a) Complaint against Schaumburg Bank & Trust Company, N.A., successor in interest to The Bank of Commerce (the "Defendant" or "Bank"), and (b) Objection to Proof of Claim Nos. 11 and 12 filed by Defendant on October 17, 2013.

## I.    JURISDICTION

1.    The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1331, 1334 and 157.  This matter is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (C), (K) and (O).

2.     This Court is the proper venue for this proceeding pursuant to 28 U.S.C. § 1409(a).

3.     The matter is brought as an adversary proceeding in accordance with Bankruptcy Rules 3007(b) and 7001(2) and (8).

## II.  <u>PARTIES</u>

A.     <u>The Debtor: Settlers'</u>

4.     Settlers' is a § 501(c)(3) non-profit organization that was founded by Joe Lodico ("Joe") and two others in January of 1992.  Its primary mission is to provide adequate, affordable housing to foreign refugees with United States resident alien status who are seeking homes in the Chicago metropolitan area, and to assist such refugees to integrate into American society by overcoming the cultural and communication barriers that interfere with their ability to obtain suitable housing and other related resources, such as employment assistance, English classes, apprenticeship programs, and counseling.

5.     Settlers' is a Community Housing Development Organization (a "CHDO").  A CHDO means a non-profit organization that (a) Is organized under State or local laws; (b) Has no part of its net earnings inuring to the benefit of any member, founder, contributor, or individual; (c) Is neither controlled by, nor under the direction of, individuals or entities seeking to derive profit or gain from the organization. (d) Has a tax exemption ruling from the Internal Revenue Service under § 501(c)(3) or ( 4) of the Internal Revenue Code of 1986, 26 CFR 1.501(c)(3)-1). 24 C.F.R. 92.2.

6.     On July 12, 2013 (the "Petition Date"), Settlers' filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code.  Since that time, Settler's has been operating its business as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108, however, certain of its property remains in the possession of a state court appointed receiver.

B.     <u>The Defendant: Schaumburg Bank</u>

7.      Defendant is a national banking institution with its principal office located in Schaumburg, Illinois, and is the successor in interest to the FDIC, which was the successor and receiver for The Bank of Commerce pursuant to 12 U.S.C. § 1821(d)(2)(A). Pursuant to an Assumption and Assignment Agreement, dated March 11, 2011 and applicable law, Defendant is liable for the conduct of its predecessor in interest, The Bank of Commerce.

8.      The Bank of Commerce was an Illinois-based bank located in Wood Dale, Illinois. It was a privately owned commercial bank founded in 1997.  In March of 2011, The Bank of Commerce was closed by the Illinois Department of Financial & Professional Regulation, which appointed the FDIC as receiver for the bank.  In a letter dated March 25, 2011, from Travis Wilbert, Director for District Licensing for the Office of the Comptroller of the Currency, to John S. Fleshood, Executive Vice President of Wintrust Financial Corporation, the FDIC approved the assignment of the assets of The Bank of Commerce to Advantage National Bank Group, which, on July 15, 2011, changed its name to Schaumburg Bank & Trust Company, N.A. At the time of closing, The Bank of Commerce had $163 million in total assets.

9.      On or about May 27, 2009, The Bank of Commerce was issued a Cease and Desist Order for following unsafe or unsound banking practices and violations of law, rule, or regulation. Among other things, the Cease and Desist Order directed The Bank of Commerce to cease and desist from operating in violation of the rules and regulations for Minimum Appraisal Standards (§ 323.4) and Appraiser Independence (§ 323.5).  Some of the specific actions that The Bank of Commerce was ordered to cease and desist included:

    a.  operating with management whose policies and practices are detrimental to the bank and jeopardized the safety of its deposits;

    b.  operating with a board of directors which had failed to provide adequate supervision over and direction to the management of the bank;

    c.  operating with an excessive level of adversely classified assets;

    d.  engaging in hazardous lending and lax collection practices;

e.   operating with an inadequate allowance for loans and lease losses for the volume, kind, and quality of loans and leases held;

f.   operating with an inadequate level of capital protection for the kind and quality of assets held;

g.   operating in such a manner as to produce low earnings;

h.   operating with an inadequate loan policy;

i.   operating with inadequate liquidity in light of the bank's asset and liability mix;

j.   operating with excessive concentrations of credit; and

k.   operating with inadequate policies to monitor and control asset growth.

10.    At the time the Cease and Desist Order was issued, The Bank of Commerce had an extraordinarily high troubled asset ratio of 564% compared to a national average of 15%.  The troubled asset ratio represents the percentage of troubled loans to a bank's capital.  Most failed banks have had a troubled asset ratio of 100% or greater.

11.    Prior to the Petition Date, Defendant filed nine foreclosure proceedings against Settlers' in the Circuit Court of Cook County, Illinois, including seven relating to the Faulkner Properties and one involving the Washington-Taylor Property (both terms defined herein).

12.    The foreclosure suits involving the Faulkner Properties were deemed related and ordered on the same calendar to be jointly administered by a single judge under Case No. 2012-CH-3839.  The foreclosure suit involving the Washington Taylor Property remained on its own schedule (the cases involving the Faulkner Properties and the Washington Taylor Property are collectively referred to as the "Foreclosure Proceedings").

13.    On January 31, 2014, the Defendant filed an Amended Proof of Claim, in the amount of $4,921,425.97, which is designated as Claim No 12-3 in the Claims Register (the "Schaumburg Bank Claim").  On information and belief, Claim No. 12-

3 amends and supersedes Claim No. 11. This objection relates to both claims. A copy of Claim No. 12-3 is attached as **Exhibit 1.**

14.     The Defendant, through the Schaumburg Bank Claim, alleges that it has a secured claim in the amount of $2,721,000.00 and an unsecured claim in that amount of $2,200.425.97.

15.     The Defendant alleges that the Schaumburg Bank Claim is secured by the 13-unit property Settlers' has owned since 1993 at Washington and Taylor Streets in Oak Park (the "Washington-Taylor Property"), in addition to the following parcels of real estate purchased on August 1, 2008 from The Bank of Commerce's borrower named Jan Faulkner (such properties are collectively referred to as the "Faulkner Properties"):

(i)     a 10-unit condominium building at 6631-6635 W. 23rd St., Berwyn, IL 60402;

(ii)     a 6-unit apartment building at 1915 S. Harlem Ave., Berwyn, IL 60402;

(iii)     a 5-unit apartment building at 2306 S. 17th Ave., North Riverside, IL 60546;

(iv)     a 6-unit apartment building at 1921 S. Harlem Ave., Berwyn, IL 60402;

(v)     a 6-unit apartment building at 7121 W. 34th St., Berwyn, IL 60402;

(vi)     a condominium unit at 1518 N. Harlem Ave., Unit 1W, River Forest, IL 60305; and

(vii)     a condominium unit at 1111 N. Harlem Ave., Unit 1B, Oak Park, IL 60302.

### III.   OTHER PERSONS INVOLVED IN THE EVENTS GIVING RISE TO THIS ACTION

A.   KJ Lodico and Joe Lodico

16.    Keo-Jye ("KJ") Lodico is Settlers' current Executive Director and previously held other officer positions with Settlers'. KJ was the Settlers' representative who had most of the involvement in the matters described herein. KJ was born and raised in Malaysia, entered the U.S. in 1987 and became a naturalized citizen in December 2003.

17.    In 1987, KJ met Joe and they married in 1988.  Joe has a high school education and a background in construction. Joe has struggled with alcohol abuse and depression throughout his adult life.

18.    KJ's original role in Settlers' was as Director of Program Development. Joe was the Executive Director. KJ developed housing programs in line with HUD requirements.

19.    In or about 2005, the marriage between KJ and Joe fell apart, and as noted, Joe and KJ formally divorced in 2007.

20.    KJ has agreed to defer her salary from Settlers' for approximately 12 years in order to keep the organization in operation and has filed a proof of claim in the amount of $502,000.

21.    As a result of Joe and KJ's relationship and the children they share, and at all times relative to the allegations contained herein, Joe had significant control and influence over KJ, and thus Settlers', even after Joe's formal position with Settlers' terminated in 2006.

22.    Joe used his influence and control over KJ on behalf of The Bank of Commerce and certain of its officers and directors, including Robert Markay, John Frale, Connie Saiger and Kenneth Peterson (collectively, the "Officers and Directors"), to persuade KJ that Settlers' should acquire the Faulkner Properties, a transaction which now threatens to destroy Settlers'.

B.   Robert Markay

23.     At all times relevant to the allegations contained herein, Markay was the Chairman of the Board of The Bank of Commerce and an Illinois resident. Markay also was a shareholder of Bancshares Holding Corp., which owned the stock of The Bank of Commerce. Markay is also a former Director of Bancshares Holding, which owned all of the stock of The Bank of Commerce. On information and belief, Markay and his family members owned a large block of stock in Bancshares Holding.

24.     At all times relevant to this case, Markay had a personal interest in seeing The Bank of Commerce continue to operate that went beyond his role as an officer and director in that, among other things, The Bank of Commerce's continued operation provided him with compensation as a Director and officer, protected him from being exposed to personal liability for wrongdoing discovered by bank regulators, and preserved the value of his shares in Bancshares Holding and shares held by family.

25.     Markay had a long-standing business and personal relationship with Joe, dating back to the late 1990s and extending to at least 2010. Markay and Joe engaged in a number of business deals together, including various business transactions related to troubled real estate loans.

26.     Joe considered himself part of Markay's extended family and he had a particularly close relationship with Markay's father.

27.     Markay also had a close relationship with Settlers'. In at least 2004, Markay was listed with the State of Illinois as Settlers' registered agent.

28.     Markay and his family had substantial sums invested in Bancshares Holding and was very concerned that he and his family would lose their investment if The Bank of Commerce was closed by regulators.

29.     On February 11, 2013, Robert Markay filed a petition for relief under chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois, Case No. 13–05010. Markay did not disclose the litigation Settlers' had filed against him or the claims asserted by Settlers' against him and thus Settlers' did not learn about the chapter 7 case.

{00014826}                               7

30.     Mr. Markay's bankruptcy schedules did disclose a potential claim ranging from $40,000,000 to $70,000,000, on behalf of the FDIC related to his involvement with The Bank of Commerce.

31.     After he obtained a chapter 7 discharge, Mr. Markay then filed a case under chapter 13 of the Bankruptcy Code on October 10, 2013, Case No. 13–39907. Mr. Markay again did not disclose the litigation involving Settlers' or Settlers' claims against him.  Settlers' learned independently, that Mr. Markay had filed for bankruptcy relief twice: in February and November of 2013.

32.     After Settlers' learned Mr. Markay had filed for bankruptcy (twice) without disclosing the litigation involving Settlers' or the claims held by Settlers', Settlers' filed a motion to dismiss Mr. Markay's chapter 13 proceeding.

33.     After the bankruptcy court set an evidentiary hearing on the motion to dismiss the chapter 13 case, and after Settlers' served discovery upon Mr. Markay and his attorneys to obtain evidence related to Mr. Markay's assertion that he did not believe he had to disclose the Settlers' litigation or claims, Mr. Markay abruptly filed a motion to dismiss the chapter 13 case, which was granted on or about December 17, 2013. Settlers' also filed a motion to re-open Mr. Markay's chapter 7 case in order to conduct a Rule 2004 examination of him in furtherance of determining whether his discharge should be revoked and whether he has assets that were not disclosed.

C.     John Frale

34.     John Frale is the former President of The Bank of Commerce and a former member of the Board of Bancshares Holding and or The Bank of Commerce. On information and belief, Frale is an Illinois resident and also was a shareholder of Bancshares Holding.

35.     At all times relevant to the allegations contained herein, Frale had an interest in seeing The Bank of Commerce continue to operate that went beyond his role as an officer and director in that, among other things, The Bank of Commerce's continued operation provided him with a salary and compensation as a Director,

protected him from being exposed to personal liability for wrongdoing discovered by regulators, and preserved the value of his shares in Bancshares Holding.

### D.    Connie Saiger

36.    Saiger is the former Vice-President of The Bank of Commerce and, on information and belief, is an Illinois resident. On information and belief, Saiger also was a shareholder of Bancshares Holding.

37.    At all times relevant to the allegations contained herein, Saiger was interested in seeing The Bank of Commerce continue to operate that went beyond her role as an officer and director in that, among other things, The Bank of Commerce's continued operation provided her with a salary, protected her from being exposed to personal liability for any wrongdoing discovered by bank regulators, and preserved the value of her shares in Bancshares Holding.

### E.    Kenneth Peterson and Kolnicki, Peterson & Wirth, LLC

38.    Kenneth Peterson is a principal of Kolnicki, Peterson & Wirth, LLC ("KPW"). KPW is an Illinois limited liability corporation located in Downers Grove, Illinois. KPW is engaged in the business of providing accounting, audit, tax and business advisory services to its clients.

39.    Peterson was at all times relevant to the allegations herein a Director of The Bank of Commerce and Bancshares Holding, and also was a shareholder of Bancshares Holding.

40.    KJ first met Peterson in or about 1989 in connection with Joe's work in the field of non-profit housing in Oak Park. Peterson worked on the Lodicos' personal taxes for over 20 years, and he advised them on the accounting requirements for setting up Settlers'.

41.    Over the years, KJ and Joe developed a strong personal bond with Peterson that extended well beyond business affairs.

42.    KJ and Joe kept Peterson abreast of their personal lives, finances, and employment, including Joe's drinking and other personal problems. Peterson continued to do Joe's personal taxes until 2011.

43.    When Settlers' was incorporated in the early 1990's, Peterson became Settlers' accountant and auditor.

44.    For approximately 15 years, Peterson prepared Settlers' federal and state tax reports, audited Settlers' financials and performed financial audits for Settlers' largest property, the Washington-Taylor Property, for submission to the IHDA.

45.    The financial audits performed by Peterson and submitted to the IHDA not only contained financial statements related to the Washington-Taylor Property but also determined Settlers' compliance with the requirements of the Loan and Grant Agreement and the Regulatory Agreement with the IHDA.

46.    Peterson and KPW also were Settlers' trusted financial and business advisors on all financial-related matters for at least 15 years. Settlers' relied heavily upon the judgment and business acumen of KPW and Peterson when dealing with financial matters. If Peterson was in favor of a particular course of action, Settlers' followed his advice and acted accordingly.

47.    For example, Settlers' consulted Peterson for advice on:

  a.  whether Settlers' should sell two (2) condo units purchased from Jan Faulkner,

  b.  whether KJ and or Settlers' would ever realize any profit from owning stock in Bancshares Holding, to which Peterson responded that The Bank of Commerce had a good year in 2007 and was doing okay in 2008,

  c.  a lawsuit related to a loan taken from Community Bank Oak Park River Forest (CBOPRF) to purchase Holding Corp stock in the name of Settlers',

  d.  a loan from a private lender to resolve the CBOPRF lawsuit,

  e.  starting a chapter of Settlers' in California,

    f.   Settlers' property tax appeal on 6631-6635 W. 23rd St., Berwyn,

    g.   selling the Faulkner properties,

    h.   new appraisal values done by Wood Dale Bank & Trust,

    i.   an "exit plan" for Settlers' in light of the upcoming default on the
Faulkner Loans and going into foreclosure,

    j.   whether KJ and Settlers' should vote for certain members of the
Board of Directors of Bancshares Holding Corp., and

    k.   whether Settlers' needed to consult a bankruptcy attorney when it
was unable to pay Defendant.

48.    KJ and Settlers' each relied upon Peterson and KPW greatly, and believed that KPW and Peterson would look out for them and would act in their best interests in all circumstances and at all times.

49.    The trust and confidence that KJ and Settlers' reposed in KPW and Peterson was based, in part, upon KPW's and Peterson's role as a financial advisor to both of them and a trained and skilled accountant and auditor, the close, personal and genuine relationship between KJ and Peterson, which led KJ and Settlers' to confide in Peterson and KPW, and the disparity between them in experience and education regarding financial matters.

50.    Settlers' willingness to acquire the Faulkner Properties and to assume the subject loans was substantially influenced by the involvement of Peterson and Settlers' belief that Peterson considered it a good business move.

51.    If Peterson had not been involved with The Bank of Commerce, Settlers' would not have agreed to acquire the properties or to assume the subject loans.

52.    KPW and Peterson also were active participants in the scheme to defraud Settlers' by improperly supplying information to The Bank of Commerce regarding Settlers'. That information was then used by The Bank of Commerce to prepare a Loan Summary report in July of 2008 that was materially false and was a key part of The Bank of Commerce's fraud on Settlers' and regulators.

53.    As a result of the close connection between Settlers' and Peterson, which is detailed herein and consists of a 15-year business relationship with Settlers' and a close personal relationship with KJ and Joe, Peterson knew by the beginning of 2006, if not earlier, that Joe was no longer affiliated with Settlers' and did not have authority to speak for Settlers'.

54.    Peterson did Joe's taxes every year from at least 2000 through 2010, and each year Joe would update Peterson on what was happening in Joe's life. From the tax returns and the conversations between Joe and Peterson, Joe has stated that Peterson was well aware in 2006 that Joe was not with Settlers'. KJ also confided in Peterson and told him that Joe was not affiliated with Settlers' and was unreliable.

55.    Settlers' Board Minutes from 2005, which Settlers' provided to Peterson in connection with the audit he prepared that year, specifically state that Joe was resigning.

56.    The 2008 Loan Summary also states that the Washington-Taylor Property at the time of the report had an "approx. $55,000 mortgage by IL Housing Authority". This information was supplied to The Bank of Commerce by Peterson, who was privy to it because it arises from a calculation based upon depreciation of the IHDA grant and loan provided to Settlers' for the Washington-Taylor Property. Only KPW was privy to the formula used to calculate the depreciation of the grant and loan amounts, which KPW had calculated each year for Settlers' year-end audit reports to the IHDA and for tax filing purposes.

57.    Settlers' did not authorize KPW to provide any of the information on the Washington-Taylor Property to The Bank of Commerce.

## IV.    BACKGROUND FACTS

### A.    The Sale of the Faulkner Properties

58.    After minimal if any contact for about 2-3 years between The Bank of Commerce and Joe, in July of 2008, The Bank of Commerce engaged Joe to help

deal with its troubled loan portfolio, including a substantial portfolio of loans made to a borrower named Jan Faulkner.

59.     The scope of Joe's engagement involved rehabilitating financially troubled properties, maintaining the properties, and helping The Bank of Commerce to sell the properties.  In exchange for such work, Joe was paid for his services either directly or by receiving a commission on the disposition of a property. Joe received about $40,000 in compensation as a result of work he did on behalf of The Bank of Commerce during 2008 and thereafter.

60.     At the time that The Bank of Commerce, through Frale and Markay, engaged Joe to help deal with its troubled loan portfolio, The Bank of Commerce, through Markay and Peterson, knew that Joe was no longer affiliated with Settlers' and had no authority to speak for Settlers' or to bind Settlers'.

61.     At the time The Bank of Commerce, through Frale and Markay, engaged Joe in mid-July 2008, Markay and Frale told Joe that The Bank of Commerce would soon be audited by the FIDC and that it was important to make the records of The Bank of Commerce look good for the audit. They further told Joe that if the loans to Jan Faulkner were shown as delinquent, The Bank of Commerce would not receive a good audit report.

62.     Markay also employed scare tactics and extortion to manipulate Joe into carrying out The Bank of Commerce's scheme to defraud Settlers' and regulators. Joe has stated that Markay repeatedly admonished him that if the Faulkner Properties were not sold to Settlers' promptly, The Bank of Commerce would be closed and Joe's Bancshares Holding stock would be rendered worthless. Although Joe had already transferred that stock to his ex-wife and children, he was concerned that they would be financially harmed if the stock became worthless

63.     By at least July of 2008, Markay, Frale, Saiger, Peterson, Joe and The Bank of Commerce (collectively, the "Conspirators"), created an enterprise with at least six common purposes, including: (a) hiding and concealing from regulators, honest bank officers, and honest bank directors and employees the true state of The Bank of Commerce's finances and lending practices so that it would not be closed

and liquidated by the FDIC, (b) using the mail and wires to disseminate false information to Settlers' so that it would acquire distressed real estate and distressed bank loans so that those loans would not have to be written down and then using the mail and wire to get Settlers' to extend such loans, (c) seeking to collect and administer the distressed bank loans in violation of various statutes, (d) preserving their jobs with The Bank of Commerce  and the value of the stock they held in Bancshares Holding, (e) avoiding personal liability to the FDIC for engaging in actionable misconduct related to The Bank of Commerce, and (f) using fear and other threats to extort property from Settlers'.

64.      For example, commencing in August of 2008, and each month thereafter through at least January 2012, The Bank of Commerce and then Defendant mailed mortgage statements and bank statements to Settlers' in California and also sent numerous emails to Settlers' in California and received emails sent by Settlers' from California regarding the subject loans and mortgages.

65.      Commencing in July of 2008 and continuing on a regular basis thereafter, the Conspirators used the mail and wires to report false information about The Bank of Commerce to banking regulators, including in October of 2008, when The Bank of Commerce divulged to regulators its files, including those related to the Faulkner Loans and Faulkner Properties.

66.      The Conspirators scheme and the enterprise they operated to father its purpose began by at least July of 2008, when Settlers' was specifically targeted to acquire the Faulkner Properties and assume the Faulkner Loans, and continued through October of 2010, when Settlers' was forced to renew the $50,000 loan and mortgage that The Bank of Commerce fraudulently placed on the Washington-Taylor Property so that it could obtain additional collateral for the Faulkner Loans.

67.      When The Bank of Commerce was taken over by the FDIC in March of 2011, and then sold to Wintrust, the enterprise continued with the involvement of Defendant, through its continued efforts to collect on the subject loans. The subject unlawful enterprise continues to this day as a result of Defendant's efforts to foreclose the mortgages on the subject loans and to liquidate Settlers'.

B.      The Bank of Commerce Engaged in Unusual and Unlawful Tactics to
        Transfer the Faulkner Properties and the Subject Loans to Settlers'
        and in Other Matters Related to Settlers'

68.     During a discussion with Joe on July 17, 2008, Markay scheduled a
meeting with Joe for the following day to discuss the properties securing the loans
The Bank of Commerce made to Jan Faulkner.

69.     Markay followed-up the discussion with an email in which he stated
that "we are set for 12:00 noon, tomorrow, at none other than Shula's steakhouse.
It'll be you, Connie, and me at lunch…then we'll meet John back at the Bank.  It's
good to be back workin' on stuff together Joe!!" (Exclamation points and misspelling
in original).

70.      On July 17, 2008, in advance of the meeting the next day at Shulas',
Markay forwarded by email to Joe a list of certain of the properties owned by
Faulkner that were pledged as collateral to The Bank of Commerce.

71.     The email sent on July 17, 2008, discloses that the list of the subject
properties had been sent originally from Connie Saiger's email account.

72.     On July 17, 2008, shortly after sending the list that disclosed Saiger's
email account, Markay used the phone to call Joe and he told Joe that he should
destroy the email with the list of Faulkner Properties sent from Saiger's email
account because Markay did not want others to know that The Bank of Commerce
was sending this information to Joe.

73.     Joe stated to Settlers' that he believes Markay did not want anybody to
know the email had been sent from The Bank of Commerce because Markay was
concerned that the email could be used as evidence against the bank, him and the
other individuals engaged in improper conduct consisting of brokering the sale of
distressed real estate owned by one of The Bank of Commerce's borrowers to
another of its borrowers.

74.     Shortly after Markay sent the list of the Faulkner Properties to Joe,
Joe then performed some limited analysis on the properties and sent it back to
Markay that night. Markay then responded to Joe, stating that "This is great…I

spoke last night to John [Frale]; I let him know that we have to avoid letting
anyone…ANYONE…"cherry pick" the good ones…I've got my suspicions already,
based on what Connie's said, so the brakes have been applied, for now at least…it'll
be a damned good meeting."

75.     In the summer of 2008, the loans The Bank of Commerce made to
Faulkner were in default because Faulkner failed to pay the required debt service.
He was between 90 and 180 days delinquent in the payments due under the loans.
Some or all of the Faulkner's loans with The Bank of Commerce were secured by
mortgages on real property, including the Lathrop property and the Faulkner
Properties.

76.     Markay told Joe on several occasions, including at the meeting on July
18, 2008 at Shula's, that The Bank of Commerce was in imminent danger of being
closed by banking regulators if the loans to Faulkner were recognized as seriously
delinquent and had to be written down.  Joe has stated that Markay told him there
was an emergency situation with The Bank of Commerce and that this deal had to
be done with Settlers' in order to save The Bank of Commerce.

77.     Joe has stated that he believes Markay told him that The Bank of
Commerce would be closed by regulators if the Faulkner Loans were not assumed
by Settlers' in order to pressure Joe into pressuring Settlers' to assume the loans
and to acquire the Faulkner Properties.

78.     A sale of the Faulkner Properties through traditional measures – i.e.,
to an unaffiliated third-party -- would have to be a short sale because the value of
the Faulkner Properties was substantially less than the approximately $3.4 million
of debt on the properties.  As Markay stated in an email regarding an additional
property owned by Faulkner on August 16, 2008, "I can assure you that the Bank
has no illusions regarding today's market place."

79.     If The Bank of Commerce consented to a short-sale, it would then have
to write-down the balance of the Faulkner Loans on its balance sheet to the amount
paid by the purchaser and it would then face closure by banking regulators.

80.     The Bank of Commerce engaged Joe to conduct research to determine
how the loans to Faulkner could be transferred at full value so that The Bank of
Commerce would not have to write them down.  In an email dated July 22, 2008,
Joe reported back to Markay about his research, advising Markay that he was
"reading up on Bank regulations all day" and that "www.regs@fdic.gov is a good web
site to review for information on Bank related items." The research was designed to
assist The Bank of Commerce in its efforts to assign the Faulkner Loans without
having to commission new appraisals.

81.     On information and belief, The Bank of Commerce also did not want to
commission new appraisals on the Faulkner Properties because it did not have
enough time to do so. Markay repeatedly told Joe that the transaction had to close
quickly, because The Bank of Commerce would soon be audited by examiners.

82.     Ultimately, The Bank of Commerce released Faulkner from liability for
the loans related to the Faulkner Properties by delivering to him a release on
August 1, 2008. Joe delivered the release to Faulkner and obtained Faulkner's
signature on the release. The release states that "Faulkner acknowledges that
*although the Bank found a purchaser of his beneficial interest in the Trust*, he
entered into the sale of the beneficial interest freely and of his own accord." An
unsigned copy of the release is attached hereto as **Exhibit 2** (Emphasis supplied).

83.     Faulkner filed for relief under the Bankruptcy Code on July 29, 2009,
in the United States Bankruptcy Court for the Northern District of Illinois.
Faulkner's bankruptcy schedules did not reflect any amounts owing to The Bank of
Commerce because all amounts owed to The Bank of Commerce had been released.

84.     On information and belief, which is based in part upon Joe's stated
belief, Markay, as agent of The Bank of Commerce, engaged Joe to help convince
Settlers' to acquire the Faulkner Properties because, among other things:

        a.  The Bank of Commerce was desperate to find a solution for the
            Faulkner Loans so that it would not have to write down the loans
            and lose them as eligible assets or available capital.

    b. Markay believed that he could manipulate and control Joe due to the fact that Joe (i) looked up to and respected Markay and Markay's father, (ii) was trying to recover from a turbulent period over the past 2 years, during which Joe withdrew from Settlers' and his marriage ended, and (iii) Joe was emotionally and financially vulnerable and easily seduced,

    c. Joe would be willing to perform various services for the benefit of Markay and The Bank of Commerce, which was controlled by Markay.

    d. Joe had considerable influence over KJ and thus Settlers'.

    e. Joe invested substantially all of his assets in The Bank of Commerce through his purchase of stock in Bancshares Holding or Bank Stock and would try to protect the value of that stock.

85. Markay told Joe during the week of July 18, 2008, that The Bank of Commerce had only a short window to sell the Faulkner Properties because the government regulators would shortly be reviewing The Bank of Commerce's books and if the Faulkner Loans were still on the books at the time the regulators reviewed the books, The Bank of Commerce could be closed.

86. It took only six business days from the time Markay approached Joe on July 17, 2008 about the transaction to July 25, 2008, when The Bank of Commerce approved a $3.5 million loan to Settlers'. In an email dated July 29, 2008, which is attached as **Exhibit 3,** Mr. Markey told Joe that "I just spoke w/ John [Frale]…he's got Connie [Saiger] and the rest of the crew, 'working feverishly' to get everything ready to close ASAP. Bob" (Emphasis on "working feverishly" in original)

87. In violation of standard lending practices, FDIC Part 323 Appraisals issued under 12 U.S.C. 1818, 1819 and title XI of the FIRREA, The Bank of Commerce approved a $3.5 million loan without commissioning current appraisals for the Faulkner Properties, even though current appraisals were required because of the substantial change in the real estate market in 2008.

88.    In violation of standard lending practices, FDIC Part 365 Real Estate Lending Standards issued under 12 U.S.C. 1828, The Bank of Commerce approved a $3.5 million loan without meeting with Settlers' or discussing the terms of the loan with Settlers'.

89.    In violation of standard lending practices, FDIC Part 365 Real Estate Lending Standards issued under 12 U.S.C. 1828, The Bank of Commerce approved a $3.5 million loan without requiring or obtaining a loan application from Settlers' and without obtaining any documents directly from Settlers'.

90.    In violation of standard lending practices, FDIC Part 365 Real Estate Lending Standards issued under 12 U.S.C. 1828, The Bank of Commerce did not obtain board resolutions for the $50,000 Line of Credit or the Line of Credit Mortgage.

91.    In violation of standard lending practices, The Bank of Commerce approved a $3.5 million loan on an accelerated basis within a span of approximately 2 weeks.

92.    In addition to working for The Bank of Commerce to transfer the Faulkner Properties to Settlers', Joe also worked for The Bank of Commerce in respect to the management and administration of other troubled properties.

93.    For example, in late 2008 and 2009, Joe provided extensive assistance to The Bank of Commerce in connection with the sale of a property at 527 Lathrop, North Riverside, on which The Bank of Commerce had a distressed mortgage granted by Faulkner.

94.    Joe acted as an agent for The Bank of Commerce in connection with the sale of this property. He signed an environmental inspection report on behalf of The Bank of Commerce, which also falsely indicated that Joe was a part of Settlers', set-up and handled the open house for the property, and procured a buyer for the property on behalf of The Bank of Commerce. In connection with that property, The Bank of Commerce paid Joe about $8,000 to help rehabilitate the property and to sell the property.

95.     Markay received a 6% sales commission related to the sale of the 527 Lathrop property, which was sold for over $900,000, and split the commission with Joe.

96.     Joe also worked on behalf of The Bank of Commerce to deal with junior mortgages on properties located at 1106 E. Oakton, Arlington Heights, 5 E. Elaine, Prospect Heights, 14404 S. Calhoun, Burnham, 8135 S. Sacramento, Chicago, 772 Bonnie Brae, Bolingbrook, and 2232 Sprucewood, Des Plaines.

97.     In connection with his work for The Bank of Commerce, Joe also was copied on confidential correspondence between Markay and attorneys representing The Bank of Commerce related to the disposition of troubled properties.

98.     Joe also worked on behalf of The Bank of Commerce to try to sell The Bank of Commerce. Markay, Peterson and Joe met in or about October or November of 2008, as part of their efforts to locate potential buyers for The Bank of Commerce. Subsequent to that meeting, Joe worked on behalf of The Bank of Commerce to try to find entities willing to invest in The Bank of Commerce. He passed along the names and information to Markay and to the investment bankers at Davis Capital hired to help sell The Bank of Commerce.

99.     Joe also worked with The Bank of Commerce in 2008 and 2009, with a loan The Bank of Commerce had that was secured by a new development in Kankakee involving about 50 acres of property and approximately 12 completed houses. The Bank of Commerce gave Joe some of the furniture from the houses that were being constructed as compensation.

C.     The False Appraisal Sheet and other fraudulent representations

100.     The list of the Faulkner Properties that The Bank of Commerce sent to Joe via email on July 17, 2008 (the "Appraisal Sheet") included a column listing the outdated and overstated appraised value (the "Appraised Values") for each Faulkner Property (exclusive of two condominiums) and some basic information about the properties and the underlying loans for the properties.  A copy of the initial Appraisal Sheet is attached as **Exhibit 4.**

{00014826}                                    20

101.    Joe has stated that the purpose of sending the Appraisal Sheet was to convince him that The Bank of Commerce was offering Settlers' a great opportunity to acquire seven parcels of real estate at below market prices, with 100% financing and on a non-recourse basis. This statement was made to Settlers' when Joe transmitted the Appraisal Sheet to Settlers' on behalf of The Bank of Commerce. Settlers' reviewed the Appraisal Sheet believing the information on the Appraisal Sheet had been supplied by The Bank of Commerce and reflected The Bank of Commerce's representations as to the value of the Faulkner Properties. Settlers' did not believe that Joe made these representations.

102.    Joe has indicated that The Bank of Commerce sent the Appraisal Sheet to him so that he would then transmit the information on the Appraisal Sheet to Settlers'. Joe sent the Appraisal Sheet through the Internet to KJ in California.

103.    The Appraisal Sheet reflected that the Faulkner Properties listed thereon collectively were worth $4,276,000 and that Settlers' would be able to acquire those properties by assuming debt of approximately $3.5 million.

104.    Shortly after Markay provided Joe with the Appraisal Sheet, Markay told Joe that The Bank of Commerce was offering Settlers' a great opportunity to purchase the Faulkner Properties because the aggregate sales price for the Faulkner Properties, which was equal to the aggregate amount due on each loan held by The Bank of Commerce on the subject properties (the "Faulkner Loans"), was materially less than the true value of the Faulkner Properties. To support this representation, Markay referred to the Appraisal Sheet.

105.    Markay also represented to Joe that there was equity in the Faulkner Properties and that the properties were in good condition. Markay further represented that many of the units in the Faulkner Properties had been remodeled and had stainless steel appliances.

106.    Neither Joe nor KJ had reasonable access to sources of information that would show that the Appraisal Values were outdated and inaccurate, and neither Joe nor KJ had any reason to suspect that The Bank of Commerce would purposefully provide them with misleading information, particularly because they

and Settlers' were shareholders in Bancshares Holding, bank customers, and had close personal and business relationships with Peterson, a board member, KPW and Markay.

107.    Based upon the representations made by The Bank of Commerce, including those on the Appraisal Sheet, Joe and Settlers' concluded that the proposed acquisition of the Faulkner Properties was a highly beneficial business transaction. Had the Appraisal Sheet not included the false values that showed there was substantial equity in the Faulkner Properties, Joe has stated that he would not have believed that Settlers' was getting a great deal by acquiring the Faulkner Properties and he would not have used his influence over KJ to convince her that Settlers' should acquire the Faulkner Properties.

108.    Had the Appraisal Sheet contained current appraised values of the Faulkner Properties, Joe has stated that he would have recognized that the Faulkner Properties were troubled assets that Settlers' should not acquire for the proposed amount (i.e., the amount of the Faulkner loans) because doing so would jeopardize Settlers' existence and its humanitarian mission.

109.    Joe and has told Settlers' that he did not believe the Appraised Values were merely The Bank of Commerce's opinion as to the value of the Faulkner Properties. Settlers' also did not believe the values were mere opinions. Both Joe and Settlers' believed the Appraised Values were provided as a statement of fact that was made to induce their reliance.

110.    Joe has stated that he believed these values were accurate and truthful based upon up-to-date appraisals.  Settlers' also believed the values were accurate and truthful and based upon up-to-date appraisals. KJ conveyed such belief in a letter to Patricia Williams of the IHDA on July 24, 2008. Settlers' also held this belief because it trusted the people involved with The Bank of Commerce, including Peterson and Markay, and believed those people would consider Settlers' best interests and would not steer Settlers' into a catastrophic deal.

111.    The Bank of Commerce knew that Settlers' would be relying upon the false values in entering into the transaction to acquire the Faulkner Properties and

thus The Bank of Commerce had a duty to advise Settlers' that the values were outdated and inaccurate, particularly because Markay knew that the real estate market had collapsed in 2008, as is evident from Markay's statement in an email from August 2008, that "the Bank has no illusions regarding today's market place."

112.    The Appraised Values for the Faulkner Properties were false and misleading in material respects.  For example, the Appraised Values were based upon appraisals that were older than 1.5 years and thus unsuitable for banking purposes under applicable banking standards; precisely one of the items cited by the FDIC in its case against The Bank of Commerce.  In one instance, the appraisal was more than 5 years old.

113.    The following chart compares the false values that The Bank of Commerce represented in July of 2008, with the values that James Lam of Defendant represented in August or September of 2011 when it conducted new appraisals:

| Property | Faulkner Loan Balances as of Closing | Bank of Commerce's 2008 Value | 2011 Appraisal |
|---|---|---|---|
| 1915 S Harlem Berwyn, IL 60402 | $595,000 | $700,000.00 | $320,000.00 |
| 1921 S Harlem, Berwyn, IL 60402 | $601,000 | $868,000.00 | $300,000.00 |
| 7121 W 34th St. Berwyn, IL 60402 | $697,000 | $820,000.00 | $370,000.00 |
| 1518 N Harlem #1W River Forest, IL 60305 | $150,000 | $195,000.00 | $60,000.00 |
| 1111 N Harlem #1B Oak Park, IL 60302 | $78,000 | $135,000.00 | $27,000.00 |
| 6631-6635 W. 23rd St. Berwyn, IL 60402 | $897,000 | $1,248,000.00 | $583,000.00 |

114.    Settlers' did not learn until January of 2009 -- after it acquired the Faulkner Properties -- that the appraisals used by The Bank of Commerce were

outdated and did not come close to accurately reflecting true market value of the Faulkner Properties.

115.    Settlers' also did not have the resources to perform its own appraisals on the Faulkner Properties. It also did not have the time to get the properties appraised because The Bank of Commerce insisted on a very hasty closing.  It is plausible that Markay used high-pressure tactics to get Settlers' to purchase the Faulkner Properties quickly in order to prevent Settlers' from obtaining additional information.  Settlers' also did not commission its own appraisals or ask The Bank of Commerce to produce the subject appraisals because, as stated elsewhere, Settlers' trusted The Bank of Commerce, and its Directors, particularly Peterson.

116.    Additionally, the Appraised Value for the property at 1921 S. Harlem improperly valued the building as if it had been converted to condominiums even though the conversion had not even started.  The appraisal for the property at 6631-6635 W. 23rd St. assumed that the building had been completely converted to condominiums when, in fact, only about half of the units were ready to be sold as condominiums.

D.    <u>Joe persuades KJ that Settlers' should acquire the Faulkner Properties.</u>

117.    At all times relevant to the allegations contained herein and in order to sanitize the subject transaction and give it an aura of legitimacy, The Bank of Commerce pretended that Joe was an agent of Settlers' and that the information it was providing to Joe was being provided to Settlers'.

118.    The Loan Summary Report The Bank of Commerce prepared on or about July 25, 2008, and that was used to persuade the Directors of The Bank of Commerce to approve the subject transaction specifically stated that "Joseph LoDico from Settlers Housing Service, Inc., a shareholder of The Bank of Commerce, is looking to purchase these apartment buildings for the company."

119.    Similarly, on August 1, 2008, Connie Saiger drafted a memo to file in which she stated that "All these loans were purchases by Settlers' Housing from Jan

Faulkner. All the properties had been previously inspected by Bank and prior to closing have also been inspected by Settlers'.  All properties are in good condition." Connie Saiger's memo to file illustrates that The Bank of Commerce was pretending that Joe was Settlers' agent because Joe, not Settlers', inspected the subject properties prior to closing.

120.    The Bank of Commerce knew that its efforts to portray Joe as an agent of Settlers' were false and fraudulent. Peterson, a Bank Director, knew full well that Joe was not Settlers' agent and that he had no authority to speak for Settlers' or to bind Settlers'. He knew that Joe's management relationship with Settlers' had terminated in 2006, as reflected in Settlers' Board Minutes, because of his role as advisor, auditor and accountant for Settlers' as well as his close relationship with KJ and Joe. Peterson also knew Joe was disassociated from Settlers' because, as stated above, Peterson prepared Joe's tax returns every year and Joe would meet with him in mid-April and catch up socially and professionally in those meetings.

121.    Further, Markay knew, or should have known, that Joe was no longer associated with Settlers' based upon his close association with Joe.  The Bank of Commerce knew that Joe was not a shareholder of The Bank of Commerce because Joe had instructed it to transfer his stock to KJ and their children. Joe also has stated that Markay knew that KJ was running Settlers' and that Joe was not associated with Settlers' when Markay approached Joe in 2008 about getting Settlers' to acquire the Faulkner Properties.

122.    Markay, Peterson and The Bank of Commerce also were on reasonable notice that Joe was unreliable and that they needed to communicate directly with KJ regarding all aspects of the sale of the Faulkner Properties and the assumption of the Faulkner Loans.  As a result of his alcohol abuse and disruptive conduct, Joe had been induced by Markay and Peterson sometime in September of 2005, to resign as a member of the board of Bancshares Holding Corp. and or The Bank of Commerce in exchange for 5,000 shares of stock in Bancshares Holding.

123.    Further, in an email dated July 29, 2008, Saiger acknowledged that Joe did not have the authority to bind Settlers' when she asked Joe "Who will be signing all the assignment & loan documents for Settler's?"

124.    Additionally, and as noted above, the 2008 Loan Report was specifically drafted to excise the statement that Joe was a principal of Settlers' although it did indicate that Joe was seeking to purchase the Faulkner Properties for Settlers'.

125.    On or about July 21, 2008, Joe contacted his ex-wife, KJ, about having Settlers' purchase the Faulkner Properties and having Settlers' also assume the loans made to Jan Faulkner in order to do so. Joe contacted KJ about this because he knew that he had no authority to speak for Settlers' or to consummate a deal on Settlers' behalf.

126.    When Joe approached KJ about the opportunity to acquire the Faulkner Properties, Settlers' believed that Joe was clothed with the authority to speak on behalf of The Bank of Commerce with respect to the entire transaction related to the Faulkner Properties and that he was The Bank of Commerce's mouthpiece.

127.    Settlers' reasonably did not believe that it needed to conduct independent due diligence with respect to the acquisition of the Faulkner Properties because the representations made to Settlers' regarding the Faulkner Properties emanated from The Bank of Commerce, an entity that it trusted for the reasons set forth herein, including (a) its long-term business advisor, accountant, confidant and auditor was on the Board, (b) it had dealt with The Bank of Commerce for almost a decade, and (c) it was a substantial shareholder, as was KJ. All of these factors resulted in Settlers' reasonably lowering its guard and agreeing to purchase the Faulkner Properties on an accelerated basis.

128.    If Joe had approached Settlers' about acquiring 7 parcels of real property from an unrelated third-party, Settlers' would have approached the transaction differently and would have, among other things, (a) retained a lawyer to

represent it as it had done in past real estate transactions and (b) conducted its own due diligence.

E.     The Fraudulent Loan Summary Report

129.    At some point between July 18, 2008 and August 1, 2008, The Bank of Commerce, with the involvement of the Officers and Directors, including Peterson, created a Loan Summary report related to Settlers' acquisition of the Faulkner Properties and its assumption of the Faulkner Loans.

130.    For example, the July 2008 Loan Summary states the information contained therein was compiled in respect to Settlers' financial condition with the assistance of KPW and Peterson. KPW and Peterson, a Bank Director, did not have Settlers' authorization to supply this information and KPW and Peterson knew that Joe could not authorize the dissemination of this information.

131.    Settlers' obtained a copy of the Loan Summary only because Defendant attached a copy to a motion it filed in the Foreclosure Proceedings in May 2012. Other than a limited number of documents Settlers' received in connection with the stay relief hearing, Settlers' has received essentially no documents in discovery at this time.

132.    On information and belief, the Loan Summary was created by The Bank of Commerce so that The Bank of Commerce could deposit the document into its loan files and show it to bank regulators (who were onsite in September and October of 2008, if not earlier) so they would be deceived and thus conclude that the subject loans in the amount of approximately $3.5 million were performing obligations and were properly booked as performing assets.  In an email dated October 8, 2008, Connie Saiger told Joe that The Bank of Commerce needed the insurance certificates that week for the properties at 1518 N. Harlem and 1111 N. Harlem because "the FDIC is here reviewing the files."  In an email dated September 3, 2008, J. Seymore, an employee of The Bank of Commerce, asked Joe for other insurance information because The Bank of Commerce had "examiners coming in this week" and needed "proof of insurance asap."

133.    The Loan Summary dated July 25, 2008, contains a lot of information that was used in an earlier Loan Summary The Bank of Commerce prepared for a Settlers' loan in 2005 in the amount of $150,000. *See* **Exhibit 5**.

134.    Similarities between the 2005 Loan Summary and the 2008 Loan Summary plausibly establish that the 2008 Loan Summary is not a *bona fide* loan summary report and was manufactured to deceive regulators or others, and to help perpetrate the fraudulent scheme set forth herein.

135.    For example, the 2005 Loan Summary states that Joe was a "principal" of Settlers' and a bank director, whereas the 2008 Loan Summary merely recites that "Joseph Lodico from Settlers Housing Service, Inc., a shareholder of The Bank of Commerce." This illustrates that The Bank of Commerce knew that Joe was no longer a principal of Settlers' and had no power to bind Settlers' and that Settlers' – not Joe -- was a shareholder of The Bank of Commerce.

136.    Furthermore, the 2005 Loan Summary states that the $150,000 "*line of credit will be used in part to hire an individual to write grant applications on behalf of the borrower.  The balance will be used to remodel a condominium at 536 Devon in Roselle which recently was vacated by a Settlers tenant in preparation for the property's re-lease.*"

137.    Similarly, the 2008 Loan Summary restates this exact language verbatim and provides that "*[t]he line of credit will be used in part to hire an individual to write grant applications on behalf of the borrower.  The balance will be used to remodel a condominium at 536 Devon in Roselle which recently was vacated by a Settlers tenant in preparation for the property's re-lease.*"

138.    The reference to the "line of credit" in the 2005 Report is accurate because in 2005, Settlers' did request a $150,000 line of credit, and did submit a Board Resolution and Certification for the loan.

139.    The reference to the "line of credit" in the 2008 report is false because, as stated above, Settlers' did not request a line of credit in 2008 and it certainly did not request such funds to hire an individual to write grant applications or to remodel the 536 Devon property.  Settlers' had never engaged a grant writer since

its inception, nor did Settlers' intend in 2008 to change its practice of writing its own grant proposals.  In addition, Settlers' Board did not submit a Board Resolution and Certification for the loan as it did not make such a request to The Bank of Commerce.

140.    The reference to the grant writer in the 2008 Loan Summary is thus a pretext to justify the $50,000 Line of Credit and, more importantly, the Line of Credit Mortgage, which are explained in greater detail below and which are central pieces of the fraud set forth herein.

F.    The Fraudulent $50,000 Line of Credit and Line of Credit Mortgage

141.    Although the July 2008 Loan Summary that details the August 1, 2008 transaction references a $50,000 line of credit, Settlers' did not request a $50,000 loan and did not learn it had access to a line of credit for $50,000 as of August 1, 2008, until much later.  Settlers' first learned that it had access to the $50,000 line of credit in late October or early November of 2008, when it was informed by Connie Saiger that such a loan had been provided in connection with the August 1, 2008. Saiger informed KJ of this in connection with discussions initiated by KJ regarding Settlers' inability to pay the real estate taxes for the Faulkner Properties.

142.    Thus, when Settlers' learned of the $50,000 line of credit, and requested a draw in late October or early November of 2008, it was not obtaining a new loan, but was merely requesting a draw on the loan that had been slipped into the documents it signed on August 1, 2008. Settlers' did not know about this loan or that it had executed the Line of Credit Mortgage until Connie Saiger brought it to KJ Lodico's attention in October or November of 2008, when KJ Lodico alerted Connie Saiger to Settlers' inability to pay the subject property taxes.  There are no other loans than those executed in August 2008.

143.    Even when Settlers' requested the $50,000 draw on the line of credit loan, at Saiger's suggestion, Settlers' still had no knowledge of the Line of Credit Mortgage that encumbered the Washington-Taylor Property.

144.   Settlers' could not afford to pay the final installment of taxes in 2008, because the Faulkner Properties were not generating sufficient cash flow to pay this obligation and because The Bank of Commerce failed to honor its promise to pay the *pro-rated* real estate taxes on the properties and misrepresented the amount of the taxes.

145.   In late July of 2008, the Conspirators, including Peterson and KPW, knew that Settlers' would not be able to pay the fall 2008 installment of real estate taxes in Cook County because of the cash flow problems associated with the Faulkner Properties.  This adds more plausibility to Settlers' belief that the Conspirators manufactured the $50,000 Line of Credit and the Line of Credit Mortgage (as defined below), as part of their scheme to capture the equity in the Washington-Taylor Property.

146.   It also is plausible that the Conspirators defrauded Settlers' into executing the $50,000 Line of Credit and the Line of Credit Mortgage because, as set forth herein, these instruments were critical to the scheme to place a mortgage on the Washington-Taylor Property to secure the entire $3.4 million owed on account of the Faulkner Properties. Without the Washington-Taylor Property as collateral, the $3.4 million loan would not have been possible to execute. The Bank required the Washington-Taylor Property to appraise at or about $1.3 million. The appraisal, commissioned on August 18, 2008 long after the July 2008 Loan Summary, came in at $1.1 million, thus conveniently providing a 24% ($1.1M) collateral to 76% loan ($3.4 million) for a total of $4.6 million value (old appraisal values).

147.   The security agreement for the $50,000 loan, which Settlers' never requested, secured not only the $50,000 line of credit obligation, which Settlers' never requested and did not need in August of 2008, but it also secured the entire indebtedness.

148.   The pertinent language provides that "The word "Note" means the Promissory Note dated August 1, 2008 in the original principal amount of $50,000.00 from Borrower in favor of Lender and the Promissory Notes dated

August 1, 2008, in the aggregate original principal amount of $3,412,000.00 from U.S. Bank, N.A. Trusts #7375, 7610, 7890, 8040, 8120, 8190 and 8200 all guaranteed by Settlers' Housing Service, Inc., together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory notes or agreements."

149.   The fact that the Bank created a $50,000 loan in August of 2008 that was not requested and that also placed a mortgage on the Washington-Taylor Property to secure not only the $50,000 loan, but also to secure the entire indebtedness permits the reasonable inference that the Bank crafted the $50,000 line of credit as a fraudulent device to suck the equity out of the Washington-Taylor property so as to meet the 20%-30% collateral standard for commercial loans.

150.   The July 2008 Loan Summary also falsely states that Settlers' agreed to provide a mortgage on the Washington-Taylor Property to secure repayment of the amounts it was borrowing.  Settlers' never agreed to provide a mortgage on the Washington-Taylor Property, nor was it able to do so due to restraints placed upon the Washington-Taylor Property under State and Federal regulations and because the IHDA had already placed a lien on the property as part of the Loan and Grant Agreement. The IHDA's lien was released on May 29, 2009, over nine months after The Bank of Commerce put a lien on the property. The fact that Settlers' requested authorization to place a mortgage on the Washington-Taylor Property but did not receive it makes it plausible that Settlers' never agreed to provide a mortgage on the Washington-Taylor Property without written approval from the IHDA as Settlers' was fully aware of the State and Federal regulations that governed the HOME funds provided for the acquisition and rehabilitation of the Washington-Taylor Property.

151.   In addition, Saiger and The Bank of Commerce asked Settlers' for Board Resolutions and Certifications for the purchase of the seven Faulkner Properties. Settlers' attorney, Greg Smith, was used solely to prepare the requested documents for Board approval and signatures. Because The Bank of Commerce did

not disclose the Line of Credit Mortgage or the $50,000 Line of Credit, Settlers'
attorney did not prepare the Board Resolution and Certification for that.

152.   Settlers' was advised by Joe that The Bank of Commerce only wanted
to secure a 10% down payment for the new loan with a mortgage on the
Washington-Taylor Property.  This information was provided to Joe by John Frale.

153.   KJ advised Joe that the Washington-Taylor Property was subject to a
Regulatory and Land Use Restriction Agreement dated March 31, 1994 (the "Land
Use Restriction Agreement"), that prevented Settlers' from encumbering the
property in favor of a third-party absent written approval from the IHDA, the
grantor, whose funding source originated from the U.S. Department of Housing and
Urban Development ("HUD").

154.   Pursuant to § 4(a) of the Land Use Restriction Agreement, Settlers'
could not "[c]onvey, transfer or encumber the [Washington-Taylor Property] or any
part thereof, or permit the conveyance, transfer or encumbrance of the
[Washington-Taylor Property] or any part thereof" without "the prior written
approval of" the IHDA, "which may be given or withheld [in the IHDA's] sole
discretion." *See* **Exhibit 6**.

155.   On July 24, 2008, in good faith and being diligent in complying with
the regulatory requirements of the agreements with the IHDA, KJ sent an email to
Patricia Williams at the IHDA, and requested authorization to place a 10%
mortgage on the Washington-Taylor Property.

156.   The IHDA never approved the 10% down payment mortgage or any
mortgage for the Washington-Taylor Property.

157.   As such, Settlers' did not advise The Bank of Commerce that the
Washington-Taylor Property could be encumbered and never agreed to encumber it.
Nonetheless, the Bank, on September 3, 2008, two months before Settlers' drew
upon the $50,000 loan, actually  recorded the August 1, 2008 mortgage and
assignment on the Washington-Taylor Property with the Cook County Recorders
Office as Document No. 0824755016 and 0824755017 respectively. Thus the harm
was done to Settlers' before the line of credit was drawn upon. Due to the cross-

collateralization provisions inserted in the Line of Credit Mortgage, at the time The Bank of Commerce tricked Settlers' into signing the document it automatically resulted in an encumbrance upon the Washington-Taylor Property in an amount equal to approximately $3.4 million

158.   In Settlers' 2008 financial audit report to the IHDA, KPW falsely reported that Settlers' was in compliance with the requirements of the Loan Agreement and the Regulatory Agreement relating to the Washington-Taylor Property when, in fact, KPW knew that The Bank of Commerce had encumbered the Washington-Taylor Property without written approval from the IHDA.

159.   The false reporting on the audit was so Settlers' would not be in default of its Agreements with the IHDA, thereby protecting the mortgage on the Washington-Taylor Property that The Bank of Commerce had secured through the Line of Credit Mortgage. KPW violated the Illinois Public Accounting Act (225 ILCS 450/20.01) by making these false statements.

160.   Shortly after the closing of the transaction, Joe learned that The Bank of Commerce had used trickery and deceit to place a mortgage on the Washington-Taylor Property through the provision of the Line of Credit Mortgage. Joe confronted Frale about the Line of Credit Mortgage and asked how much of the Washington-Taylor Property The Bank of Commerce took. Frale responded that "we took the whole thing." Joe did not disclose this information to Settlers' upon learning about it from Frale.

161.   Settlers' did not learn that a mortgage had been placed on the Washington-Taylor Property until January of 2009, when Markay conveyed this information to KJ.

G.   The Fraudulent Closing of the Transaction

162.   The Bank of Commerce prepared all of the sales contracts for the sale of the Faulkner Properties to Settlers'.

163.   During the entire transaction, none of Settlers' officers or directors negotiated any of the terms of the sale with Faulkner. None of Settlers' officers or

directors ever spoke with Faulkner or had any other forms of communication with him. All of the terms of the sale were negotiated by The Bank of Commerce.

164.    From July 20, 2008 through July 30, 2008, Joe was working full-time for The Bank of Commerce to arrange the sale of the Faulkner Properties to Settlers'. This was part of his job responsibilities in helping The Bank of Commerce deal with its troubled assets.

165.    For example, The Bank of Commerce directed Joe to (a) obtain the final water meter readings for each of the Faulkner Properties so that the closing could take place, (b) pay the final water bills so that the properties could be transferred, (c) obtain the necessary approvals from local municipalities for the sale of the Faulkner Properties, (d)  deliver all of the closing documents to Faulkner for his signature, (e) forge KJ's name on the sales contracts, (f) arrange for KJ to be at the closing on August 1, 2008, and (g) sign the real estate transfer tax declarations as the agent for Settlers' and as the agent for The Bank of Commerce.

166.    On July 24, 2008, Joe sent an email to Peterson attaching copies of the documents that The Bank of Commerce provided to Joe about Settlers' assets and liabilities. Peterson responded by stating that "this all looks good to me" and that he would forward such information to The Bank of Commerce.

167.    Peterson also stated on July 24, 2008, that The Bank of Commerce asked him to prepare a compiled financial statement for Settlers' as of December 31, 2007, and that he would prepare that document and once it was prepared he would forward it directly to The Bank of Commerce so that the financial report it could be used in connection with the acquisition of the Faulkner Properties. As stated above, Settlers' never authorized Peterson to disclose this information. On information and belief, this information was inserted into the 2008 Loan Summary report discusses above. A copy of the email is attached as **Exhibit 7**.

168.    On July 30, 2008, Saiger directed Joe to take the check for the transfer stamps from The Bank of Commerce and then go to Berwyn per the village attorney.   The City of Berwyn attorney viewed and acknowledged Joe as the authorized agent of The Bank of Commerce and Settlers' and therefore  allowed the

official document to be signed by Joe as the Seller/Agent, The Bank of Commerce, and as the Buyer/Agent, Settlers'.

169.   On July 30, 2008, Joe wrote a letter on Settlers' stationary to the Village of North Riverside, in which he explained that The Bank of Commerce was actively involved in transferring the ownership of the Faulkner Properties to Settlers'.

170.   In connection with the closing of the sale of the Faulkner Properties, The Bank of Commerce paid the typical seller's closing costs including the Village Transfer Tax and title insurance and the premium for the owner's insurance policy.

171.   In the last week of July, 2008, Settlers' advised Joe that Settlers' was still unsure about purchasing the two condominium units and Joe then advised The Bank of Commerce of this.

172.   Frale reassured and promised Joe that after the closing The Bank of Commerce would find another purchaser for the two condominiums so that Settlers' would not have to deal with them, which information Joe conveyed to Settlers. The Bank of Commerce never followed through with its promise.

173.   On July 31, 2008, the day before the closing of the transaction, Frale directed Joe to have someone from Settlers' sign the sales contracts in respect to the sale of the Faulkner Properties. When Joe informed Frale that KJ was out of the state at the time, Frale insisted that the documents be signed that day.

174.   Understanding that Frale was essentially directing him to forge KJ's signature on the sale documents, Joe went to the parking lot of The Bank of Commerce, signed KJ's name on all seven sales contracts, and handed them back to Frale. Upon receiving the signed documents shortly after being told by Joe that KJ was out of state and could not sign the documents, Frale said, "good." Since The Bank of Commerce had KJ's signature on file at The Bank of Commerce, it cannot rely on the excuse that it did not know whether that was indeed KJ's signature.

175.   On July 31, 2008, after Joe forged KJ's name on the sale documents, Saiger directed Joe to deliver the sale documents to Faulkner at his office in River Forest, Illinois for signatures.

176.    Prior to the closing on August 1, 2008, The Bank of Commerce again instructed Joe to meet Faulkner at his office to pick up the keys and leases for the Faulkner Properties.

H.    The Fraud at the Closing

177.    At the closing on the Faulkner Properties on August 1, 2008, Saiger handed a stack of documents related to the transaction to KJ and directed KJ to sign them.

178.    In connection with the closing, Settlers' did not hire an attorney to represent it because it trusted The Bank of Commerce, Peterson, and Joe, and it did not believe these parties would allow it to enter into a transaction that would cause its financial demise or would cause Settlers' to pledge all of the equity in the Washington-Taylor Property.

179.    Had Settlers' been involved in a similar transaction with parties that it did not know well or trust implicitly, it would have hired an attorney to represent its interests and to protect it from being taken advantage of.

180.    The closing occurred at The Bank of Commerce's office at 171 E. Irving Park Rd., Wood Dale, Illinois. KJ had flown in from California on her way out of the country specifically to attend the closing and to sign the documents and was in the area for only a few hours on August 1, 2008.

181.    The stack of documents that Saiger handed to KJ to sign contained multiple "Sign Here" tabs. Saiger went over the first set of loan documents for one of the seven properties from the stack with KJ.  Saiger indicated to KJ that the remaining documents in the stack were the same as the first set, except they were for the other properties.

182.    KJ also told Saiger on August 1, 2008 that KJ had a plane to catch. Saiger told KJ that "in the interest of time," KJ did not need to review each closing document separately because they were all the same. Based upon Saiger's representation that the closing documents were identical and based upon the goodwill and trust that Settlers' reposed in The Bank of Commerce and Saiger and

the others involved in the acquisition of the Faulkner Properties, including Peterson, Settlers' long-term auditor and trusted business advisor, KJ did not review the stack of documents, but instead signed them as directed.

183.    Without KJ's knowledge and in conflict with the representation made to her, one of the documents in the stack that Saiger handed to KJ on August 1, 2008, was a mortgage (the "Line of Credit Mortgage") encumbering the Washington-Taylor Property to secure a $50,000 line of credit (the "$50,000 Line of Credit") and to secure all of the other amounts Settlers' owed to The Bank of Commerce.

184.    As explained above, a Bank of Commerce employee (most likely Saiger because she was the loan officer on the file) falsely stated in the 2008 Loan Summary that Settlers' was requesting the $50,000 Line of Credit to hire a grant writer and to rehab the Devon property -- identical language lifted from the 2005 Loan Summary prepared for another loan taken out in 2005.  The reference to the $50,000 Line of Credit and the related mortgage, however, was a ruse to get Settlers' to pledge the equity in the Washington-Taylor Property.

185.    In order not to arouse Settlers' awareness by preparing Change in Terms Agreements and to secure the Washington-Taylor Property, The Bank of Commerce prepared a brand new loan which could secure the Washington-Taylor Property. The Bank of Commerce did so in the form of the Line of Credit Mortgage.

186.    The Line of Credit Mortgage provided that it cross-collateralized the entire amounts owing to The Bank of Commerce in connection with the assumption of the loans made to Jan Faulkner. As such, through subterfuge and deceit, The Bank of Commerce and Saiger tricked KJ into signing a document that placed an approximately $3.5 million mortgage upon the Washington-Taylor Property.

187.    Had KJ known that one of the documents in the pile handed to her encumbered fully the Washington-Taylor Property, she would not have signed it. As set forth above, KJ corresponded with Ms. Williams of the IHDA on July 24, 2008, to ascertain if Settlers' could place a mortgage on the property equal to 10% of the purchase price (which would have been about $350,000), but had not received any

response to that inquiry request and therefore would not have proceeded with
encumbering the Washington-Taylor Property in any fashion.

I.      The Fraud is Discovered and Continues after the Closing.

188.   After the closing of the transaction, The Bank of Commerce instructed
Joe to give Frank Murriello access to the Washington-Taylor Property to complete
an appraisal report

189.   Notably, the 2008 Loan Summary states that an appraisal had been
"ordered from Krueger Appraisal Service."  Krueger had prepared the original
appraisals of the Faulkner Properties.

190.   The appraisal of the Washington-Taylor Property conducted after the
closing of the transaction also violated FDIC Rules and Regulations Part 365 (Real
Estate Lending Standard) regarding safe and sound underwriting standards and
Part 323 regarding Appraisals.

191.   Within a few months after acquiring the Faulkner Properties, Settlers'
was having difficulty servicing the obligations. As stated above, Settlers' did not
have the funds in November of 2008, to make the final installment of the 2007 Cook
County real estate taxes.

192.   Settlers' did not take legal action against The Bank of Commerce in
January of 2009 when it learned about the mortgage on the Washington-Taylor
property because, among other things:

    a.   It was concerned that IHDA would call a default on the project and
         Settlers' would lose the Washington-Taylor Property after
         monitoring it for nearly 15 years (Settlers' had just two more
         months to completion of the IHDA contract).

    b.   It did not have a sufficient factual or legal understanding to
         challenge the transactions -- it did not obtain a copy of the 2008
         Loan Summary until the spring of 2012,

    c.   It did not have the financial resources to engage counsel to
         investigate the fraud.

{00014826}                                38

d.  It was trying to consensually work out its issues with The Bank of
Commerce and was hoping that its relationship with The Bank of
Commerce, including Peterson and KPW, would result in some form
of relief.

193.   On February 4, 2009, KJ sent a letter to Frale and Markay, in which
she advised them of some of the false representations, stating:

> According to the document "FAULKNER/SETTLERS' NOI
> ADDENDUM 7/08" as presented to Settlers' the annual property tax
> for the property at 6631-6635 W. 23rd St, Berwyn was $18,000. In
> reality, Settlers' paid $32,948.35 for that property, plus over $7,000
> more than the stated tax liability for the other 6 BOC properties.
> Within 4 months of purchasing the properties, Settlers' had to utilize
> the $50,000 line of credit to cover expenses incurred by the properties
> purchased from the Bank. I want to point out that in all the years of
> administrating Settlers' this is the first time the organization has had
> to borrow money to pay for its operations.

194.   In October of 2010, The Bank of Commerce used duress and coercion to
force Settlers' into executing a new note in the amount of $50,000, and to
acknowledge that the new note was secured by a Mortgage and Assignment of
Rents in the amount of $3,412,000. As a result of the fraud and illegality
surrounding the initial transaction, The Bank of Commerce did not have the right
to pressure Settlers' into executing these documents, upon pain of suffering a
foreclosure.

195.   In the attached letter dated June 2011 (**Exhibit 8**), Settlers' advised
Defendant of the fraudulent scheme and, in that connection, apprised the new
owners of The Bank of Commerce of many of the factual allegations set forth herein,
including the following:

> Sometime in July 2008, the Bank approached Settlers'
> Housing Service about properties the Bank had recently
> foreclosed upon, or was in the process of foreclosing. There
> were five multi-family rental properties and two
> condominium units all owned by the same entity. The
> Bank approached Settlers' alluding that these properties
> were a "great" deal and that the Bank would be able to

provide 100% financing for those properties. The Bank
presented Settlers' a Net Operating Income statement
(see enclosure entitled "Faulkner/Settlers' NOI
Addendum 7/08) indicating the appraised value of the
properties, the loan amount, and projected annual gross
income and expenses. The Bank made the process very
easy and quick, and the closing went smoothly.

Shortly after taking ownership of the properties, Settlers'
found itself unable to meet its financial obligations. Only
after a few months of ownership, Settlers' had to take out
a $50,000 loan from the Bank (loan # 28264209) to help
pay the property taxes and the mortgages on these
recently purchased properties. Settlers' reviewed the
operations of the buildings, loan documents, and
subsequently asked the Bank for the appraisals that were
used to prepare the NOI.

Settlers' found that the appraisals used by the Bank to
lure and mislead Settlers' into purchasing the properties
were not current, and in fact were as old as October 2001.
The buildings were overpriced. Since Settlers' had a good
relationship with the Bank and was already doing
business with the Bank prior to the purchases, Settlers'
had no reason to believe that the information the Bank
provided was grossly misleading and inaccurate.

In addition, at the time of the closing, Settlers' was not
aware that the Bank had taken one of Settlers' properties,
known as the Washington-Taylor Village Apartments
(WTVA), as a collateral for the loans. Settlers' came to
know of this about five months after the closing. WTVA
was a State project funded by the Illinois Housing
Development Authority. In August 2008, WTVA was still
under contract with the State, and the contract forbade
the building to be encumbered by any other entity. This
act by the Bank was illegal. The Bank was fully aware
that WTVA was a State project but went ahead anyway.
The closings were transacted at the Bank and there were
many sets of documents in a big pile that required
signatures. Nothing was disclosed to Settlers' at the
closing that one of the sets of documents presented for
signatures was for the collateral.

Settlers' admits we should have taken more care in reviewing the accuracy of the data in the documents presented to us. In the Bank's interest to avert a full blown foreclosure of seven properties, the Bank presented misleading and inaccurate information, and committed the illegal act. As mentioned before, Settlers' had operated on a good faith relationship with the Bank, and therefore had no reason to doubt the integrity of the Bank nor any documents presented by the Bank to the Organization. Settlers' has always operated in good faith with all agencies, institutions, and clients.

## V.    CAUSES OF ACTION:

## COUNT 1:NON-INSIDER AND INSIDER EQUITABLE SUBORDINATION OF ALL CLAIMS UNDER 11 U.S.C. § 510(c)

196.    The Debtor repeats and realleges in this Count of this Complaint all of the other allegations set forth herein, as if fully set forth below, except to the extent such allegations are inconsistent with the allegations in this Count.

197.    This Count is plead in the alternative to any other counts that are inconsistent with the allegations herein.

198.    At all times relevant to the allegations set forth herein, § 510(c) of the Bankruptcy Code provides that:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may--(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 USCS § 510(c).

199.    Equitable subordination is proper under § 510(c) if (a) a creditor engaged in some type of inequitable conduct, (b) the misconduct resulted in injury to other creditors or gave the creditor some unfair advantage, and (c) subordination is not inconsistent with other provisions of the Bankruptcy Code.

{00014826}                           41

200.    When a creditor is not an insider or fiduciary, equitable subordination requires a showing of gross and egregious conduct such as fraud, spoliation or overreaching.

201.    When a creditor is an insider, they are subject to a heightened standard and equitable subordination is proper when, among other things, the creditor's conduct is in bad faith or unfair. In addition to the statutory definition of an insider, a creditor can be deemed an insider when the creditor has a sufficiently close relationship with the debtor such that its conduct is made subject to closer scrutiny than those dealing at arms-length with the debtor.

202.    The Bank is an "insider" or "fiduciary" of the Debtor within the meaning of the Bankruptcy Code.  The Bank's status as an insider or fiduciary stems from the following facts:

      a.    Under Illinois law, a real estate broker owes a fiduciary duty to the entity for whom it is procuring real estate. A broker owes general duties of good faith, loyalty, and trust. In this case, The Bank of Commerce acted as a real estate broker to effectuate the sale of the Faulkner Properties to Settlers', by presenting the opportunity to acquire the Faulkner Properties to Settlers', negotiating the sale with Settlers', including the price, and handling all of the aspects of the sale on behalf of the purported seller, including paying the closing costs. These actions make The Bank of Commerce a real estate broker, which means an "individual, partnership, limited liability company, corporation, or registered limited liability partnership other than a real estate salesperson or leasing agent who, whether in person or through any media or technology, for another and for compensation, or with the intention or expectation of receiving compensation, either directly or indirectly … [1] Offers to sell, exchange, purchase, rent, or lease real estate, … [2] Negotiates, offers, attempts, or agrees to negotiate the sale, exchange, purchase, rental, or leasing of real estate … [3] Assists or

directs in the negotiation of any transaction intended to result in the sale, exchange, lease, or rental of real estate." 225 ILCS 454/1-10. As set forth above in multiple paragraphs, The Bank of Commerce took on the role of a real estate broker in respect to the sale of the Faulkner Properties to Settlers', to wit,

b.  There was a close business and personal relationship and kinship between Settlers' and the Bank's Director, Peterson, which is based on the fact that Peterson was Settlers' long-term accountant and auditor, a trusted business advisor and a confidant and he had in the past treated Settlers' in a paternalistic and protective manner. KJ and Settlers' would base their business decisions on the recommendations provided by KPW and Peterson.  For example, Settlers' consulted Peterson for advice on:

    i.  selling the condo units purchased from Jan Faulkner,

    ii.  a lawsuit related to a loan taken from Community Bank Oak Park River Forest (CBOPRF) to purchase Holding Corp stock in the name of Settlers',

    iii.  a loan from a private lender to resolve the CBOPRF lawsuit;

    iv.  starting a chapter of Settlers' in California,

    v.  Settlers' property tax appeal on 6631-6635 W. 23rd St., Berwyn,

    vi.  selling the Faulkner properties,

    vii.  new appraisal values done by Wood Dale Bank & Trust,

    viii.  an "exit plan" for Settlers' in light of the upcoming default on the loans owed to The Bank of Commerce and going into foreclosure, and

    ix.  whether KJ and Settlers' should vote for certain members of the Board of Directors of Bancshares Holding Corp., and

    x.  whether Settlers' needed to consult a bankruptcy attorney to deal with the default on the Faulkner Loans.

{00014826}                                          43

c. The Bank of Commerce, through its Officers and Directors and Joe, exercised a great deal of influence and control over Settlers' and made Settlers' the subservient party as a result of that influence and control. This is evident from the fact that The Bank of Commerce was able to pressure Settlers' into acquire seven parcels of real estate and to assume loans of approximately $3.5 million, without engaging in due diligence or hiring its own attorney to represent it and based solely upon the representation that acquiring the properties was a great deal for Settlers'. Settlers' did hire professionals in the past to advise it when dealing with third-parties that it did not rely upon.

d. Settlers' was a substantial shareholder of Bancshares Holding and KJ was also a substantial shareholder.

e. Joe exercised a substantial amount of control over KJ and thus Settlers', and Joe was acting at the behest and under the control of The Bank of Commerce with respect to the acquisition of the Faulkner Properties and the assumption of the Faulkner Loans.

f. The Debtor was induced by The Bank of Commerce to enter into transactions that were not in its best interests and that no reasonable third-party with knowledge of the facts would have entered into at arms'-length.

203.   Because The Bank of Commerce was a fiduciary and an insider, its actions vis-à-vis the Debtor are subject to a heightened scrutiny when determining whether Defendant's claim should be equitably subordinated.

204.   Even if The Bank of Commerce is not a fiduciary or insider, The Bank of Commerce also has engaged in gross and egregious conduct in respect to the Debtor, and also has not acted in good faith and fairly, by among other things:

a. Lying to Settlers' at the closing of the transaction by telling Settlers' that all of the subject loan documents were identical and did not need to be reviewed separately when, in fact, one of the

documents was the $50,000 Line of Credit and the Line of Credit
Mortgage that pledged the equity in the Washington-Taylor
Property, in violation of the Grant and Loan Agreement and the
Regulatory Agreement with the IHDA.

b.  Causing the Debtor to pledge the Washington-Taylor Property on
terms and conditions so highly unfavorable to the Debtor that such
transactions caused the Debtor to become insolvent and to breach
its agreements with the IHDA, as set forth above, in an effort to
hide The Bank of Commerce's unsound banking practices from
regulators and from being shut down.

c.  Intentionally diverting and converting the Debtor's rents and
interfering with the Debtor's relationships with its tenants without
any legal justification, thereby causing loss of credibility and trust
between Settlers' and its tenants as well as a substantial amount of
confusion in the minds of tenants regarding their duty to pay rent
and causing tenants to withhold rent payments to Settlers' and to
the Receiver.  This confusion also contributed to the Debtor's
inability to generate sufficient cash to pay operating expenses in
full.

205.   The Bank of Commerce's conduct was not only inequitable and unfair
to the Debtor and its creditors, but to the public at large, as reflected by the fact
that The Bank of Commerce was shut down by regulators in March of 2011, and
such conduct has deprived the Debtor of resources that would have otherwise been
put towards its humanitarian mission.

206.   The Bank's conduct has injured the Debtor by, among other things,
causing it to incur substantial liabilities that rendered it insolvent, resulting in the
Foreclosure Proceedings and eventually forcing the Debtor into bankruptcy.
Further, if The Bank of Commerce's secured claim against the Washington-Taylor
Property is allowed to stand, the Debtor will lose all of the equity in that property,

as well as the nearly $70,000 to $100,000 in annual net cash flow that was being generated by that property prior to the transactions giving rise to this action.

207.    Based upon the Defendant's inequitable conduct, all of the Defendant's claims should be subordinated to all other creditors and the Court should avoid any liens held by Defendant against the Debtor's property.

208.    Subordination of all of the Defendant's claims and avoidance of the Defendant's liens are consistent with the provisions of the Bankruptcy Code.

WHEREFORE, for all of the foregoing reasons, the Debtor requests that the Court (a) subordinate the Defendant's claims below the claims of all other creditors, (b) avoid Defendant's mortgage on the Washington-Taylor Property and the mortgages on the Faulkner Properties, and (c) provide such other and further relief as is just and proper.

## COUNT 2: AIDING AND
## ABETTING BREACH OF FIDUCIARY DUTY

209.    The Debtor repeats and realleges in this Count of this Complaint all of the other allegations set forth herein, as if fully set forth below, except to the extent such allegations are inconsistent with the allegations in this Count.

210.    This Count is plead in the alternative to any other counts that are inconsistent with the allegations herein.

211.    At all times relevant to the allegations set forth herein Peterson and KPW (collectively, the "Advisors") owed a fiduciary duty to Settlers'.

212.    The Advisors owed a fiduciary duty to Settlers' because Settlers' placed special trust and confidence in the Advisors, which resulted in these persons and entities having superior influence and control over Settlers'.

213.    The special trust and confidence that Settlers' had in the Advisors is a result of the extensive and close relationship between Settlers' and the Advisors, as well as the lack of sophistication on the part of Settlers' and its reliance upon the Advisors.

214.    The Advisors also owed a fiduciary duty to Settlers' because they were Settlers' long-term accountant and also had access to confidential financial information about Settlers'.

215.    Settlers' also relied on Peterson and KPW as a business advisor and placed special trust and confidence in Peterson and KPW and their judgment, as set forth in Count 1.

216.    KPW and Peterson also exercised a great deal of influence and control over Settlers'. This is evident from the fact that Settlers' was willing to enter into the subject transactions based solely upon the involvement of its trusted advisors. This also allows the reasonable inference that such trusted advisors dominated and influenced Settlers'.

217.    Peterson and KPW breached the fiduciary duties owed to Settlers' by participating in the conduct described herein, including by assisting in the preparation of the Loan Summary Report, which was critical to the overall scheme, including the fraudulent mortgage on the Washington-Taylor Property, and by providing financial information, without Settlers' consent, to the Bank's appraiser, Frank Muriello. In the Washington-Taylor appraisal report dated August 22, 2008, it makes references to the "Illinois Housing Development Subsidy … This subsidy ended in March 2009 at which time the subject property will be free and clear of mortgage debt" and "*The CPA firm of Kolnicki Peterson Wirth provided the appraiser with the 2006 and 2007 audits." On information and belief, The Bank of Commerce enlisted KPW and Peterson to provide the subject appraisals.

218.    The Loan Summary Report from July of 2008, indicates that the information was provided by KPW and Peterson.

219.    Furthermore, and as alleged above, the only way that the Bank could have obtained the information contained in the Loan Summary Report was by directing Peterson and KPW to provide it.

220.    The 2008 Loan Summary also states that the Washington-Taylor Property at the time of the report had an "approx. $55,000 mortgage by IL Housing Authority". This information was supplied to The Bank of Commerce by Peterson

and KPW, who were privy to it because it arises from a calculation based upon depreciation of the IHDA grant and loan provided to Settlers' for the Washington-Taylor Property. Only Peterson and KPW was privy to the formula used to calculate the depreciation of the grant and loan amounts, which Peterson and KPW had calculated each year for Settlers' year-end audit reports to the IHDA and for tax filing purposes.

221.   But for Peterson and KPW providing this information to the Bank, the Bank would not have known about the Washington-Taylor Property and the potential equity in the property to act as the 24% collateral to the 76% loan-to-value ratio needed for the execution of the Faulkner loans.

222.   The BOC aided and abetted KPW and Peterson in their breach of duty to Settlers' by actively engaging in a business relationship with KPW and Peterson even though KPW and Peterson were not the Bank's auditor/accountant.  By employing the services of KPW and Peterson, the Bank developed a business relationship with the final effect of aiding and abetting KPW and Peterson to breach their fiduciary duty to Settlers' by providing financial information about Settlers' without Settlers' knowledge or consent.

223.   On information and belief, The Bank of Commerce asked Peterson and KPW to provide the information contained in the Loan Summary Report and in the appraisal of the Washington-Taylor Property.

224.   The BOC actively requested financial information about Settlers' from KPW and Peterson, knowing that Settlers' had not requested the information and that by providing such information without Settlers' knowledge or consent KPW and Peterson were breaching their duties to Settlers'.

225.   The Bank also accepted and used the confidential information about Settlers' by incorporating it into the Loan Summary Report and using it to obtain the fraudulent mortgage on the Washington-Taylor Property.

226.   The Bank of Commerce also knew that Settlers' did not authorize KPW and Peterson to provide the information about the Washington-Taylor Property and knew, or should have known, that KPW and Peterson were breaching their

fiduciary duties to Settlers' by disclosing financial information about Settlers'. This is evident from the fact that The Bank of Commerce knew that Settlers' never provided a loan application in connection with the $50,000 Line of Credit and never authorized the release of information about its finances to obtain this line of credit, including financial information about the status of the Washington-Taylor Property.

227. It is thus plausible that The Bank of Commerce encouraged KPW and Peterson to breach their fiduciary duty to Settlers'.

228. Additionally, Peterson's status as a Director of The Bank of Commerce, caused his knowledge to be imputed to The Bank of Commerce.

229. KPW and Peterson would not have been able to breach the fiduciary duty owed to Settlers' without the active involvement, encouragement and direction of The Bank of Commerce.

WHEREFORE, Settlers' respectfully requests that the Court enters a judgment in its favor and against Defendant that provides, among other things that: (a) Settlers' is entitled to damages, including punitive damages, in an amount to be further determined; (b) for payment of Settlers' attorneys' fees; and (c) for such other and further relief as is just and proper.

## COUNT 3: FRAUDULENT MISREPRESENTATION CLAIM RELATED TO FRAUD IN THE EXECUTION

230. The Debtor repeats and realleges in this Count of this Complaint all of the other allegations set forth herein, as if fully set forth below, except to the extent such allegations are inconsistent with the allegations in this Count.

231. This Count is plead in the alternative to any other counts that are inconsistent with the allegations herein.

232. Under Illinois law, the elements of a fraudulent misrepresentation claim are: (a) a false statement of material fact; (b) defendant's knowledge that the statement was false; (c) defendant's intent that the statement induce the plaintiff to act; (d) plaintiff's reliance upon the truth of the statement; and (e) plaintiff's damages resulting from reliance on the statement.

233.    The Bank of Commerce made many false representations of material facts to Settlers' with the intent that Settlers' would rely upon them, including that:

    a.   The Bank of Commerce, through its agent Saiger, falsely represented to KJ on August 1, 2008 that the stack of documents presented to KJ to sign were all the same and related solely to mortgages and loans for the seven Faulkner Properties when, in fact, one set of the documents was not the same as the others and instead of being a mortgage for a specific piece of property, was the Line of Credit Mortgage that placed a mortgage on the Washington-Taylor Property to secure the entire purchase price for the seven Faulkner Properties.

    b.   The Bank of Commerce, through its agent Saiger, falsely represented to KJ on August 1, 2008, that KJ did not need to read each of the documents in the pile Saiger handed to KJ when, in fact, KJ needed to closely read each document in order to understand that one of the documents was the Line of Credit Mortgage. However due to the fact that KJ had an international flight to catch and had rearranged her departure with a short stop in Chicago to cater to the Bank's request for a quick closing, Saiger said that "in the interest of time", KJ did not need to read the rest of the stack of documents and that the remainder documents were the same as the first set of loan documents KJ had already read.

234.    Settlers' reliance upon The Bank of Commerce's omissions and false representations was reasonable under the circumstances for at least the following reasons:

    a.   There was a long-standing prior relationship of trust and confidence between Settlers' and The Bank of Commerce, and the Officers and Directors, including Peterson, as set forth above;

    b.   The Bank of Commerce had been advised that Settlers' could not pledge the Washington-Taylor Property without obtaining prior

approval from the IHDA and such approval had not been obtained, so Settlers' believed no mortgage would be placed on that property;

c.  Even if Settlers' could have done so, which it could not, it was not standard and normal for an entity to pledge the equity in its unencumbered property as part of the acquisition of seven other parcels of property that supposedly were worth approximately 25% more than the amount of debt associated with those properties.

235.   The Bank of Commerce knew that Settlers' never agreed to pledge its equity in the Washington-Taylor Property and The Bank of Commerce deliberately misled Settlers' into executing the Line of Credit Mortgage.

236.   Similarly, the false statements conveyed to Settlers' by Joe were made by The Bank of Commerce, or are attributable to it, because Joe was acting on behalf of The Bank of Commerce with respect to the transmission of the false information.

237.   The Bank of Commerce's false statements were material to Settlers' in that, among other things, Settlers' would never have signed the Line of Credit Mortgage or the $50,000 Line of Credit documents had The Bank of Commerce not represented that all of the documents in the stack handed to KJ were the same and did not need to be reviewed.

238.   Absent the representation that all of the documents in the stack handed to KJ were the same and did not need to be reviewed, KJ would have reviewed the pile of documents and discovered that one of the documents was encumbering the Washington-Taylor Property.

239.   KJ would have then refused to sign the subject document because Settlers' had never agreed to pledge the Washington-Taylor Property (KJ had not yet heard back from the IHDA about the limited request to place a 10% mortgage) and because signing the Line of Credit Mortgage would have jeopardized the continued ownership of Washington-Taylor Property, which is something that Settlers' wanted to avoid.

240.   At the time The Bank of Commerce decided to place a mortgage on the Washington-Taylor Property, it knew that the Property was still under contract with IHDA and that the contract prohibited Settlers' from allowing a third party from encumbering the Property without first obtaining written approval from IHDA.

241.   Settlers' acted in reliance on the false statements and omissions of The Bank of Commerce and Settlers' was not aware of the falsity of such statements and representations or the information that was omitted.

242.   Because The Bank of Commerce intentionally failed to disclose material facts to Settlers' and because of the false representations made by The Bank of Commerce, Settlers' has sustained substantial damages.

243.   The damages include the amounts that Settlers' has lost in connection with acquiring the Faulkner Properties and losing the equity in the Washington-Taylor Property.  Absent The Bank of Commerce's false representations, Settlers' would not have executed the Line of Credit Mortgage, which would have then resulted in The Bank of Commerce not forcing the Faulkner Properties onto Settlers'.

244.   Defendant is the successor to The Bank of Commerce and contractually agreed pursuant to a Purchase and Assumption Agreement dated March 25, 2011, to assume liability for the matters set forth herein.

WHEREFORE, the Debtor respectfully requests that the Court enter a judgment in its favor and against Defendant that provides, among other things: (a) that the Debtor is entitled to damages, including punitive damages, in an amount to be determined at trial; (b) for payment of Settlers' attorneys' fees incurred in bringing and prosecuting this action, and (c) for such other and further relief as is just and proper.

## COUNT 4: FRAUDULENT CONCEALMENT
## RELATED TO FRAUD IN THE EXECUTION

245.   The Debtor repeats and realleges in this Count of this Complaint all of the other allegations set forth herein, as if fully set forth below, except to the extent such allegations are inconsistent with the allegations in this Count.

246.   This Count is plead in the alternative to any other counts that are inconsistent with the allegations herein.

247.   Illinois recognizes the tort of fraudulent concealment. In place of the false-representation element of the common law fraud claim, fraudulent concealment requires proof that the defendant concealed a material fact when it was under a duty to disclose that fact to plaintiff.

248.   A duty to disclose a material fact may arise out of several situations: if plaintiff and defendant are in a fiduciary or confidential relationship, then defendant is under a duty to disclose all material facts and a duty to disclose material facts may arise out of a situation where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff. This position of superiority may arise by reason of friendship, agency, or experience.

249.   The Bank of Commerce omitted, failed to disclose and deliberately concealed material facts that it had a duty to disclose.

250.   The material facts that The Bank of Commerce knew, but concealed and failed to disclose to Settlers', include that the stack of documents that Saiger handed to KJ on August 1, 2008, contained the Line of Credit Mortgage and that by signing these documents, Settlers' would be pledging the equity in the Washington-Taylor Property to secure the loans assumed from Jan Faulkner, in violation of IHDA requirements.

251.   Settlers' reliance upon The Bank of Commerce's omissions was reasonable under the circumstances for at least the following reasons:

    a.  There was a long-standing prior relationship of trust and confidence between Settlers' and The Bank of Commerce, and the Officers and Directors, including Peterson, as set forth above;

    b.  The Bank of Commerce had been advised that Settlers' could not pledge the Washington-Taylor Property without obtaining prior written approval from the IHDA and such approval had not been obtained, so Settlers' believed no mortgage would be placed on that property;

    c.  It was not standard and normal for an entity to pledge the equity in its unencumbered property as part of the acquisition of seven other parcels of property that supposedly were worth approximately 25% more than the amount of debt associated with those properties.

252.    The Bank of Commerce also had a duty to disclose material facts to Settlers' arising from, among other things,

    a.  The Bank of Commerce easily knew that the stack of documents contained the Line of Credit Mortgage and the Line of Credit.

    b.  The Bank of Commerce, voluntarily offered information to Settlers' regarding the status of the Faulkner Properties and thus took on the obligation to make sure the information was complete and accurate.

    c.  The Bank of Commerce voluntarily assumed the role of brokering the sale of the Faulkner Properties and thus took on the duties of a real estate broker to provide full and complete disclosures, as is evident from the fact that it located the buyer for the properties, paid the seller closing costs, and arranged all aspects for the sale of the properties.

    d.  Peterson, a Director of The Bank of Commerce, acted as a financial advisor to Settlers'.

    e.  The Bank of Commerce, including Markay, KPW and Peterson, knew that Joe was no longer associated with Settlers' and that he

suffered from alcoholism and other similar issues and was not
reliable.

    f.    The Bank of Commerce's precise and easy knowledge of the status
and condition of the Faulkner Properties as a result of taking over
the administration and ownership of such properties, as is evident
from Robert Markay's email proclaiming that The Bank of
Commerce was in control of Faulkner's properties.

    g.    The Bank of Commerce had commissioned the original appraisals
and knew that they were obsolete and outdated.

253.    Settlers' could not have discovered the information that The Bank of
Commerce concealed and omitted through a reasonable inquiry or inspection and
Settlers' was prevented from making a reasonable inquiry, in that:

    a.    The Bank of Commerce created an exaggerated sense of urgency by
repeatedly stating that the transaction had to close promptly.

    b.    Settlers' did not have the resources to commission its own
independent appraisals, nor did it have the resources to evaluate
the cash flows from the Faulkner Properties.

    c.    Settlers' had no reason to believe that The Bank of Commerce,
including Peterson, its trusted financial advisor, would provide
materially false information about the value and status of the
Faulkner Properties.

254.    Settlers' would not have executed the Line of Credit Mortgage or
acquired the Faulkner Properties or assumed the Faulkner Loans if The Bank of
Commerce had not intentionally concealed and failed to disclose the Line of Credit
and the Line of Credit Mortgage..

255.    Because The Bank of Commerce intentionally failed to disclose and
intentionally concealed the Line of Credit and the Line of Credit Mortgage, Settlers'
has sustained substantial damages.

256.    The damages include the amounts that Settlers' has lost in connection
with acquiring the Faulkner Properties and losing the equity in the Washington-

Taylor Property.  Absent The Bank of Commerce's false representations, Settlers' would not have executed the Line of Credit Mortgage, which would have then resulted in The Bank of Commerce not forcing the Faulkner Properties onto Settlers'.

257.    Defendant is the successor to The Bank of Commerce and contractually agreed pursuant to a Purchase and Assumption Agreement dated March 25, 2011, to assume liability for the matters set forth herein.

WHEREFORE, the Debtor respectfully requests that the Court enter a judgment in its favor and against Defendant that provides, among other things: (a) that the Debtor is entitled to damages, including punitive damages, in an amount to be determined at trial; (b) for payment of Settlers' attorneys' fees incurred in bringing and prosecuting this action, and (c) for such other and further relief as is just and proper.

## COUNT 5: BREACH OF ILLINOIS CONSUMER FRAUD ACT ARISING FROM FRAUD IN THE EXECUTION

258.    The Debtor repeats and realleges in this Count of this Complaint all of the other allegations set forth herein, as if fully set forth below, except to the extent such allegations are inconsistent with the allegations in this Count.

259.    This Count is plead in the alternative to any other counts that are inconsistent with the allegations herein.

260.    The conduct of The Bank of Commerce has a substantial nexus to Illinois consumers in that the Faulkner Properties and the Washington-Taylor Property provide housing to families in Illinois and Settlers' primary mission is to help Illinois consumers locate affordable, sanitary and safe housing.

261.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. (the "Consumer Fraud Act") is a regulatory and remedial statute intended to protect consumers against fraud, unfair methods of competition, and other unfair and deceptive business practices.

{00014826}                                    56

262.   Conduct is unfair under the Consumer Fraud Act if (a) the practice offends public policy; (b) it is immoral, unethical, oppressive, or unscrupulous; or (c) it causes substantial injury to consumers.

263.   As a result of the allegations set forth herein, The Bank of Commerce engaged in unfair and deceptive business practices in connection with their transactions with Settlers'.

264.   It is fundamentally and substantially unfair to consumers, and thus violates the Consumer Fraud Act, for The Bank of Commerce to use trickery, deceit and misrepresentation to cause Settlers' to place a mortgage on the Washington-Taylor Property.

265.   The unfair and deceptive conduct has injured consumers and threatens to continue to injure consumers, as set forth herein.

WHEREFORE, Settlers' respectfully requests that this Court (a) enter judgment in its favor and against Defendant in an amount to be determined at trial; (b) award Settlers' its attorneys' fees for bringing this action; and (c) provide such other and further relief as is available under the Consumer Fraud Act and other applicable law.

## COUNT 6: FRAUD, ILLEGALITY AND UNENFORCEABILITY REGARDING WASHINGTON-TAYLOR MORTGAGE

266.   The Debtor repeats and realleges in this Count of this Complaint all of the other allegations set forth herein, as if fully set forth below, except to the extent such allegations are inconsistent with the allegations in this Count.

267.   This Count is plead in the alternative to any other counts that are inconsistent with the allegations herein.

268.   The mortgage on the Washington-Taylor Property is void because the underlying agreements violated existing law, including the HOME Investment Partnership Act (the "*Home Act*"), in which "Congress affirms the national goal that every American family be able to afford a decent home in a suitable environment." 42 U.S.C. § 12701.

269.   The mortgage on the Washington-Taylor Property also is void and unenforceable under federal common law related to the ownership of property purchased with federal grant funds.

270.   Settlers' participated in the HOME Act from March 31, 1994 till April 1, 2009. The project was called the Washington-Taylor Village Apartments (WTVA), a 13-unit multi-family building located at 101-103 Washington Blvd, 409-411 S. Taylor Ave, Oak Park, IL 60302.

271.   The regulations for implementing the HOME Act are codified at 24 C.F.R. § 92.1 (2010). In implementing the HOME Act, HUD allocates funds to eligible state and local governments to provide safe, decent, and affordable housing for very low-income and low-income families. Sub-Part K of the HOME provisions outlines the requirements for administration of the program. 24 C.F.R. § 92.500.

272.   HUD establishes a HOME Investment Trust Fund United States Treasury account for each participating jurisdiction which may, in turn, either use a separate local trust fund account or a subsidiary account within its general fund (or other appropriate fund) as the local HOME Investment Trust Fund account. 24 C.F.R § 92.500(a).

273.   The local account includes deposits of HOME funds disbursed from the United States Treasury account; any state funds; local funds that enable the jurisdiction to meet a participating threshold amount described in 24 C.F.R. § 92.102(b)(2); any program income (from allocated funds and matching contributions); and any repayment or recaptured funds. 24 C.F.R. § 92.500(c)(1).

274.   The income from the HOME Program must be used in accordance with the requirements set forth in the HOME Investments Partnership Act, and the funds must be deposited in the HOME Investment Trust Fund local account "unless the participating jurisdiction permits the State recipient or subrecipient to retain the program income for additional HOME projects" in accordance with the terms of a written agreement required by 24 C.F.R. § 92.504. 24 C.F.R. § 92.503(a)(1).

275.   The HOME Act program provides formula grants to States and localities that communities use, often in partnership with local nonprofit groups, to

fund a wide range of activities including building, buying, and/or rehabilitating affordable housing for rent or homeownership or providing direct rental assistance to low-income people. HOME is the largest Federal block grant to state and local governments designed exclusively to create affordable housing for low-income households.

276.    The IHDA has been designated the program administrator of the HOME Act program for the State of Illinois, as authorized by, among other things, the IHDA rules for the program, codified at 47 Ill. Adm. Code, Part 370.

277.    The grants that are provided through the HOME Act program also are governed by the Community Block Grant Development program (the "CDBG"), 42 U.S.C. § 5301, *et seq*. Settlers' was already a successful recipient of the CDBG funds and the approval by the IHDA of the Washington-Taylor Village Apartments was contingent upon Settlers' success in getting approval from the Village of Oak Park to reassign $40,000 of CDBG funds previously granted to Settlers' for another housing project to the Washington-Taylor Project.

278.    Federal law provides that Community Development Block Grants ("Block Grants") may be used for any number of qualified public purposes, including to provide quality low cost housing.  Local government units are provided these funds and the recipient has the discretion of how to carry out the eligible activity that it has chosen and for which the Block Grants have been provided.  *See* 24 CFR § 570.200(f).  It may do so by administering the project (a) itself through its own employees, *see id* at § 570.200(f)(1)(i)(A), (b) by procurement contracts, *see id* at § 570.200(f)(1)(i)(B), (c) by grants to a subrecipient (usually a non-profit), *see id* at § 570.200(f)(1)(ii), (d) by loans to subrecipients (usually a non-profit), *see id*, or (e) by public agency of the recipient, *see id* at § 570.200(f)(1)(iii).

279.    The federal regulations as to Block Grants impose the same restrictions on how the properties purchased by the grant funds may be used by the subrecipients. *See generally* 24 CFR § 570.1, *et seq*.

280.    As a result of the applicable federal statutes and regulations, applicable law provides that a recipient and subrecipient of CDBG and HOME Act funds holds those funds and the property acquired with such funds in trust.

281.    The applicable regulations provide that "[r]eal property, equipment, intangible property and debt instruments that are acquired or improved with Federal funds shall be held in trust by the recipient as trustee for the beneficiaries of the project or program under which the property was acquired or improved." 24 CFR 84.37.

282.    The regulations also apply to subrecipients such as Settlers' pursuant to 24 CFR § 84.5, which provides that "[u]nless sections of this part specifically exclude subrecipients from coverage, the provisions of this part shall be applied to subrecipients performing work under awards if such subrecipients are institutions of higher education, hospitals, commercial organizations and international organizations operating domestically, or other non-profit organizations."

283.    The regulations have the force and effect of federal law, and their provisions are binding on Settlers' as a recipient of those federal grant funds.

284.    Even in the absence of a contractual obligation to hold the federal grant funds in trust, Settlers' was bound by federal law and regulations to act in the role of a trustee of the federal grant funds. It held no beneficial interest in any of the property derived from CDBG and HOME Act grant funds.

285.    Consistent with federal law, the Land Use Restriction Agreement provided in § 4(a) that Settlers' could not "[c]onvey, transfer or encumber the [Washington-Taylor Property] or any part thereof, or permit the conveyance, transfer or encumbrance of the [Washington-Taylor Property] or any part thereof" without "the prior written approval of" the IHDA, "which may be given or withheld [in the IHDA's] sole discretion." *See* **Exhibit 6**.

286.    Although Settlers' did request such approval for a partial mortgage on July 24, 2008, the IHDA did not provide it.

287.    At all times relevant to the allegations set forth herein, KPW, Peterson and The Bank of Commerce knew that Settlers' was unable to encumber the

Washington-Taylor Property with a mortgage in favor of The Bank of Commerce without violating Federal and State regulations governing the use of funds drawn from the HOME Investment Trust Fund United States Treasury account.

288.   At all times relevant to the allegations contained herein, Settlers' did not have the legal power or authority to grant a mortgage on the Washington-Taylor Property because Settlers' held such property in trust for the benefit of HUD and the IHDA. Although Settlers' held legal title to the property, the Washington-Taylor Property was purchased and rehabilitated using funds from the HOME Investment Trust Fund United States Treasury account and so retains characteristics as property held in trust and is subject to all Federal and State regulations that govern the use of such funds.

289.   Additionally, Settlers' board never authorized the Line of Credit Mortgage, nor did Settlers' execute a resolution authorizing the transaction.

290.   KJ did not have the authority to execute the Line of Credit Mortgage because it was an unusual and extraordinary contract that was not within Settlers' ordinary course of business and because it involved the transfer of an interest in substantially all of Settlers' property at the time. It also was unlawful and against public policy.

291.   Under Illinois law, mortgages and agreements that are provided in violation of federal, state and or local law or that are for an illegal purpose are void and unenforceable. No recovery can be had by either party to a contract where the performance would involve the violation of an existing law. The law of Illinois provides a defense to the enforcement of a contract if that contract is illegal either as a matter of Illinois or Federal law.

292.   The Bank of Commerce acted illegally and in violation of federal and state law by taking a mortgage on the Washington-Taylor Property.  Federal and state law prohibited Settlers' from granting a mortgage on the Washington-Taylor Property.

293.   The mortgage on the Washington-Taylor Property is void.

WHEREFORE, Settlers' respectfully requests that this Court enter judgment in its favor and against Defendant that (a) voids the mortgage in favor of Defendant on the Washington-Taylor Property; (b) awards Settlers' its attorneys' fees for bringing this action; and (c) provides such other and further relief as is available under applicable law.

## COUNT 7: CONSTRUCTIVE FRAUD

294.    The Debtor repeats and realleges in this Count of this Complaint all of the other allegations set forth herein, as if fully set forth below, except to the extent such allegations are inconsistent with the allegations in this Count.

295.    This Count is plead in the alternative to any other counts that are inconsistent with the allegations herein.

296.    The transaction by which Settlers' pledged the equity in the Washington-Taylor Property was so one sided and fraudulent as to shock the conscience.  Settlers' did not receive anything of value in exchange for pledging the equity in the Washington-Taylor Property and instead was saddled with substantial debt.

297.    Additionally, The Bank of Commerce owed Settlers' a fiduciary duty that obligated it to not manipulate, trick, or deceive Settlers' into pledging the equity in the Washington-Taylor Property.

298.    The Bank of Commerce breached that duty by tricking Settlers' into pledging the Washington-Taylor Property. The Bank of Commerce orchestrated the forgery of KJ's signature and tricked Settlers' into placing a mortgage on the Washington-Taylor Property and, as a result, Settlers' lost the substantial equity it had in the Washington-Taylor Property and faces financial ruin.

299.    The Bank of Commerce also accepted the benefits of its misconduct. As a result of improperly and illegally capturing the equity in the Washington-Taylor Property, The Bank of Commerce, was able to continue operating longer, avoid being closed by regulators, and obtain additional collateral to secure repayment.

300.    Defendant is the successor to such benefits in that, on information and belief, it paid a fraction of the actual loan amounts to acquire the loans on the Faulkner Properties, the mortgages on the Faulkner Properties and the Line of Credit Mortgage.  On information and belief, Defendant will be made more than whole if it is allowed to retain the Line of Credit Mortgage and the equity in the Washington-Taylor Property.

WHEREFORE,  the Debtor respectfully requests that the Court enters a judgment in its favor and against Defendant that provides, among other things that: (a) Settlers' is entitled to damages, including punitive damages, in an amount to be further determined; (b) for payment of Settlers' attorneys' fees; and (c) for such other and further relief as is just and proper.

## COUNT 8: SETOFF

301.    The Debtor repeats and realleges in this Count of this Complaint all of the other allegations set forth herein, as if fully set forth below, except to the extent such allegations are inconsistent with the allegations in this Count.

302.    This Count is plead in the alternative to any other counts that are inconsistent with the allegations herein.

303.    Under Illinois law, a defendant may set off a debt owed to it by a plaintiff against any amounts the defendant owes to the plaintiff.

304.    To the extent the Court determines that Settlers' owes a debt to Defendant, the amount thereof is subject to setoff against the amount that Defendant owes to Settlers'.

WHEREFORE, Settlers' respectfully requests that to the extent the Court determines that Settlers' owes a debt to Defendant, the amount thereof is subject to setoff against the amount that Defendant owes to Settlers' and provides such other and further relief as is available under applicable law.

## COUNT 9: UNJUST ENRICHMENT

305.    The Debtor repeats and realleges in this Count of this Complaint all of the other allegations set forth herein, as if fully set forth below, except to the extent such allegations are inconsistent with the allegations in this Count.

306.    This Count is plead in the alternative to any other counts that are inconsistent with the allegations herein.

307.    As a result of the wrongful conduct alleged herein, The Bank of Commerce and Defendant as its successor, has been unjustly enriched. Such enrichment occurred through the benefit of having a mortgage on the Washington-Taylor Property. It would be inequitable for Defendant to retain that benefit.

WHEREFORE, Settlers' respectfully requests that the Court enter a judgment in its favor and against Defendant that provides, among other things that: (a) the mortgage on the Washington-Taylor Property is void or that Settlers' is entitled to compensation in the amount of the value of the Washington-Taylor property, (b) for payment of Settlers' attorneys' fees; and (c) for such other and further relief as is just and proper.

## COUNT 10: CONSPIRACY TO DEFRAUD
## AND CIVIL CONSPIRACY INVOLVING KPW AND PETERSON

308.    The Debtor repeats and realleges in this Count of this Complaint all of the other allegations set forth herein, as if fully set forth below, except to the extent such allegations are inconsistent with the allegations in this Count.

309.    This Count is plead in the alternative to any other counts that are inconsistent with the allegations herein.

310.    To state a conspiracy to defraud claim, a plaintiff has to show (a) a conspiracy; (b) an overt act of fraud in furtherance of the conspiracy; and (c) damages to the plaintiff as a result of the fraud.

311.    Civil conspiracy consists of a combination of two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means. It is an intentional tort and requires proof

{00014826}                                    64

that a defendant knowingly and voluntarily participated in a common scheme to commit an unlawful act or a lawful act in an unlawful manner.

312.    The Bank of Commerce, Peterson and KPW each agreed knowingly and actively to participate in a conspiracy or combination to cause Settlers' to pledge the equity in the Washington-Taylor Property. The conspiracies and combinations were designed and tailored to use fraud, trickery and other deceit to encumber the Washington-Taylor Property with a mortgage in favor of The Bank of Commerce.

313.    The conspiracies and combinations involved overt acts of fraud in furtherance thereof.

314.    The conspiracies and combinations also involve the accomplishment of an unlawful purpose in that they were designed to cause Settlers' to pledge the equity in the Washington-Taylor Property, which is was holding in trust for the benefit of HUD and IHDA, and which violation federal and state law.

315.    Settlers' was damaged as a result of the fraud.

WHEREFORE, the Debtor respectfully requests that the Court enter a judgment in its favor and against Defendant that provides, among other things that: (a) Settlers' is entitled to damages, including punitive damages, in an amount to be further determined; (b) for payment of Settlers' attorneys' fees; and (c) for such other and further relief as is just and proper.

## COUNT 11: TORTIOUS INTERFERENCE WITH CONTRACT

316.    The Debtor repeats and realleges in this Count of this Complaint all of the other allegations set forth herein, as if fully set forth below, except to the extent such allegations are inconsistent with the allegations in this Count.

317.    This Count is plead in the alternative to any other counts that are inconsistent with the allegations herein.

318.    At all times relevant to the allegations herein, Settlers' had valid leases with the tenants in the Washington-Taylor Property and the tenants in the Faulkner Properties. Pursuant to the terms of those leases, the tenants were

granted the right to occupy an apartment and in exchange for that right, the tenants were obligated to pay rent to Settlers'.

319.    Defendant knew that Settlers' had leases with the tenants in the properties. Its knowledge of this is evident from the letter that it sent to building tenants directing them to pay rent to Defendant.

320.    Defendant intentionally and maliciously induced the tenants to breach their leases with Settlers' by directing the tenants in writing that they should not pay rent to Settlers' but instead should pay rent directly to Defendant.

321.    Defendant's conduct caused the tenants to withhold payment of rent to Settlers' either because the tenants were confused about whether they should pay the rent to Settlers' or Defendant, or because they paid rent directly to Defendant instead of Settlers'.

322.    Settlers' was damaged by Defendant's interference with the leases between Settlers' and tenants. Such damages consist of the failure to receive the rent to which Settlers' was entitled under the lease agreements.

WHEREFORE, Settlers' respectfully request that the Court enter judgment in its favor and (a) disallowing Defendant's Proof of Claim, and (b) providing such other and further relief as is available to Settlers' on account of the allegations set forth in this Count of the Complaint.

## COUNT 12: BREACH OF FIDUCIARY DUTY
## ARISING FROM FRAUD IN EXECUTION

323.    The Debtor repeats and realleges in this Count of this Complaint all of the other allegations set forth herein, as if fully set forth below, except to the extent such allegations are inconsistent with the allegations in this Count.

324.    This Count is plead in the alternative to any other counts that are inconsistent with the allegations herein.

325.    Settlers' placed special trust and confidence in The Bank of Commerce, including its Officers and Directors and its agent, Joe, which resulted in The Bank of Commerce having superior influence and control over Settlers'.

{00014826}                                    66

326.    The special trust and confidence that Settlers' had in The Bank of Commerce and the Defendant's awareness and acceptance of that special trust and confidence resulted from, among other things, the facts set forth in Count I and the additional fact that Settlers' lacked sophistication with respect to acquiring commercial properties because the properties it acquired in the past related to HUD or similar projects

327.    The Bank of Commerce also accepted the trust and confidence that Settlers' reposed in The Bank of Commerce by using the trust and confidence to take advantage of Settlers'.  The Bank of Commerce specifically targeted Settlers' to acquire the Faulkner Properties because The Bank of Commerce knew that Settlers' trusted The Bank of Commerce and would enter into the transaction based upon The Bank of Commerce's recommendations and other statements.  The Bank of Commerce also controlled the process involving the acquisition of the Faulkner Properties and the assumption of the Faulkner Loans, and assured Settlers' that the transactions were in its best interests.

328.    The Bank of Commerce breached the fiduciary duties owed to Settlers' by, among other things, using trickery and deceit to cause Settlers' to sign documents that pledged the Washington-Taylor Property to secure the amounts due in connection with the Faulkner Properties.

329.    The breaches of the fiduciary duties owed to Settlers' damaged Settlers'. Among other things, but for the trickery related to the Washington-Taylor Property, Settlers' would still have the Washington-Taylor Property and potentially would have avoided the foreclosure process entirely by agreeing to deed the Faulkner Properties to the Bank, instead of defending itself in the foreclosure process.  In December of January of 2011, before the Bank filed suit to foreclose the mortgages it obtained, including the mortgage it obtained illegally, Settlers' offered to deed the Faulkner Properties to the Bank in satisfaction of all obligations related thereto, but the Bank declined this offer, presumably because it also wanted to sell the Washington-Taylor Property.

330.    Settlers' also was damaged by the Bank of Commerce's breach of the fiduciary duty owed to Settlers' because, on information and belief, the Bank of Commerce would not have agreed to the sale of the Faulkner Properties to Settlers' absent the trickery related to the Washington-Taylor Property and thus Settlers' would not have been in its current financial predicament.

331.    Settlers' also has been damaged by having a mortgage placed on the Washington-Taylor Property, having been saddled with properties that it cannot afford, having a receiver placed in possession of certain of its properties, and having had to spend considerable amounts to deal with the adverse consequences directly and proximately related to the acquisition of the Faulkner Properties, including the filing of this bankruptcy case.

WHEREFORE, the Debtor respectfully requests that the Court enter a judgment in its favor and against Defendant that provides, among other things that: (a) Settlers' is entitled to damages, including punitive damages, in an amount to be further determined; (b) for payment of Settlers' attorneys' fees; and (c) for such other and further relief as is just and proper.

## COUNT 13: CONVERSION AND ACCOUNTING

332.    The Debtor repeats and realleges in this Count of this Complaint all of the other allegations set forth herein, as if fully set forth below, except to the extent such allegations are inconsistent with the allegations in this Count.

333.    This Count is plead in the alternative to any other counts that are inconsistent with the allegations herein.

334.    On January 27, 2012, Defendant's agent sent a notice to the tenants of properties owned by Settlers' that directed the tenants to start paying rent directly to Defendant. A copy of the subject letter is appended hereto as **Exhibit 9**.

335.    Under Illinois law, the party in possession of real property is entitled to collect the rents for such property. This is true even if the rents have been pledged to a lender.

336.   At the time Defendant directed the tenants in Settlers' buildings to pay rent to Defendant, Settlers' was still in possession of the buildings and Settlers' thus had the sole and exclusive right to collect such rents.  Defendant thus had no right to direct tenants to pay rent directly to it and had no ownership interest in the rents.  Such rents belonged to Settlers'.

337.   As a result of Defendant's actions, on information and belief, certain tenants started to pay rent directly to Defendant.  Certain tenants also failed to pay any rent to Settlers' out of fear that they would have to pay rent twice if they paid rent to Settlers.'

338.   In correspondence transmitted on or about January 30, 2012 (**Exhibit 10)**, Settlers' requested that Defendant return at least $16,000 of the rents that had been taken from Settlers' so that Settlers' could pay necessary expenses, but Defendant refused to do so. The request to return at least $16,000 constitutes a demand for the return of part of the rents.

339.   Settlers' believes that further demands for the return of rents would have been futile because The Bank of Commerce incorrectly believed that it had the right to collect the rents prior to the appointment of a receiver and it would not have honored such demands.

340.   Further demands also would have been futile and counterproductive because Settlers' was trying to achieve a consensual workout and believed that threatening the Bank would hamper a consensual resolution.

341.   Defendant should be ordered to account for any rents that it received from tenants of Settlers' properties.

342.   By diverting rental payments from Settlers', Defendant improperly exercised dominion and control over Settlers' property and converted such property.

WHEREFORE, Settlers' respectfully requests that this Court (a) enter judgment in its favor and against Defendant in an amount to be determined at trial (b) award Settlers' punitive damages; (c) direct Defendant to account for all rents that it received from tenants of the buildings; and (d) provide such other and

further relief as is available to Settlers' on account of the allegations set forth in this Count of the Complaint.

## COUNT 14: CLAIM IS INFLATED WITH IMPROPER AMOUNTS

343.    The Debtor repeats and realleges in this Count of this Complaint all of the other allegations set forth herein, as if fully set forth below, except to the extent such allegations are inconsistent with the allegations in this Count.

344.    This Count is plead in the alternative to any other counts that are inconsistent with the allegations herein.

345.    Defendant has inflated its claim with unreasonable receiver fees.

346.    Defendant's Amended Proof of Claim, *i.e.*, Claim 12-3, filed on January 31, 2014, states that the amount of Defendant's claim as of the date the case was filed was $4,921,425.97.

347.    The case was filed on July 12, 2013.

348.    The property that Defendant alleges secures its claim is worth less than the total amount of its claim and therefore Schaumburg is not entitled to include post-petition interest in its claim.

349.    The receiver's professional fees for purportedly managing the properties at issue in the Foreclosure Proceedings are in excess of $220,000 as of the last set of receiver's reports.

350.    This amount does not include maintenances fees in maintaining the properties or attorney's fees in prosecuting the Foreclosure Proceedings.

351.    Depending on the receiver report examined, the cost of preparing the receiver's reports themselves is between 25% and 40% of the total professional fees charged.  Professional fees charged in connection with the filing of each receiver's reports include items such as "Draft notice of presentment for Receiver's Report … [.5 hours]," "Draft the order approving the Receiver's … Report … [.5 hours]," and "Draft the notice of mailing for Receiver's … Report … [.5 hours]."  These line items appear not on one receiver's report, but in one form or another across the reports filed in most if not all of the nine (9) Foreclosure Proceedings.

352.    There have also been six (6) to seven (7) receiver's reports filed in each of the nine (9) Foreclosure Proceedings.

353.    The receiver reports have been scheduled for presentment on the same days, notice is given to the same people, and the orders are forms with blanks to insert the differences.  Thus, the receiver has essentially charged 1.5 hours in each Foreclosure Proceeding, six to seven times, to prepare the same documents, which are all form documents to begin with.  This adds up to more than 81 hours, *i.e.*, over two (2) weeks of billable time, to draft the certificate of service, notice of presentment and proposed order for each report.

354.    This shows a clear pattern of unreasonable fees and the request for reimbursement of such claimed services must be questioned.

WHEREFORE, Settlers' respectfully request that the Court enter judgment in its favor and (a) disallowing Defendant's Proof of Claim to the extent such claim is for unreasonable receiver fees and other improper amounts, and (b) providing such other and further relief as is available to Settlers' on account of the allegations set forth in this Count of the Complaint.

[Signatures on Next Page]

Respectfully Submitted,

SETTLERS' HOUSING SERVICE, INC., AN
ILLINOIS NON-PROFIT, debtor and debtor
in possession


By:  /s/ William J. Factor
        One of Its Attorneys


William J. Factor (6205675)
Sara E. Lorber (6229740)
David P. Holtkamp (6298815)
**THE LAW OFFICE OF**
    **WILLIAM J. FACTOR, LTD.**
105 W. Madison St., Suite 1500
Chicago, IL 60602
Tel:   (847) 239-7248
Fax:  (847) 574-8233
Email:     wfactor@wfactorlaw.com
           slorber@wfactorlaw.com
           dholtkamp@wfactorlaw.com