United States Bankruptcy Court
Northern District of Illinois
Eastern Division

| | |
|---|---|
| In re:<br><br>Settlers' Housing Service, Inc.,<br><br>Debtor. | Bankruptcy No. 13-28022<br><br>Chapter 11 |
| Settlers' Housing Service, Inc.,<br><br>Plaintiff<br><br>v.<br><br>Schaumburg Bank & Trust Company, N.A.,<br><br>Defendant. | Adversary No. 13-1328 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This adversary proceeding, related to a voluntary Chapter 11 bankruptcy case, is before the court for decision after trial. The debtor in the bankruptcy case, Settlers' Housing Service, Inc. ("Settlers'" or the "Debtor"), is an Illinois nonprofit corporation organized and operated to fulfill the housing needs of recently arrived legal immigrants. After incurring large amounts of debt to acquire properties in August of 2008, the properties failed to generate enough revenue to pay the loans and Settlers' failed to pay the debt. In the meantime, the original bank lender failed and the Federal Deposit Insurance Corporation ("FDIC"), as receiver for the defunct lender, transferred its interests in Settlers' loans to Schaumburg Bank and Trust, N.A. ("Schaumburg Bank" or the "Bank"). When Schaumburg Bank sued Settlers' to foreclose on properties then asserted to be collateral for the loans, Settlers' responded by filing the bankruptcy case and this proceeding, which contests the right to foreclose and the claim filed in bankruptcy by the Bank.

The adversary proceeding was brought on behalf of the Chapter 11 estate. The

complaint alleges that one of the mortgages on property claimed as collateral for all loans was obtained by the Bank's predecessor through fraud, without Settlers' actual knowledge or authorization. Among other things, the complaint seeks determination that the mortgage on the Washington-Taylor Property (as defined in the Findings of Fact below) is void and unenforceable against Settlers' and its estate for fraud in the execution or other illegality. Equitable subordination of the Bank's claim and other relief is also sought.

Trial was held over the course of twelve afternoons. At the conclusion of trial, all parties having rested, the court directed the parties to submit written proposed findings of fact and conclusions of law in lieu of final oral argument. This was done, and the resulting argument has been reviewed. Findings of Fact and Conclusions of Law will now be made and entered below. It is held therein that Settlers' met its burden of proof in disputing the validity and enforceability of a mortgage claimed by the Bank on the Washington-Taylor Property, and Settlers' objection to the Bank's claim will be sustained in that respect. Other factual allegations in the complaint were also established, but Settlers' is not entitled to all the relief sought. Judgment will be separately entered in favor of Settlers' as to some, but not all counts tried. An order and judgment disallowing part of the Bank's claim, in part, and protecting the Washington-Taylor Property from foreclosure will be entered.

## CONCLUSIONS OF LAW AS TO JURISDICTION

Under 28 U.S.C. § 1334, federal district courts have original and exclusive jurisdiction of all cases under the Bankruptcy Code (title 11, U.S.C.), and original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11. The district courts may refer these cases and proceedings to the bankruptcy judges for their districts pursuant to 28 U.S.C. § 157(a), and the

District Court for the Northern District of Illinois has made such reference through Internal Operating Procedure 15(a).

After a case is referred to a bankruptcy judge, 28 U.S.C. § 157(b)(1) authorizes the judge to issue final judgments in "core proceedings" arising under the Bankruptcy Code, or arising in a bankruptcy case, and § 157(b)(2) gives several examples of core proceedings. However, unless the parties consent, related proceedings may only be treated by a bankruptcy judge through the issuance of proposed findings of fact and conclusions of law pursuant to 28 U.S.C. § 157(c)(1), with judgment entered by the district court after *de novo* review. *Exec. Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2173–74 (2014).

This adversary proceeding deals with the objection of Settlers' estate to the claim filed by Schaumburg Bank in the bankruptcy case, as well as a request to equitably subordinate the Bank's claim and other affirmative relief. By prior Opinion, it was held that despite certain protections given to banks taking from the FDIC as receiver, subject matter jurisdiction lies here to consider defenses to the validity and enforceability of the Bank's claim, equitable subordination, and counterclaims relating to some asserted actions or omissions by Schaumburg Bank. *See Settlers' Hous. Serv., Inc. v. Schaumburg Bank & Trust Co., N.A. (In re Settlers' Hous. Serv., Inc.)*, 540 B.R. 624, 634–35 and 636–37 (Bankr. N.D. Ill. 2015). The Bank's motion to dismiss the Third Amended Complaint for lack of subject matter jurisdiction was therefore denied with respect to Counts 1, 3, 6, 8, 9 and 11. *Id.* at 637. The reasoning and ruling in that Opinion, as well as two prior Opinions on motions to dismiss filed by the Bank in this adversary case, *see* 520 B.R. 253 (Bankr. N.D. Ill. 2014); 514 B.R. 258 (Bankr. N.D. Ill. 2014), are incorporated into the Conclusions of Law by this reference.

3

## Counts 3, 6, 9: Objections to Claim Relating to Fraud in the Execution

Schaumburg Bank still maintains that subject matter jurisdiction is lacking as to Counts 1 (Equitable Subordination), 3 (Fraudulent Misrepresentation related to Fraud in the Execution), 6 (Fraud, Illegality and Unenforceability of the Washington-Taylor Mortgage), 8 (Setoff) and 9 (Unjust Enrichment related to Fraud in the Execution) because those claims relate to purported acts or omissions of its predecessor in interest prior to appointment of the FDIC as receiver. (*See* Def.'s Proposed Findings of Fact and Conclusions of Law, Dkt. No. 327 ["*Def.'s FFCL*"], at 2.)

With respect to Counts 3 (Fraudulent Misrepresentation related to Fraud in the Execution), 6 (Fraud, Illegality and Unenforceability of Washington-Taylor Mortgage) and 9 (Unjust Enrichment related to retention of Washington-Taylor Mortgage), it was earlier held that available relief is "limited to that which is needed to dispute the validity of Schaumburg Bank's claim against the estate or otherwise disallow the bank's claim." *Settlers'*, 540 B.R. at 637. Defendant maintains that consideration of defensive theories identified in these counts is barred by the FDIC administrative exhaustion requirement, *see* 12 U.S.C. § 1821(d)(13)(D). The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101–73, 103 Stat. 183, limits judicial review of claims against the FDIC and its successors. The statutory provision limiting court jurisdiction to review those claims provides as follows:

> Except as otherwise provided in this subsection, no court shall have jurisdiction over—
> (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or
> (ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

12 U.S.C. § 1821(d)(13)(D). *See also Settlers'*, 540 B.R. at 630–31.

The Bank cites *Farnik v. F.D.I.C.*, 707 F.3d 717 (7th Cir. 2013), which held that claims brought against the successor bank that related to pre-FDIC receivership acts of the predecessor bank were subject to FIRREA's administrative claims process exhaustion requirement, *see id.* at 722–23 (citing 12 U.S.C. § 1821(d)(13)(D)(ii)); *See also Settlers'*, 540 B.R. at 631–32. However, for reasons discussed in the prior Opinion, defenses to enforcement of rights raised after a FDIC receivership are not subject to FIRREA's administrative exhaustion requirement. *Settlers'*, 540 B.R. at 633–34; *see also Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. City Sav. F.S.B.*, 28 F.3d 376, 393 (3d Cir. 1994); *Am First Fed., Inc. v. Lake Forest Park, Inc.*, 198 F.3d 1259, 1264 (11th Cir. 1999). Nothing in *Farnik* compels a different result.

In *Farnik*, the plaintiffs had instituted a class action suit alleging that the predecessor bank had breached loan agreements and violated various state laws regulating interest rates. Such claims were asserted before the FDIC stepped in as receiver, and the plaintiffs later substituted the successor bank as defendant. The complaint there set forth claims "for violations of the Illinois Interest Act, 815 ILCS 205/1 et seq., and the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1 et seq., as well as for contract reformation and fraud." *Farnik*, 707 F.3d at 720. The *Farnik* opinion held that such claims were subject to FIRREA's administrative exhaustion requirement, *id.* at 722–23, a requirement that was not met.

In contrast, consideration of Counts 3, 6, and 9 in this case is limited to defensive theories challenging the validity and enforceability of the Bank's claim in the bankruptcy case. *See* reasoning at *Settlers'*, 540 B.R. at 635 (holding that while requests for damages are jurisdictionally barred, defensive theories challenging the enforceability of the Bank's claim are not barred). Those counts seek a holding that the mortgage on the Washington-Taylor Property is void for fraud in the execution or other theories and is therefore unenforceable against Settlers' and the estate.

5

Unlike the claims at issue in *Farnik*, unenforceability based on fraud and other
grounds pleaded here are affirmative defenses, *see* Fed. R. Civ. P. 8(c) (made applicable
by Fed. R. Bankr. P. 7008), generally interposed by way of defense to a suit to enforce a
contract rather than an independent right to relief. *See Cohen v. Orthalliance New Image,
Inc.*, 252 F. Supp. 2d 761, 766 (N.D. Ind. 2003) (collecting cases); *Cf. Cox v. Zale Delaware,
Inc.*, 239 F.3d 910, 914 (7th Cir. 2001) ("A statute regulating purely private rights that
makes a contract void makes the contract rescindable by a party to it, especially when
the other party to the contract is trying to enforce it, so that the contract's illegality is
interposed by way of defense, rather than as the basis for an independent suit" (citation
omitted)).

In fact, absent actual or imminent breach of contractual obligations,
unenforceability is a hypothetical defense to a potential claim, the type of hypothetical
question that courts will not generally consider. *See Textron Lycoming Eng. Div. v. United
Auto., Aerospace, Agric. Implement Workers of Am., Int'l Union*, 523 U.S. 653, 660–61 (1998)
(declaratory relief is unavailable until an "actual controversy" is shown); *Hyatt Int'l
Corp. v. Coco*, 302 F.3d 707, 711–12 (7th Cir. 2002) (same). While the right to relief
claimed by the plaintiffs in *Farnik* arose before the FDIC took over as receiver, Settlers'
was not entitled to challenge enforcement of the rights claimed by Schaumburg Bank
until default was declared by the Bank years after the FDIC receivership. Such rights
could not be disputed by it prior to or at the time the FDIC took over as receiver. *Farnik*
did not deal with a party's ability to challenge the validity and enforceability of
contractual rights asserted by the successor in interest of a failed bank. Schaumburg
Bank's reliance on *Farnik* in this case is therefore misplaced.

Accordingly, for reasons discussed at length in the prior Opinion, jurisdiction
lies here to consider and adjudicate defenses to the Bank's claim contained in Counts 3,
6 and 9. Schaumburg Bank does not dispute this court's statutory and constitutional

6

authority to determine the validity and extent of its claim, *see* 28 U.S.C. § 157(b)(2)(B);

*Peterson v. Somers Dublin Ltd.*, 729 F.3d 741, 747 (7th Cir. 2013), and final judgment may

therefore be entered to adjudicate defenses to that claim to determine the validity and

extent of the claim filed by Schaumburg Bank in the bankruptcy case.

## Count 1: Equitable Subordination

With respect to Count 1 (Equitable Subordination), subject matter jurisdiction is

held to exist, notwithstanding FIRREA, because the right to relief asserted thereunder

did not exist before Settlers' bankruptcy case was filed.  Equitable subordination

proceedings arise under the Bankruptcy Code, *see* 11 U.S.C. § 510(c), and concern the

priority of distribution scheme set forth thereunder, *see, e.g.*, 11 U.S.C. §§ 507, 1123, 1129.

Like defensive theories earlier discussed, the right to relief asserted in Count 1 did not

arise until the bankruptcy case was filed.  Therefore, it is not the type of claim that

would have been brought before the FDIC as part of its administrative claims process.

*See* reasoning in *Settlers'*, 540 B.R. at 636.

Schaumburg Bank contends that equitable subordination claims cannot proceed

against the FDIC or its successor when such claims are based on alleged wrongful

conduct of a failed, predecessor bank. (*See* Def.'s FFCL, at 43.)  In support, the Bank cites

*Holt v. FDIC (In re CTS Truss, Inc.)*, 868 F.2d 146 (5th Cir. 1989), which held that the

equitable subordination based on claims or defenses of a debtor that are barred by the

FDIC's federal statutory and common law protections, *see* 12 U.S.C. § 1823(e) (codifying

doctrine in *D'Oench, Duhme & Co. v. Fed. Deposit Ins. Corp.*, 315 U.S. 447 (1942)), could

not be established. *See CTS Truss*, 868 F.2d at 150.  However, *CTS Truss* relied on

§ 1823(e) and the *D'Oench* doctrine; it did not hold that equitable subordination claims

in bankruptcy were jurisdictionally barred.

So long as claims or defenses on which the claim for equitable subordination is

based are not barred by the FDIC's recognized federal defenses, *see* 12 U.S.C. § 1823(e),

and provided the misconduct shown would warrant equitable subordination under bankruptcy law, no basis for exempting the FDIC from the remedy of equitable subordination permitted under the Bankruptcy Code has been recognized by other courts facing this issue. *See In re 604 Columbus Ave. Realty Trust*, 968 F.2d 1332, 1354–57 (1st Cir. 1992) (discussing *CTS Truss*) (holding that the FDIC in its receivership capacity was not exempted from the remedy of equitable subordination in bankruptcy where the underlying claims were not barred by § 1823(e) and *D'Oench*). Schaumburg Bank points to no relevant case supporting a different conclusion.

In this case, claims predicated on an alleged fiduciary relationship or sounding in fraud in the inducement have already been dismissed as barred by *D'Oench* and § 1823(e). *See Settlers'*, 514 B.R. at 277–78 (holding that "Counts 1 and 4–9 of the Complaint cannot be pursued except to the extent the facts pleaded therein could be relevant to an assertion of fraud in the execution or illegality"); *Settlers'*, 520 B.R. at 261 (dismissing Counts 4 and 7 alleging fraudulent concealment and constructive fraud because *D'Oench* and § 1823(e) precluded Settlers' from relying on an alleged fiduciary relationship with the predecessor bank) and 266 (dismissing Count 12 claiming breach of fiduciary duty arising from fraud in the execution because Settlers' could not plead breach of fiduciary duty). Claims based on an asserted fiduciary duty or fraud in the inducement cannot be pursued because *D'Oench* and § 1823(e) preclude Settlers' from relying on unwritten agreements or obligations tied to the assets transferred to Schaumburg Bank by the FDIC. *See D'Oench*, 315 U.S. 447 and its progeny, as discussed in the prior opinions, *Settlers'* 514 B.R. at 270 and 277–78; *Settlers'*, 520 B.R. at 161 and 266.

However, claims and defenses that are not barred against the FDIC and its successors—including fraud in the execution and illegality—could amount to misconduct sufficient to warrant equitable subordination under bankruptcy law. *See 604*

8

*Columbus Ave. Realty Trust*, 968 F.2d at 1359–63; *Settlers'*, 514 B.R. at 277.  Accordingly, this court has jurisdiction to consider and determine Settlers' equitable subordination claim (Count 1), notwithstanding the jurisdictional bar under FIRREA, *see* 12 U.S.C. § 1821(d)(13)(D).

Schaumburg Bank does not dispute this court's statutory and constitutional authority to hear and determine equitable subordination claims against creditors who have filed claims against the estate. *See* 28 U.S.C. § 157(b)(C).  A proceeding to equitably subordinate a creditor's claim is a core proceeding that arises under the Bankruptcy Code and does not determine creditor rights outside of bankruptcy; it affects only the creditor's entitlement to distributions under the Bankruptcy Code on account of an otherwise valid and enforceable claim.  As such, it "stems from the bankruptcy itself" and may constitutionally be decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).  Therefore, final judgment may be entered by this court on Count 1.

### Counts 8 and 11: Post-Receivership Claims

Subject matter jurisdiction over remaining Counts 8 and 11, as they have been allowed in this case, is not disputed by the Bank. *See Def.'s FFCL*, at 2.  Count 11 alleges intentional interference with contract based on post-receivership conduct by the Bank, and Count 8 seeks setoff of any damages awarded to Settlers' against the Bank's claim in the bankruptcy case.  Because damages have been limited to claims arising from post-receivership conduct by the Bank, setoff under Count 8 is only available to the extent damages are awarded to Settlers' under Count 11. *See Settlers'*, 540 B.R. at 636–37.

Although claims for damages based on post-receivership conduct originate from non-bankruptcy law, "related-to" jurisdiction exists for the primary purpose of determining all claims for and against the Debtor in the same forum, and because these actions may benefit the estate. *See Zerand–Bernal Group, Inc. v. Cox*, 23 F.3d 159, 161–162 (7th Cir. 1994).

Pursuant to 28 U.S.C. § 157(c)(2), parties may consent to adjudication of related, non-core matters in the bankruptcy court. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 1939 (2015) ("Article III is not violated when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge").  In this case, both parties have sought entry of final judgment in their favor, and have thereby implicitly consented to adjudication by this court, or at least forfeited any objection to adjudication of Settlers' tortious interference claim by this court. *See Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) (citing *Wellness*).

Accordingly, final judgment may be entered by this court on Counts 8 and 11.

## FINDINGS OF FACT

On February 13, 1992, Settlers' incorporated in Illinois as a non-profit corporation and § 501(c)(3) charitable organization. (*See* Stipulated Facts, Dkt. No. 249 at 5–11, ["Stip."] ¶ 2; Joint Trial Ex. ["JX"] 1.)  Its primary mission is to provide adequate, affordable housing to foreign refugees with United States resident alien status who are seeking homes in the Chicago metropolitan area. (Trial Tr., vol. IV, 6:5–10 (Keo-Jye Lodico ["KJ"] test.); *see also* JX 1, at 4 and 9 of 9; JX 2, at 4 of 22.)

Joseph Lodico ("**Joe Lodico**" or "**Joe**") started Settlers'. At the time, Joe was married to Keo-Jye Lodico ("**KJ**"), who initially worked for Settlers' as Director of Program Development and Rehabilitation from 1992 to 2000.  In that capacity, KJ administered Settlers' programs, work which included writing grants, collecting rents, paying bills, and working with the families by helping them take English classes, enroll their children into school, obtain public aid, and serving as interpreter.  Joe Lodico originally served as director and officer of Settlers', and was in charge of repairing and rehabilitating properties managed or owned by Settlers'. (*See* Stip. ¶¶ 1, 4, 5; Trial Tr., vol. I, 83:8–84:9 (Joe Lodico ["J.L."] test.), vol. IV, 10:3–17, 17:24–18:12 (KJ test.).)

Between 1992 and 1993, Settlers' focused on rehabilitating properties owned by the U.S. Department of Housing and Urban Development ("**HUD**") and then arranging for sale of those properties to low income families. Settlers' participated in the rehabilitation of and placement of families in as many as forty HUD properties that were in foreclosure. (Trial Tr., vol. IV, 10:21–11:12 (KJ test.).)

In 1993 and 1994, Settlers' participated in community development block grant programs administered by state and local agencies providing funds to rehabilitate properties in foreclosure to Section 8 housing standards for housing low-income families. (Trial Tr., vol. IV, 11:10–25 (KJ test.).)

### The Washington-Taylor Property

On March 31, 1994, Settlers' obtained legal title to properties commonly known as 101-103 W. Washington Blvd. and 409-411 S. Taylor Ave., Oak Park, Illinois, a 13-unit structure comprised of two buildings side by side (the "**Washington-Taylor Property**"). The purchase price for the Washington-Taylor Property was $635,000, which was funded through a $231,310 forgivable loan and a $500,000 conditional grant from the Illinois Housing Development Authority ("**IHDA**") under the HOME Investment Partnership Program (the "**HOME Program**"), a federal block grant program administered by IHDA. (*See* Stip. ¶¶ 6–8; JX 10–12; Trial Tr., vol. IV, 11:18–12:21 (KJ test.).)

Also on March 31, 1994, Settlers' executed a number of documents in favor of IHDA including a Regulatory and Land Use Restriction Agreement (the "**IHDA Use Agreement**") and a Mortgage, Security Agreement and Collateral Assignment of Rents and Leases (the "**IHDA Mortgage**"). (Stip. ¶ 9; JX 11, 12.) Pursuant to these documents, IHDA provided Settlers' with the $500,000 grant and the $231,310 loan, which was structured as a 15-year forgivable loan. Under the loan, if Settlers' maintained the Washington-Taylor Property in accordance with rules and regulations described in the

11

IHDA Use Agreement for 15 years, the entire loan would be forgiven and the IHDA
Mortgage would be released. (Trial Tr., vol. IV, 12:1–21 (KJ test.).)

The IHDA Use Agreement described all management, rent limitations and
reporting requirements imposed by IHDA's regulatory authority. Compliance with the
regulations and requirements set forth in the IHDA Use Agreement, and the loan and
grant documents referenced and incorporated therein, was required by IHDA during
the period until the loan was forgiven. (*See* JX12; Trial Tr., vol. XI, 35:4–9, 40:10–23
(Williams test.).)

As relevant here, Section 4 of the IHDA Use Agreement prohibited Settlers' from,
among other things, conveying, transferring or encumbering any part of the
Washington-Taylor Property without prior IHDA approval. (*See* JX 12, at 5 of 23.) The
IHDA Mortgage further provided that "Mortgagor shall not, without the prior written
consent of Mortgagee, creates, effect, consent to, suffer or permit any 'Prohibited
Transfer,'" defined therein as including "any sale or other conveyance, transfer, lease or
sublease, mortgage, refinancing, assignment, pledge, grant of a security interest, grant
of any easement, license or right of way affecting the Project, hypothecation or other
encumbrance of the Project . . . ." (JX 11, at 7 of 22.)

Under the IHDA Use Agreement, Settlers' was also required to rent at least four
of the thirteen units to "Very Low-Income Families," and the remainder to "Low
Income Families," both defined in accordance with IHDA regulations. (*See* JX12, sec.
3(a), at 3 of 23.) Settlers' was also required to comply with rent limitations specified in
the IHDA Use Agreement, and to manage the Washington-Taylor Project in accordance
with IHDA rules and regulations. (*See* JX12, sec. 3(b)–(n), at 3–5 of 23.) These and other
conditions and limitations were listed in the IHDA Use Agreement and incorporated by
reference into the IHDA Mortgage.

12

In 1994, Settlers' also owned five single-family townhouses in DuPage County, Illinois. One of the townhouses was acquired through the HOME Program and the other four from community development block grants administered by the DuPage County Community Development. (Trial Tr., vol. IV, 17:4–23 (KJ test.).)

After purchase of the Washington-Taylor Property in 1994, Settlers' did not undertake any further projects with HUD. (Trial Tr., vol. IV, 13:1–12 (KJ test.).)

**Joe Lodico Joins the BOC Board of Directors**

In 1997, The Bank of Commerce (the "**BOC**") was founded as a privately owned commercial bank with its principal place of business in Wood Dale, Illinois. (*See* Stip. ¶¶ 16, 17.) Joe Lodico first learned about the BOC through his accountant, Ken Peterson ("**Peterson**"), who was a member of the BOC Board of Directors. Peterson had prepared Joe and KJ's tax returns since the early 90s, and became the auditor for Settlers' from the beginning. (*See* Trial Tr., vol. I, 91:10–93:5 (J.L. test.), vol. IV, 24:22–25:15 (KJ test.), vol. X, 9:25–10:5 (Markay test.).)

In or about 1997, Joe Lodico invested approximately $1,000,000 of his funds in the BOC and joined the BOC Board of Directors as a member. (Trial Tr., vol. I, 93:9–15 (J.L. test.), vol. IV, 24:11–21 (KJ test.).) As a result of his board membership with the BOC, Joe Lodico developed a friendship with Robert Markay ("**Markay**"), another BOC board member and a licensed realtor. Markay was a director of the BOC from its inception until it was closed in 2011. (*See* Trial Tr., vol. X, 5:23–6:5, 7:23–9:24 (Markay test.).)

**Joe Lodico Resigns as Executive Director of Settlers'**

Joe Lodico resigned as Executive Director of Settlers' in 1998 or 1999. He had been spending a lot of time in California after his parents fell ill, and he would eventually relocate to California. (*See* Trial Tr., vol. I, 95:3–96:7 (J.L. test.).)

In December 1999, KJ moved her residence to California. (Stip. ¶ 12.) She

remained involved with Settlers' but primarily focused on the accounting side of Settlers' operations, including entering rents, making deposits, paying bills. Day-to-day administrative tasks like collecting rents and paying bills were handed over to another individual hired by Settlers'. (Trial Tr., vol. IV, 19:13–20 (KJ test.).)

From 2000 to 2006, KJ was awarded compensation of around $40,000 to $60,000 per year from Settlers' but she deferred that compensation and collected no salary for those years. (Trial Tr., vol. IV, 20:18–25 (KJ test.).)

### Joe Resigns from Settlers' Board and the BOC Board, and KJ Becomes Settlers' Executive Director

In 2005, Joe Lodico resigned from Settlers' Board of Directors and from the Board of Directors of the BOC. (Stip. ¶ 13.) But later from time to time he performed various services for the BOC regarding properties securing loans extended by the bank.

Joe Lodico and KJ's marriage deteriorated and they separated in 2005. According to KJ, their separation was prompted by Joe's heavy drinking and infidelity. Joe's resignation from Settlers' the BOC's Boards of Directors was also precipitated by his heavy drinking and unreliability. (Trial Tr., vol. IV, 21:10–22 (KJ test.).) He was asked to resign from the BOC's Board of Directors because he was disruptive, unreliable and drinking too much. (Trial Tr., vol. I, 93:22–94:20 (J.L. test.).)

In 2006, KJ became the Interim Executive Director of Settlers', and subsequently became the Executive Director of Settlers'. (Stip. ¶ 14.) In that role, KJ continued to prepare and maintain Settlers' financial statements for Peterson, who prepared Settlers' audits; she also coordinated all communications with government agencies and administered Settlers' programs, worked with the families on any lease issues, except as to needed repairs or similar day-to-day issues which she could not attend to in California. (Trial Tr., vol. IV, 22:1–24 (KJ test.).)

KJ and Joe Lodico received a decree of divorce in 2007. (Stip. ¶ 15.)

**The Faulkner Properties**

In July, 2008, Settlers' owned the five single family townhouses in DuPage County and the thirteen unit buildings known as the Washington-Taylor Property. In July, 2008, Setters' acquired additional properties (the "**Faulkner Properties**") through the BOC in exchange for assuming $3.4 million in loans. The loans had been made to another customer of the BOC by the name of Jan Faulkner ("**Faulkner**"). Faulkner was a real estate developer who had several loans with BOC, secured by properties which he held in trust. Faulkner's loans fell into default due to his inability to make the loan payments. Before foreclosing on the properties, the officers and directors of the BOC began looking for buyers to acquire the properties and assume the debt owed by Faulkner in order to minimize loss to the BOC. (*See* Trial Tr., vol. X, 17–18, 20–21 (Markay test.), vol. VIII, 9:14-16, 13:5-8 (Gahan test.).)

On or about July 17, 2008, Joe Lodico was approached by Markay—a director and Chairman of the Board of the BOC—concerning an opportunity to purchase the properties then owned by Faulkner, which were at risk of foreclosure. Markay forwarded a list of the properties available for purchase to Joe Lodico via email, which included a description of each property, and for each its purported appraised values, the loan amounts due, gross income, taxes, other expenditures, and the net operating income ("NOI"). (*See* JX 124; Trial Tr., vol. I, 108:5–109:6, 116:21–117:7 (J.L. test.).) The list of properties included the following seven properties, known herein as the Faulkner Properties:

1. 6631-6635 W. 23rd Street, Berwyn, Illinois;

2. 7121 Maple Avenue, Berwyn, Illinois;

3. 1921 S. Harlem, Berwyn, Illinois;

4. 1915 S. Harlem Avenue, Berwyn, Illinois;

5. 2306 S. 17th Avenue, North Riverside, Illinois;

15

6.  1518 N. Harlem Avenue, Unit 1W, River Forest, Illinois;

7.  1111 N. Harlem, Unit 1-B, Oak Park, Illinois.

The appraisals shared by Markay with Joe Lodico showed high values of the Faulkner
Properties, each exceeding the outstanding loan amounts. The total valuation of the
Faulkner Properties shown was approximately $4.3 million, and the loans due totaled
about $3.4 million. (*See* JX 24, at 2 of 2; PX 23, at 36.) Most of the appraisals shown were
two to three years old, earlier that the 2007-2008 financial crisis which brought about
sharp collapse in the nation's property values beginning in the later half of 2007. (*See* PX
23, at 36.)

    The opportunity to purchase the Faulkner Properties was related to KJ by Joe
Lodico, based on his discussions with Markay and other BOC board members. The
BOC offered to transfer the Faulkner Properties to Settlers' in exchange for Settlers'
assuming the bank debt covering each property, which the bank would fully finance on
interest only terms. KJ received all information she reviewed about the Faulkner
Properties through Joe Lodico, who related the information he received from Markay
and others at the BOC. She did not deal directly with any employee, or speak to officers
or directors of the BOC about the properties, until she appeared at the BOC offices to
close on the transactions on August 1, 2008. (*See* Trial Tr., vol. I, 134:18–138:20 (J.L. test.),
vol. IV, 151:18–155:23 (KJ test.).)

    KJ relied on Joe Lodico's oral representations regarding terms of the transaction
by which Settlers' could acquire the Faulkner Properties, and his belief as to the value
and the condition of the properties. Joe Lodico told KJ that the properties had
approximately $1 million in equity, and that acquiring the properties was a good
opportunity for Settlers'. (*See* Trial Tr., vol. I, 129:4–135:11 (J.L. test.), vol. IV, 28:5–24 (KJ
test.).) While protecting his million dollar investment in the BOC, Joe also testified at
trial that he "was helping the Bank of Commerce, and . . . manipulated Settlers'

Housing Service to take those properties." (Trial Tr., vol. II, 126:19–21) According to

Joe, he believed that the sale of the Faulkner Properties to Settlers' would help the BOC

and also benefit Settlers'. (Trial Tr., vol. II, 129:17–18.) However, he testified at trial as

to his belief that "I was being manipulated by the Bank of Commerce. And I ended up

manipulating K.J." (Trial Tr., vol. II ,132:20–21.)

On July 20, 2008, a special meeting of Settlers' Board of Directors was held via

telephone with the participation of four of five of Settlers' directors, including KJ, as

Secretary of the Board, who prepared the minutes of the meeting:

> At this special meeting KJ informed the Board of an opportunity
> presented by The Bank of Commerce regarding several properties for sale.
> The Bank is requesting a 10% equity down payment of the Washington-
> Village Apartments. The Board voted and approved to pursue the
> purchase and to request written approval for the 10% equity from IHDA.
> KJ abstained from voting.

(JX 117; *see* Trial Tr., vol. V, 121:23–122:11 (KJ test.).)

On July 23, 2008, KJ sent a letter to IHDA seeking approval by IHDA "of an

opportunity that has come upon Settlers' which will benefit low-income families,"

describes as follows:

> Terms & Proposal
> The Bank is requiring 10% equity as down payment, which is
> approximately $400,000. Settlers' is requesting permission to use [the
> Washington-Taylor Property] to cross-collateralize this transaction. [The
> Washington-Taylor Property] has been successfully manages for 14 years,
> 4 months, with only 8 months left to completion and contract compliance.
> The current market value of [the Washington-Taylor Property] is
> approximately 1.5 million dollars. If approved by IHDA, the Bank of
> Commerce will take second position as lien holder to IHDA's zero-percent
> interest, forgivable loan. . . .

(JX 119, at 2 of 2; *see also* PX 59, at 1 of 9.) The letter was sent to and received by Patricia

Williams, manager of the asset management division at IHDA and IHDA employee for

10 years, and was forwarded to the assistant director and director of IHDA's asset

17

management department. Patricia Williams was senior asset manager and oversaw Settlers' loan and grants from IHDA. (*See* Trial Tr., vol. XI, 8:17–10:11, 13:11–15 (Williams test.).)

### The 2008 Loan Summary Report

On July 25, 2008, Connie Saiger ("**Saiger**"), a loan officer for the BOC, presented a Loan Summary Report to the BOC's loan committee for approval of new loan commitments to enable Settlers' to "[p]urchase via assignment of beneficial interest [the Faulkner Properties] from Jan Faulkner at the current loan balance and remodel vacant units." (*See* JX 6, at 1 of 4; Trial Tr., vol. VI, 37:18–38:3 (Saiger test.).) The Loan Summary Report stated that, in connection with the loans to Settlers', the BOC was providing a $50,000 line of credit secured by a mortgage on the Washington-Taylor Property, which also guaranteed the loans to purchase the Faulkner Properties. The $3,562,000 loan commitment to purchase the Faulkner Properties would extend the current maturity of the loans by 4 years, with interest only payments due on a monthly basis and principal due at maturity. (*See* JX 6, at 1 of 4).

The BOC did not send any loan commitment letter to Settlers'. Saiger testified that the BOC generally would only send term sheets to new loan customers, and she believed there was no need to do so because the transaction involved an assumption of debt rather than a new loan disbursement. (*See* Trial Tr., vol. VI, 40:3–16.) However, she admitted that most information as to Settlers' in the Loan Summary Report came from Settlers' file at the BOC, since Settlers' had previously obtained a $150,000 loan from the BOC in 2005. (Trial Tr., vol. VI, 38:7–39:6.)

The Loan Summary Report stated purpose of the $50,000 line of credit was described as follows:

> The line of credit will be used in part to hire an individual to write grant applications on behalf of the borrower. The balance will be used to

remodel a condominium at 536 Devon in Roselle which recently was
vacated by a Settlers tenant in preparation for the property's re-lease.

(JX 6, at 2 of 4.) That information did not come from Settlers', because Settlers' had not

requested a line of credit from the BOC in 2008. KJ testified that she was not aware of

any request for approval of a line of credit from BSM since 2005, and she had made no

such request. (*See* Trial Tr., vol. IV, 76:8–15, vol. V, 113:15–19.) At trial, the Bank could

point to no record, testimony or other evidence to the contrary. Saiger testified that she

could not recall where the information came from for the $50,000 line of credit included

in the Loan Summary Report. She admitted that it had not been provided to her by KJ,

and that there was no written request for that loan from Settlers' in the BOC records.

(Trial Tr., vol. VI, 40:17–41:25.) However, the information was identical to information

listed in the loan summary report for a $150,000 line of credit requested by Settlers' in

2005. (*See* JX 5, 6; Trial Tr., vol. VI, 54:17–55:3 (Saiger test.).)

Financial information supplied to the loan committee for review in the Loan

Summary Report was also not supplied by or authorized to be delivered to Settlers' in

connection with the transaction. That data appears to have come from Settlers' 2006 and

2007 tax returns which had been prepared by Peterson's accounting firm, Kolnicki,

Peterson & Wirth LLC, and provided to the BOC. (*See* Trial Tr., vol. VI, 43:8–44:4 (Saiger

test.).) More specific information about rents and expenses of the properties owned by

Settlers' at the time was given to Saiger by Peterson but put together by Joe Lodico on

behalf of the BOC a few days before the Loan Summary Report was presented. (Pl.'s

Trial Ex. ["PX"] 24; *see* Trial Tr., vol. II, 7–25 (J.L. test.).) According to Joe, the numbers

were estimated by him and checked by Peterson for consistency with prior records held

by him and his accounting firm. Joe Lodico testified at trial that he had been asked by

Markay, Peterson and others from the BOC to put together Settlers' rent and income

information the day before he sent the list to Peterson, who forwarded Joe's email to

Saiger on July 24, 2008. At no point did KJ or Settlers' authorize Joe Lodico or Peterson

19

to estimate or turn over this information to the BOC for the purchase by Settlers' of the Faulkner Properties. (*See* PX 24; Trial Tr., vol. II, 17–25 (J.L. test.).)  Rather, the numbers appear to have been based, at least in part, on financial statements held in Settlers' record at the BOC and forwarded to Joe Lodico by a bank employee on behalf of Saiger on July 22, 2008. (*See* PX 13, at 484–488 of 950; Trial Tr., vol. II, 25–33 (J.L. test.).)  No reliable evidence disputing Joe Lodico's account of these events was brought forward by the Bank at trial.

Closing costs for the sale and transfer of the Faulkner Properties to Settlers' were to be paid by the BOC, including local transfer taxes and title insurance premiums, and were estimated at approximately $30,000.  The BOC agreed to pay these costs even though Faulkner was seller of the properties; it did so in order to facilitate and expedite the sale of the Faulkner Properties, assuming that Faulkner would not have the funds or an incentive to act with sufficient diligence. (*See* Trial Tr., vol. VI, 42:5-43:1 (Saiger test.).)  The BOC provided Joe Lodico with the funds and documents needed in preparation for the closing. (*See* Trial Tr., vol. I, 147–154 (J.L. test.).)  Indeed, as our country slipped into financial crisis, the BOC showed itself to be strongly incentivized to move the Faulkner debt over to Settlers'.

Joe Lodico testified at trial that "Robert Markay and John Frale both instructed [him] to do everything necessary to get these properties closed ASAP." (Trial Tr., vol. I, 146:22–24.)  At the behest and with the assistance of directors or others at the BOC, Joe Lodico performed the following tasks to facilitate closing on the sale of the Faulkner Properties to Settlers':

a. Visited each village and city, spoke with the building inspectors and requested a waiver for a 100 percent inspection (*see* JX 127);
b. Obtained and delivered to the taxing authorities a check issued by the BOC to pay the transfer taxes for the Faulkner Properties;

20

c. Signed the transfer tax declarations on behalf of the buyer (Settlers') and the seller (Faulkner), so that the transaction could be approved by the respective municipalities;

d. Provided and delivered the sales contracts for the sale of the Faulkner Properties;

e. Signed the sales contracts on behalf of Settlers' (*see* PX 1–7);

f. Obtained signatures needed to effectuate the transfer of the properties from Faulkner to Settlers' (*see* JX 128);

g. Provided financial information to the Bank about Settlers' without approval from Settlers' (*see* JX 126);

h. Arranged for the purchaser of the Faulkner Properties (Settlers') to be at the BOC offices on August 1, 2008, to sign the documents needed to close on the loans for Settlers' to acquire the Faulkner Properties.

(*See* Trial Tr., vol. I, 147–156 (J.L. test.).)

Testimony given by Markay and other individuals employed or associated with the BOC indicates a concerted effort by individual officers, directors and employees of the BOC to prevent imminent liquidation of the Faulkner Properties by finding a buyer for the properties from Jan Faulkner. (*See, e.g.*, Trial Tr., vol. X, 20:23–21:11, 36:6–14 (Markay test.).)  The testimony of Joe Lodico shows that he was used by the BOC to find Settlers' to acquire that property.  In doing so, his deceit of KJ, whether intentional or not, was done on behest of the BOC by providing Joe Lodico with exaggerated information.

KJ was told that the Faulkner Properties were going to be acquired from the BOC directly, not from a third party.  (*See, e.g.*, PX 59 ("Settlers Housing Service was recently contacted *with an opportunity by the Bank of Commerce* with whom we have done business with for several years. The Bank has come into possession of several multifamily buildings.") (July 24, 2008 letter to IHDA) (emphasis added).)  Joe Lodico testified that he first telephoned KJ to advise her that the BOC "is receiving a bunch of buildings back, and it could be a good opportunity for Settlers' Housing Service, because it's going to be one hundred percent financing, and I think and I believe it's going to produce cash flow." (Trial Tr., vol. I, 129:4–15.)

### Closing for Sale of Faulkner Properties

On August 1, 2008, KJ appeared at the BOC's offices to close on the loans to purchase of the Faulkner Properties. (Trial Tr., vol. IV, 91:6-12, vol. V, 122:7–11 (KJ test.).) The Closing took place at BOC in a conference room after hours. Saiger agreed to stay after hours because KJ flew in from California and had limited time. Joe Lodico, KJ, and Saiger were present. (*See* Trial Tr., vol. VI, 82:19–83:9 (Saiger test.), vol. IV, 86–87 (KJ test.).)

KJ Lodico recalls being at the closing for approximately 15 to 30 minutes. Joe Lodico was also present at the closing; he testified that KJ signed the documents in 10 to 15 minutes. (Trial Tr., vol. IV, 84:1–3 (KJ test.), vol. II, 84:16–21 (J.L. test.).) When KJ arrived at the BOC offices in Wood Dale, Illinois, Saiger, the bank officer responsible for closing of the transaction, walked KJ into a conference room and returned with a stack of documents about 1.5 to 2 inches thick, which she handed to KJ. The stack contained yellow stickers identifying the locations for KJ Lodico's signature. (Trial Tr., vol. IV, 86:20–87:20 (KJ test.).)

Saiger reviewed with KJ the first set of documents in the stack, which related to one of the seven properties. According to KJ, Saiger explained that the remaining documents in the stack were the same as the first set, except they were for the other properties. KJ testified as follows:

> THE WITNESS: And they had these yellow tabs that say sign here all throughout the document -- documents. And Connie Saiger went through the first set, that it was for one of the properties that we were going to buy. It was a loan document. She explained to me that these were loan documents. And she went through the first set and showed me where I needed to sign, and so and so forth, and went through it with me. *And then she said, in the interest of time, these are all the same, and so you can just go ahead and sign them.*
> Q. And did you sign them?
> A. I did. I signed them everywhere there were these yellow tabs that said sign  here. And so because she went through with me the first

Case 13-01328    Doc 339    Filed 05/19/17    Entered 05/19/17 16:18:09    Desc Main
Document       Page 23 of 54

set of documents, I understood that the remaining documents were for the closing of the remaining six properties.

(Trial Tr., vol. IV, 87:18–88:10 (emphasis supplied).)  Joe Lodico's trial testimony is consistent with KJ's testimony of the events at the closing. (*See* Trial Tr., vol. II, 81:10–82:7 (J.L. test.).)

KJ signed all loan documents she was handed at the Faulkner Properties closing on August 1, 2008. (*See* Stip. ¶ 55; JX 14, 17, 18, 19, 20, 21, 22, 30, 32, 38, 40, 45, 47, 52, 54, 59, 61, 67, 69, and 73.)  Included among these documents, however, was a Promissory Note extending a $50,000 line of credit (the "**LOC**"), as well as Mortgage and Assignment of Rents documents providing for a lien on the Washington-Taylor Property as security for the LOC and all loans for the Faulkner Properties (the "**Washington-Taylor Mortgage**").[1]  The BOC also appended a corporate resolution authorizing KJ to execute the LOC and the Washington-Taylor Mortgage on behalf of Settlers', which KJ signed along with the other documents presented to her that day. (*See* JX 20; Trial Tr., vol. IV, 64:15–19, 76:8–25 (KJ test.).)

Pursuant to those documents, the beneficial interests in all of the respective trusts that owned the Faulkner Properties were sold to Settlers' as of August 1, 2008.  Settlers' financed the purchase through loans to it by the BOC, including a $50,000 line of credit made by the BOC to Settlers'.  Settlers' collateralized the loan in part by granting the BOC a second mortgage on the Washington-Taylor Property. (JX 17.)

KJ testified at trial that Saiger never advised her that the stack of documents included a mortgage on the Washington-Taylor Property or a line of credit for $50,000 and that she would not have signed the documents if she had known they included a

---

[1] The Washington-Taylor Mortgage provides for a lien on the property to secure indebtedness not to exceed $3,412,000.00.  The mortgage included a "cross-collateralization" clause providing that, in addition to the Note, the mortgage secured additional indebtedness described as "Loans to U.S. Bank, N.A. Trusts #7375, 7610, 7890, 8040, 8120, 8190 and 8200." (JX 17.)

23

mortgage on the Washington-Taylor Property and a line of credit. (Trial Tr., vol. IV, 88:11–89:3.)

Saiger testified that she did not specifically remember telling KJ about the LOC and the Washington-Taylor Mortgage at the closing, but believed she had explained every document presented. However, she testified that her general practice and procedure was to go over each and every document with the client before the document was signed, so in trial testimony she presumed that she had done so in this case as well. (*See* Trial Tr., vol. VI, 84–87, 115–122.) However, Saiger's testimony in this respect is unreliable and not credible in light of all other evidence.

First, the evidence shows that closing of the loans on the Faulkner Properties was anything but a typical closing and Saiger had reason to deviate from standard practice when closing on those loans with Settlers'. Multiple aspects of the transactions deviated from customary safe and sound banking practices, as reported by Settlers' expert witness, Mr. Fitzgibbons. (*See* PX 23.) According to Mr. Fitzgibbons, the BOC failed to follow normal and customary banking practices in failing to obtain independent appraisals prior to the issuance of a commitment to loan prepared by Saiger and the closing of the loan, which was also supervised by Saiger as loan officer. Mr. Fitzgibbons also opinioned that the BOC also failed to follow normal and customary practices by acting as agent for the sale of the Faulkner Properties for the then owner of the properties. (*See* PX 23, at 4–5 of 134.)

Second, Joe Lodico and KJ both testified that KJ was at the BOC for approximately 15 to 30 minutes. Their testimony in this respect is undisputed by cross examination or other evidence presented, and was credible in light of other testimony and evidence presented. Therefore, Saiger's testimony that she followed usual practice of separately reviewing each and all documents with KJ is unreliable.

Third, Saiger's involvement in preparing the Loan Summary Report, reviewing

24

and putting together all documents and her years of experience in banking suggest that she was or should have been aware that KJ had had little to no opportunity to review and understand the terms included in the documents presented for signature by Saiger at the closing. She testified that the BOC did not generally send a loan commitment letters to clients in transactions like the one Settlers' took part. At the same time, the evidence suggests that Saiger was or should have been aware that certain documentation had not been obtained from Settlers', including any corporate resolution authorizing KJ to pledge the Washington-Taylor Mortgage and any corporate request or documentation for approval of a $50,000 line of credit. (*See* PX 13, at 502–505 (July 30, 2008 email to Joe Lodico requesting resolutions and attaching 2005 resolutions); *see also* Trial Tr., vol. II, 76:21–77:8 (admitting email to show that the BOC requested a resolution like the one they obtained in 2005).)

According to KJ, she was wholly unaware that included among the documents she was asked to sign were those for the line of credit, the Washington-Taylor Mortgage and the Corporate Resolution signed by her that day. (*See* JX 17-20.) She testified at trial that she never requested a line of credit for Settlers' and was unaware that the transaction to acquire the Faulkner Properties would include a line of credit. Nor was she aware that the documents included the Washington-Taylor Mortgage as collateral for all indebtedness. Her testimony was credible in light of other corroborating evidence. KJ had no prior authorization from Settlers' Board of Directors to execute such documents. Instead, the BOC included a corporate resolution, which was signed only by KJ on behalf of Settlers' board of directors to authorize herself to execute loan and security documents not previously approved by the board. (*See* JX 20.)

The evidence shows that KJ was acutely aware of the need to seek and obtain authorization from IHDA before she could pledge any interest in the Washington-Taylor Property as collateral. She never obtained such authorization, nor did she obtain

authorization from Settlers' Board of Directors to do anything other than to execute loan documents for the Faulkner Properties.

The evidence also shows that Settlers' never requested a line of credit and was given no prior notice that one would be included among documents to be executed at the closing. Records of email communications between Joe Lodico and employees and/or directors of the BOC include no reference to a line of credit or the need for one. Ultimately, the Bank could point to no record or reliable testimony establishing that either KJ or Joe Lodico were made aware of terms other than the purchase and loan agreements for the Faulkner Properties.

Prior transactions between Settlers' and the BOC are informative. In 2005, Settlers' requested a $150,000 line of credit from the BOC. That line of credit was secured by another property owned by Settlers'. (*See* JX 5.) In connection with that request, Settlers' submitted details about the purpose of the loan, financial information, IHDA authorization to grant a lien on the Washington-Taylor Property, and resolutions from Settlers' Board of Directors approving the terms of the loan. (*See* PX 13, at 502–505; *See also* Trial Tr., vol. II, 68–77 (J.L. test.).)

In the case of the Faulkner Properties, the BOC was provided with Board resolutions from Settlers' approving the purchase of the seven properties. The only other resolution made by Settlers' Board of Directors was to authorize KJ to request authorization from IHDA to grant a ten percent mortgage on the Washington-Taylor Property as additional collateral for the loans. Although KJ submitted to IHDA a request for allowing that, she received no response or authorization from IHDA prior to closing on August 1, 2008.

KJ admits that she failed to review the documents at closing or hire an attorney to assist with the transaction. However, the evidence shows that she had no basis for believing that the documents executed at the closing would involve anything other than

26

the purchase and loan documents to acquire the Faulkner Properties. KJ's testimony that she relied on Joe Lodico's representations and the disclosures provided by Saiger at the closing was credible, in light of the speed with which the transaction closed (between July 17 and August 1 of 2008), the terms related by Joe (guaranteed financing, $1,000,000 in supposed equity based on older appraisals), and her belief that the information provided by Joe Lodico came from Markay and other individuals at the BOC with whom Joe Lodico had previously dealt with and trusted.

While nothing prevented KJ from requesting additional time to review the loan documents, Settlers' had no financial reason to close on the purchase of the Faulkner Properties in such a short period of time, and had provided no documents or information, and had not invested considerable effort in pursuing the sale. On the other hand, the evidence shows that the BOC favored, facilitated and directed the short closing timeline in order to protect its interests. While the Bank argues that the transaction closed quickly due to demands by Jan Faulkner, there is no evidence that Jan Faulkner had any interest in proceeding in such a manner. Faulkner had defaulted on the loans and was considering bankruptcy. (*See* Trial Tr., vol. X, 20:23–21:11 (Markay test.) (describing settlement between the BOC and Faulkner).)

The only other interested party in the transaction was the BOC. It is clear that its directors and officers were interested in finding a purchaser for the properties. And so was the BOC itself. The BOC agreed to pay for closing costs despite not being a party to the sale, it approved the loan terms and closed on the loans with Settlers' less than one month from the time Settlers' was even approached with the opportunity to acquire the Faulkner Properties.

Schaumburg Bank now argues that such actions were done by Joe Lodico on behalf of Jan Faulkner or Settlers,' but the evidence shows that the BOC voluntarily paid

27

costs despite its status as nonparty to the sale, that Joe Lodico was instructed to perform these transactions by directors or officers of the BOC and for the benefit of the bank.

Schaumburg Bank has argued that Joe Lodico's testimony is unreliable because of his drinking. Joe Lodico does not dispute that his heavy drinking during those years sometimes made him unreliable and affected his memory. However, his testimony during trial was credible, he provided extensive testimony involving detailed recollections of events that were consistent and corroborated by email records, documents and other testimony during trial. Indeed, his testimony at trial was quite coherent. Accordingly, the Court finds that the testimony of Joe Lodico of the events leading up to the closing are found to be credible and more reliable than the limited recollection offered by Saiger who, for reasons discussed earlier, is found not to be credible under the circumstances.

Sad, but also credible was Joe Lodico's testimony that he "was helping the Bank of Commerce, and . . . manipulated Settlers' Housing Service to take [the Faulkner Properties]." (Tr., vol. II, 126:19–21.) Email communications between Joe Lodico and Markay, Peterson and Saiger are consistent with Joe Lodico's trial testimony regarding the circumstances leading up to closing in early August of 2008. His testimony was credible in light of all of the evidence introduced at trial. Although Schaumburg Bank has argued that Joe Lodico's lifestyle choices at the time should diminish his credibility, it failed to dispute any material part of his testimony by cross examination or other evidence. Accordingly, in light of all the evidence, trial testimony provided by Joe Lodico is found to be reliable, especially when compared to the testimony of Saiger and other key witnesses introduced by Schaumburg Bank.

The evidence at trial shows that the BOC used Joe Lodico to unload troubled loans on Settlers' and cross-collateralize such loans with substantial equity held by Settlers' in the Washington-Taylor Property. The BOC knew that Settlers' had not

agreed to pledge the Washington-Taylor Property as guarantee for the Faulkner loans, and would not know that the LOC and the Washington-Taylor Mortgage would be included among the other documents.  The BOC led Joe Lodico into believing that the transactions would be beneficial for Settlers' and the BOC alike.  At a minimum, the bank took advantage of his reliance on such representations and his ability to persuade KJ that Settlers' could proceed with less caution under the circumstances and that she would rely on Joe's representations of favorable terms offered by the BOC to Settlers' to facilitate prompt closing only a few weeks later with minimal effort.

It is clear that KJ only agreed to acquire the Faulkner Properties on such a short closing schedule because the opportunity was presented to her by Joe Lodico on behalf of the BOC and its directors.  KJ testified that she trusted the BOC and its personnel because she had known Peterson and Markay for several years. (*See* Trial Tr., vol. V, 91:14–92:6.)  Peterson and Markay knew or should have known that Joe Lodico was no longer associated with Settlers' but that he had a degree of influence over KJ due to their family history. (*See* Trial Tr., vol. V, 110:22–111:4 (KJ test.) ("During the years of 2005 to 2008, Joe had already left the family and I was still hoping that Joe would come back to the family. And when I was not able to get ahold of him on the phone, I would call Bob Markay and Ken Peterson for advice and also to ask them if they had seen him. And if they did, could they please tell Joe to call me. And -- and basically they just counseled me.")  Under these circumstances, KJ relied on the representations related by Joe that had been made by Markay and others at the BOC, and agreed to close on the sale on very short notice.

### Cross-Collateralization of the Washington-Taylor Mortgage

After closing on the purchase of the Faulkner Properties, the BOC mailed copies of all of the loan documents to KJ.  She admits that she received copies of the

documents mailed to her by the BOC, which she did not review at the time and would not review for several months after the closing date. (*See* Trial Tr., vol. V, 4:10–5:4.).

On September 3, 2008, the Washington-Taylor Mortgage and Assignment of Rents, both dated August 1, 2008, were recorded with the Cook County Recorder of Deeds. (Stip. ¶ 57; JX 17, 18.)

On September 4, 2008, IHDA emailed KJ requesting additional information about the proposed second mortgage. (*See* JX 120.) KJ did not respond to this email, believing the matter to be moot since the Faulkner Properties had been acquired. Since no response was received by IHDA, IHDA never granted Settlers' request for written authorization. (*See* Trial Tr., vol. V, 22:5–23:14 (KJ test.), vol. XI, 14–16 (Williams test.).)

In November, 2008, KJ approached the BOC to request a loan for Settlers' to pay the installment due for property taxes for the Faulkner Properties. According to KJ, when the next installment of property taxes for the Faulkner Properties became due, Settlers' was unable to pay them because the properties failed to generate enough revenue. At that point, she testified that she was told that Settlers' already had a letter of credit available (the LOC), and she then drew on the LOC extended at the closing on August 1, 2008. (*See* Trial Tr., vol. IV, 94:20–97:7.)

According to KJ, she did not know that the LOC was secured by the Washington-Taylor Mortgage, or that the draw on the $50,000 line of credit would result in cross-collateralization upon the Washington-Taylor Property of all indebtedness due to the BOC for all the Faulkner Properties. KJ testified that she did not learn about the Washington–Taylor Mortgage until of January of 2009. (*See* Trial Tr., vol. IV, 97:13–98:25.) KJ testified that she learned that the BOC had taken a mortgage on the Washington-Taylor Property in a conversation she had with Markay in January of 2009. According to KJ, she mentioned to Markay that Joe wanted to sell the Washington-Taylor Property once the contract with IHDA was completed in March of 2009; at that

point, she testified that Markay told her that Settlers' could not do that because the BOC had a mortgage on the property for the Faulkner loans. (Trial Tr., vol. IV, 98:2–18.)

On March 2, 2009, Peterson submitted copies of Settlers' audited financial statements for the year ended on December 31, 2008 to IHDA, as required by the IHDA Use Agreement and regulations, and submitted copies thereof to KJ. (See JX 111, at 1 and 2 of 33.) In Notes to Financial Statements, it was stated that Settlers' was "not in default" of the forgivable note and conditional grant with IDHA, and that the Washington-Taylor project was in "material compliance" with all the conditions of the IHDA grant. (See JX 111, at 15–16 of 33; Trial Tr., vol. XII, 48:24–51:7 (Peterson test.).) The Washington-Taylor Mortgage was not mentioned in the audit for that year, despite the fact that Peterson was or should have been aware that the terms of the Faulkner loan included the Washington-Taylor Mortgage. (See Trial Tr., vol. XII, 79–81 (Peterson test.).)

### Release of the IHDA Mortgage and Renewal of the LOC

On May 29, 2009, IHDA recorded a Release of the IHDA Mortgage with the Cook County Recorder of Deeds as document number 0914948018. (Stip. ¶ 58; JX 21.)

In August 2009, the LOC became due and Settlers' was unable to pay it. KJ executed a new promissory note extending the maturity of for that loan, which had been fully drawn and remained unpaid. The promissory note stated that it was secured by the Washington-Taylor Mortgage. (See JX 15; Trial Tr., vol. V, 33:20–34:11 (KJ test.).)

In August 2010, KJ executed a second renewal of the $50,000 line of credit, which remained secured by the Washington-Taylor Mortgage. (See JX 16; Trial Tr., vol. V, 36:1–7 (KJ test.).)

### FDIC Receivership and Assignment of Assets to Schaumburg Bank

On March 25, 2011, BOC was closed by the Illinois Department of Financial and Professional Regulation, which appointed the FDIC as receiver. (Stip. ¶ 19.) Through an

31

Asset and Purchase Agreement dated March 25, 2011, the FDIC, as receiver for BOC,
assigned certain of the assets of the BOC to Advantage National Bank Group, who
would change its name to Schaumburg Bank & Trust Company, N.A. in July of 2011
(Stip. ¶¶ 20, 21; JX 4.)  Schaumburg Bank is a national banking association with its
principal office located in Schaumburg, Illinois. (Stip. ¶ 22.)

On or about June 1, 2011, Settlers' sent a letter to the Bank, which was also sent to
the FDIC and Settlers' board, which related Settlers' belief that the Washington-Taylor
Mortgage had been obtained by the BOC without approval from Settlers' or from
IHDA. Settlers' requested that the Bank follow through with ordering appraisals of the
Faulkner Properties to modify the loans, and that the mortgage of the Washington-
Taylor Property be removed. (*See* JX 109; Trial Tr., vol. IV, 117:12–118:17 (KJ test.).)  She
was later informed that the Bank would be ordering appraisals, which she received
some time prior to October, 2011. (*See* Trial Tr., vol. IV, 122:10–15 (KJ test.).)

**Default and Foreclosure Proceedings in Illinois State Court**

On October 31, 2011, Schaumburg Bank & Trust sent a Notice of
Default and Demand for Payment letter to Settlers' at 12220 Whitley St. Whittier, CA.
(Stip. ¶ 59; JX 82.)

Also on October 31, 2011, Schaumburg Bank sent Notice of Default and Demand
for Payment letters to each of the respective trusts that owned the Faulkner Properties,
in care of Settlers', and in care of Jan Faulkner at 345 Ashland Ave, River Forest, IL. (*See*
Stip. ¶ 60; JX 31, 39, 46, 53, 60, 68, and 74.)

On February 3, 2012, Schaumburg Bank & Trust filed seven complaints (the
"**Foreclosure Complaints**") seeking foreclosure, among other things, of the Faulkner
Properties. (Stip. ¶ 61; JX 75-81.)

On February 6, 2012, Schaumburg Bank filed a complaint seeking foreclosure,
among other things, of the Washington-Taylor Property. (Stip. ¶ 62; JX 83.)

32

On or about January 27, 2012, Schaumburg Bank sent letters to tenants. (*See* JX 83.) KJ testified that Settlers' rental receipts declined by $10,000.00 in the month subsequent to when the letters were sent out. (*See* Trial Tr., vol. IV, 125:19-21 (KJ test.).)

In February of 2012, Schaumburg Bank & Trust filed motions for the appointment of a receiver to manage the Faulkner Properties and the Washington-Taylor Property during the pendency of the foreclosure proceeding. (Stip. ¶ 63.)

### The Chapter 11 Bankruptcy Case

On July 12, 2013, Settlers' filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code. (Stip. ¶ 64.)

On January 31, 2014, Schaumburg Bank filed an Amended Proof of Claim, in the amount of $4,921,425.97, which is designated as Claim No 12-3 in the Claims Register (the "**Schaumburg Bank Claim**"). (Stip. ¶ 65.) The Schaumburg Bank Claim asserts a secured claim in the amount of $2,721,000.00 secured by the Faulkner Properties and the Washington-Taylor Property, and an unsecured claim in the amount of $2,200,425.97 for its deficiency claim. (*See* Answer ¶13.).

KJ filed a proof of claim asserting deferred salary due in the amount of $502,000. (*See* Claim No. 10). That amount is asserted by Settlers' to be owed to KJ for unpaid wages since 2000 based on the organization's audited financial statements. The amounts claimed by KJ and Schaumburg Bank represent approximately half of the total amount claimed by creditors in Settlers' bankruptcy case. (*See* Claims Register Summary, Settlers' Housing Service, Inc., 13-28022.)

Additional facts set forth in the Conclusions of Law will stand as additional Findings of Fact.

### CONCLUSIONS OF LAW

Settlers' Third Amended Complaint pleaded fourteen counts, some of which have already been disposed of, as set out below:

| Counts Disposed of By Prior Orders | | |
|---|---|---|
| Count | Nature of Claim | Disposition |
| 2 | Aiding and Abetting Breach of Fiduciary Duty | Dismissed with prejudice, *see* 520 B.R. 253 (Bkrtcy.N.D. Ill. 2014) |
| 4 | Fraudulent Concealment | Dismissed with prejudice, *see* 520 B.R. 253 (Bankr. N.D. Ill. 2014) |
| 5 | Breach of Illinois Consumer Credit Act | Dismissed for lack of Subject Matter Jurisdiction under FIRREA, *see* 12 U.S.C. § 1821(d)(13)(D) |
| 7 | Constructive Fraud | Dismissed with prejudice, *see* 520 B.R. 253 (Bankr. N.D. Ill. 2014) |
| 10 | Conspiracy to Defraud and Civil Conspiracy | Dismissed for lack of Subject Matter Jurisdiction under FIRREA, *see* 12 U.S.C. § 1821(d)(13)(D) |
| 12 | Breach of Fiduciary Duty Arising From Fraud in the Execution | Dismissed with prejudice, *see* 520 B.R. 253 (Bankr. N.D. Ill. 2014) |
| 13 | Conversion and Accounting | Dismissed with prejudice, *see* 520 B.R. 253 (Bankr. N.D. Ill. 2014) |
| 14 | Improper Post–Petition Interest and Receiver's Fees | Dismissed with prejudice, *see* 520 B.R. 253 (Bankr. N.D. Ill. 2014) |

The remaining counts, which still need to be resolved, are the following:

| Pending Counts | |
|---|---|
| Count | Nature of Claim |
| 1 | Equitable Subordination |
| 3 | Fraudulent Misrepresentation Related to Fraud in the Execution |

| 6 | Fraud, Illegality and Unenforceability of Washington-Taylor Mortgage |
| 8 | Setoff |
| 9 | Unjust Enrichment |
| 11 | Tortious Interference with Contract |

These pending counts involve three types of claims: (1) objections to claim based on fraud in the execution (Counts 3, 6, 9); (2) equitable subordination under 11 U.S.C. § 510 (Count 1), and (3) claims arising out of post receivership conduct and setoff (Counts 8, 11). These claims are described and treated separately below.

## I. ALLOWANCE AND DISALLOWANCE OF CLAIMS

Creditors seeking to recover on prepetition claims against the debtor must file a proof of claim in the bankruptcy case, *see* 11 U.S.C. § 501. Proofs of claim are "file[d] . . . against the [bankruptcy] estate." *Travelers Cas. & Sur. Co. of Am.* v. *Pacific Gas & Elec. Co.,* 549 U.S. 443, 449 (2007). The estate is a separate legal entity which is comprised of property, wherever located, including "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1); *see also* 11 U.S.C. § 1115 (including all property acquired post-petition but before dismissal). Property of the estate is held and administered for the benefit of all creditors by a bankruptcy trustee, who is generally tasked with maximizing the recovery of unsecured creditors. *See In re Duckworth*, 776 F.3d 453, 458 (7th Cir. 2014); *see also* 11 U.S.C. § 1107 (authorizing the debtor in possession to act as trustee in Chapter 11 cases).

Section 502 of the Bankruptcy Code governs the allowance and disallowance of claims against the estate. Pursuant to this provision, proofs of claim filed under § 501 are "deemed allowed" unless a party in interest objects. 11 U.S.C. § 502(a). If an

35

objection is made, the court must determine the amount of the claim as of the date of the petition and to allow such claim, except to the extent that enumerated grounds for disallowance set forth in subsection (b) apply. *See* 11 U.S.C. §§ 502(b)(1)--(9). Because a proof of claim is generally deemed valid, the objecting party has the burden of establishing grounds for disallowance. *See* Fed. R. Bankr. P. 3001(f); *In re Sentinel Mgmt. Group, Inc.,* 417 B.R. 542, 550 (Bankr. N.D. Ill. 2009); *In re Vastag,* 345 B.R. 882, 885 (Bankr. N.D. Ill. 2006).

As relevant here, § 502(b)(1) disallows any claim that is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." This provision is understood to mean that, with narrow exceptions, "any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy." *Travelers,* 549 U.S. at 450 (citing 4 Collier ¶ 502.03[2] [b], at 502–22).

This is consistent with the longstanding principle that "[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code." *Raleigh v. Ill. Dep't of Revenue,* 530 U.S. 15, 20 (2000) (citing *Butner v. United States,* 440 U.S. 48, 55 (1979))); *see Peterson v. McGladrey & Pullen, LLP,* 676 F.3d 594, 598 (7th Cir. 2012). "That principle requires bankruptcy courts to consult state law in determining the validity of most claims." *Travelers,* 549 U.S. at 450 (citing *Raleigh,* 530 U.S. at 20). In fact, the Supreme Court has long recognized that the "'basic federal rule' in bankruptcy is that state law governs the substance of claims[.]" *Raleigh,* 530 U.S. at 20 (citing *Butner,* 440 US at 57); *see Peterson,* 676 F.3d at 598.

Defendant, Schaumburg Bank filed a secured claim in Settlers' bankruptcy case asserting liability in the total amount of $4,921,425.97. *See* Claim 12-3. Because the total value of the properties securing the Bank's claim is estimated at $2,721,000.00, the Bank

36

claims to be secured to the extent of the value of its collateral, and unsecured as to the remaining $2,200,425.97. Settlers' filed this adversary proceeding seeking Equitable Subordination and other relief, and to object to and disallow the Bank's claim or parts thereof.

## A. Fraudulent Misrepresentation in Relation to Fraud in the Execution (Count 3)

Settlers' challenges the validity of Schaumburg Bank's secured claim, in part, by disputing the validity and enforceability of the Washington-Taylor Mortgage based on fraud in the execution. Under Illinois law,[2] fraud in the execution of an instrument renders the contract void *ab initio. George J. Cooke Co. v. Kaiser*, 163 Ill. App. 210, 213 (1st Dist. 1911). "[A] contract that is void *ab initio* is treated as though it never existed." *Illinois State Bar Ass'n Mut. Ins. Co. v. Coregis Ins. Co.*, 821 N.E.2d 706, 713 (Ill. App. Ct. 2004). Federal and state law are similar in this regard. *See Laborers' Pension Fund v. A & C Envtl., Inc.*, 301 F.3d 768, 779–80 (7th Cir. 2002); *Blaylock v. Toledo, P. & W.R. Co.*, 356 N.E.2d 639, 641 (Ill. App. Ct. 1976). Accordingly, Settlers' seeks determination that the Washington-Taylor Mortgage was void *ab initio* for fraud in the execution, and that the Bank's claim in the bankruptcy case must be disallowed to extent it asserts rights under a mortgage that is void because of fraud in the execution.

### 1. Fraud in the Execution

"'Fraud in the execution,' . . . entails deceiving a party to an agreement as to the very nature of the instrument it signs so that the party 'actually does not know what he

---

[2] The Mortgage states that it "will be governed by federal law applicable to lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflict of law provisions. . . ." (JX 17, at 11 of 14.) The parties do not dispute that Illinois law governs the substance of the Bank's claim. *Auto–Owners Ins. Co. v. Webslov Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) ("We honor reasonable choice-of-law stipulations in contract cases regardless of whether such stipulations were made formally or informally, in writing or orally").

is signing, or does not intend to enter into a contract at all.'" *A & C Envtl.*, 301 F.3d at 779 (citing *Rosenthal v. Great Western Fin. Sec. Corp.*, 926 P.2d 1061 (Cal. 1996)); *see Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 881 (7th Cir. 2005) (quoting *Belleville Nat'l Bank v. Rose*, 456 N.E.2d 281, 283 (Ill. App. Ct. 1983)). This occurs "where there is a surreptitious substitution of one paper for another, or where by some other trick or device a party is made to sign an instrument which he did not intend to execute." *Davis*, 396 F.3d at 881 (quoting *Belleville Nat'l Bank*, 456 N.E.2d at 283). "A promisor's signature procured by fraud in the execution gives no more effect to a contract than a promisor's signature that has been forged. In either case the contract is void; it has never had any legal effect." *A & C Envtl.*, 301 F.3d at 779; *see Coregis Ins.*, 821 N.E.2d at 713; U.C.C. § 3-305(2)(c); Restatement (Second) of Contracts § 163 (1981).

To establish the defense of fraud in the execution, Settlers' had to show that it did not know that it was signing a note for a $50,000 line of credit or a mortgage agreement granting a lien on the Washington-Taylor Property to secure indebtedness of up to $3,412,000, and that its ignorance was excusable because it had reasonably relied upon the representations made by the BOC. *See A & C Envtl.*, 301 F.3d at 780 (citing *Ill. Conf. of Teamsters & Employers Welfare Fund v. Steve Gilbert Trucking*, 71 F.3d 1361, 1365–66 (7th Cir. 1995), U.C.C. § 3–305(a)(1)(iii)); *see also Agathos v. Starlite Motel*, 977 F.2d 1500, 1505-06 (3rd Cir. 1992) (a party must prove "excusable ignorance of the contents of the writing signed" and that the instrument signed "is radically different from that which he is led to believe that he is signing"). Settlers' has met that burden.

2. <u>Washington-Taylor Mortgage Was Void For Fraud in the Execution</u>

Settlers' has alleged that the BOC engaged in a scheme to defraud that induced Settlers' into believing that the documents signed at the closing related to the loans to purchase the Faulkner Properties; however, it surreptitiously included documents for a $50,000 loan (which Settlers' had not requested or approved at the time) and a mortgage

38

agreement pledging on the Washington Taylor Property to secure that debt, and guaranteeing payment of the loans for the Faulkner Properties. Settlers' claims it never accented to the basic terms set forth in the LOC and Washington-Taylor Mortgage, and that it would not have agreed to purchase the Faulkner Properties if it had known that those loans were secured by the mortgage on the Washington-Taylor Property.

a. *Settlers' Did Not Know It Was Signing the Washington-Taylor Mortgage*

The evidence in this case shows that Settlers' did not know that the documents executed at the closing included documents for a $50,000 line of credit and a $3,412,000 lien on the Washington-Taylor Property. Settlers' board had not approved those terms, and had never agreed to pledge the Washington-Taylor Property as collateral for the loans to acquire the Faulkner Properties. No corporate resolution approving these transactions had been submitted to the BOC, nor had the bank received a request for the line of credit from Settlers', and the request for written authorization from IHDA to encumber the Washington-Taylor Property had not been obtained in the short closing schedule set up by the BOC.

The evidence also shows that any prior proposal regarding a 10% equity down payment in the Washington-Taylor Property had been unambiguously conditioned on IHDA approval. Shortly after KJ sent the request for written approval to IHDA, the BOC put together an approved a different transaction that would involve a $50,000 loan consisting of the LOC and a mortgage on the Washington-Taylor Properties to secure all loans extended, including the seven individual loans, but not to exceed approximately $3.5 million. Settlers' never approved these transactions, nor was KJ or anyone else informed. KJ had expressly declined encumbering the property without IHDA approval; such was prohibited by the IHDA loan. Violation of that prohibition could threaten Settlers' rights under the IHDA loan and grant agreements, and the IHDA Mortgage. Since the revocable loan from IHDA was expected to mature in 2009, KJ or

Settlers' had little to no incentive to grant any interest in the Washington-Taylor Property.

KJ's testimony at trial is credible in light of the evidence in this case. Schaumburg Bank can point to no record or communication to show that KJ understood the nature of the additional documents signed along with those for the Faulkner Properties. The BOC did not communicate with her, and Joe Lodico's testimony is consistent with KJ's testimony and was credible. KJ did not know or have reason to know that the documents she would sign included the LOC and the Washington-Taylor Mortgage, which was suddenly being pledged to secure loans of approximately $3.5 million.

### b. Settlers' Lack of Knowledge was Excusable Under the Circumstances

The evidence in this case shows that KJ had no knowledge or reason to know that she would be executing the LOC and the Washington-Taylor Mortgage, and that her ignorance was excusable under the circumstances. KJ had no prior knowledge of a $50,000 line of credit, and IHDA had not granted written authorization to use the Washington-Taylor property for a 10% equity down payment to cross-collateralize the loans. Settlers' board had not authorized KJ to incur additional indebtedness in the form of a 50,000 line of credit or to grant a mortgage on the Washington-Taylor Property.

Schaumburg Bank argues that even if KJ lacked specific knowledge that the documents at closing would include the LOC and the Washington-Taylor Mortgage, that her failure to review all the documents, or even ask Saiger about the possibility that the Washington-Taylor Property was included was not reasonable or excusable. But KJ's reliance on the terms of the transaction that had been related to her by the Bank and approved by Settlers' was reasonable under the circumstances, where the BOC had decided to close on the loans as quickly as possible and had represented that the

properties were profitable and were worth significantly more than the amount of the loans. The Bank made these representations to induce Settlers' to acquiring the properties for the amount of loans outstanding and to close on such transaction in the span of two weeks. The Bank knew that no new appraisals or inspections could be ordered by KJ in the span of two weeks from the time KJ first heard of the Faulkner Properties and the time that the Bank scheduled closing for those properties. Under these circumstances, the Bank's assertion that KJ had a duty to inquire or to be suspicious of the representations made by the BOC is unpersuasive.

As described above, the Washington-Taylor Mortgage and related documents had not been requested or otherwise approved by Settlers' prior to closing, nor did Settlers' receive any notice or have a reasonable opportunity of knowing that the additional documents had been included among those that it had previously approved and sought to execute: the purchase and loan documents for the Faulkner Properties.

Schaumburg Bank argues that KJ's failure to read all the documents or hire counsel shows that her reliance not excusable because she would have realized that the LOC and the Washington-Taylor Mortgage were included had she reviewed the documents at closing or hired counsel to do so. While "[a] party cannot close his eyes to the contents of a document and then claim that the other party committed fraud merely because it followed this contract[,]" *N. Trust Co. v. VIII S. Mich. Assoc.*, 657 N.E.2d 1095, 1103 (Ill. App. Ct. 1995), a party lacking any notice of the nature of the documents being executed and lacking reasonable opportunity to review the documents cannot be faulted for relying on representations made at the time of the execution of those documents. *See AMPAT/Midwest, Inc. v. Illinois Tool Works Inc.*, 896 F.2d 1035, 1041 (7th Cir. 1990) ("That a more cautious buyer might not have relied, might have smelled a rat, does not defeat liability. There is no defense of contributory negligence to an intentional tort, including fraud."). KJ's failure to review each of the documents and her reliance

41

on Saiger's representation that the remaining documents were substantially similar
does not excuse liability. *See id.* at 1041–42 ("while the victim of an ordinary accident is
required to use the ordinary care of an average person (even if he is below average in
his ability to take care)—and thus to avoid being *negligent*—the victim of a deliberate
fraud is barred only if he has notice of the fraud, and so he need only avoid *deliberate* or
*reckless* risk-taking.")

In *Laborers' Pension Fund v. A & C Envtl., Inc.*, 301 F.3d 768 (7th Cir. 2002), an
employer contended its signature on a collective bargaining agreement had been
procured by fraud. In evaluating this claim, the Seventh Circuit contrasted the facts,
which ultimately were not sufficient to establish fraud in the execution, with the facts in
*Operating Eng'rs Pension Trust v. Gilliam*, 737 F.2d 1501, 1505 (9th Cir. 1984), where the
fraud in the execution claim had been established. That exercise by the Seventh Circuit
informs as to the nature of that court's precedent regarding what is required to prove
fraud in the execution.

In *Gilliam*, an employer signed a collective bargaining agreement and later
asserted the fraud in the execution claim to defend against the union's efforts to collect,
arguing that he thought he was signing a union membership form. Prior to signing, the
union representative told the employer the documents were "standard ... forms" and
based upon that he "did not read the documents ... but merely relied on the union
representative's word." *A & C Envtl.*, 301 F.3d at 781. Based on those fact, "[t]he Ninth
Circuit concluded that no binding agreement was created because Gilliam did not know
what he signed and his ignorance was reasonable." *Id.*

In *A & C Envtl.*, on the other hand, the Seventh Circuit reasoned that the
employer's reliance on a union representative's statement was not reasonable because
he signed a "one page document written in English and entitled "Collective Bargaining
Agreement." *Id.* Thus, the employer failed to establish that reliance on the

42

representations without reading the contract was reasonable.

In *Connors v. Fawn Mining Corp.*, 30 F.3d 483 (3d Cir. 1994), an employer, Fawn Mining, signed a collective bargaining agreement that contained materially different terms than it had been promised by the union. In ruling that the trial court erred in granting summary judgment against the employer on the fraud in the execution claim, the Third Circuit observed that "there was significant time pressure on both sides" to sign the agreement and that fraud in the execution would exist if the "union surreptitiously substitutes a materially different contract document before both sides execute it." *Id* at 493.

In this case, the LOC and Washington-Taylor Mortgage documents were included among a set of similar documents pertaining to purchase of the seven Faulkner Properties. KJ was told and believed that she was signing documents that were identical in nature except that they related to seven separate properties. The documents had been filled out by Saiger on behalf of the BOC, and were presented to KJ at the closing with tabs identifying the sections which KJ needed to sign. KJ signed all the documents presented to her at the closing and left the BOC offices no later than 30 minutes after arriving.

Under these circumstances, Settlers' reliance on representations at the time the Washington Taylor Mortgage was executed was reasonable, and her lack of knowledge that she was signing the Washington-Taylor Mortgage was excusable. Settlers' has therefore met its burden of proving the defense of fraud in the execution.

Accordingly, the Washington-Taylor Mortgage, including the cross-collateralization provisions authorized therein, was void *ab initio* and is now unenforceable against Settlers' or its property.

3.  Void Mortgage Cannot be Ratified

Schaumburg Bank has argued that, even if the Washington-Taylor Mortgage was

initially invalid due to fraud, Settlers' was later ratified the grant of the Mortgage when it drew on the LOC in October of 2008, and executed promissory notes renewing the maturity of the fully drawn $50,000 line of credit in August of 2009, and again in August of 2010, both of which acknowledged the Washington-Taylor Mortgage as collateral.  However, the mortgage contract here was void *ab initio* for fraud in the execution, rather than merely voidable:

> The difference between a contract that is void *ab initio* and one that is merely voidable is that "a voidable contract can be ratified and enforced by the obligor, although not by the wrongdoer, while the void contract cannot be." *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 234 Ill.App.3d 1017, 1023, 176 Ill.Dec. 105, 601 N.E.2d 803 (1992), citing Restatement of Contracts § 475, Comment b (1932), rev'd *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill.2d 112, 189 Ill.Dec. 31, 619 N.E.2d 732 (1993); see also *Smith v. Hunter*, 171 Ill. App. 30, 36 (1912) (stating where "a contract is void *ab initio*, or where it becomes void by the terms and conditions therein expressed and agreed to by the parties, no action can be maintained thereon by either party"). In other words, a contract that is void *ab initio* is treated as though it never existed; neither party can chose to ratify the contract by simply waiving its right to assert the defect. On the other hand, if a contract is merely voidable, a party can either opt to void the contract based upon that defect, or choose, instead, to waive that defect and ratify the contract despite it.

*Illinois State Bar Ass'n Mut. Ins. Co. v. Coregis Ins. Co.*, 821 N.E.2d 706, 713 (Ill. App. Ct. 2004).  The case cited by the Bank in support of its proposition involved the ratification by a principal of the unauthorized acts of its agent. *See Stathis v. Geldermann, Inc.*, 630 N.E.2d 926, 932–33 (Ill. App. Ct. 1994).  It did not involve fraud in the execution or any type of void contract.  Schaumburg Bank has not cited any authority supporting ratification of a contract that was void *ab initio*, which means that no contract ever arose. *See Laborers' Pension Fund v. A & C Envtl., Inc.*, 301 F.3d 768, 779 (7th Cir. 2002) ("A promisor's signature procured by fraud in the execution gives no more effect to a contract than a promisor's signature that has been forged. In either case the contract is

void; it has never had any legal effect."). Therefore, Settlers' could not have ratified the Washington-Taylor Mortgage.

## B. Fraud, Illegality and Unenforceability of Mortgage (Count 6)

Count 6 seeks a determination that the Washington-Taylor Mortgage was void *ab initio* for illegality. *See Coregis Ins.*, 821 N.E.2d 706, 712 (2004) (noting that "if the subject matter of a contract is illegal, that contract is void *ab initio*."). Settlers' claims that the Washington-Taylor Mortgage was void because it agreed to transfer an interest in property which was held by Settlers' in trust for purposes specified by the IDHA grant. Allegations in this respect plead an alternative ground for determining that the Washington-Taylor Mortgage was void *ab initio*.

Settlers' illegality theory in Count 6 is rather strange, asserting that because it breached an IHDA requirement the bank transaction is void. However, the issue is moot because the loan was released by IHDA without any claim by IHDA of violation of the terms of its loan to Settlers'. IHDA had standing to complain but did not do so, and Settlers' has not shown that it has standing to assert those rights.

Settlers' seeks to enforce the prohibition in the IHDA loan and grant documents on the theory that, because those terms were breached when the Washington-Taylor Mortgage was granted, such mortgage violated public policy and is thus void *ab initio* for illegality. But the plain reading of the IHDA Mortgage and Use Agreement does not give Settlers' standing to enforce a default under the loan. Section 7 of the IHDA Use Agreement provides that upon violation, Settlers' shall have an opportunity to cure and if it fails to cure, IHDA "may declare a default under this Agreement . . . ." (*See* JX 12, at 7 of 23.) Paragraph 11 of the IHDA Mortgage contains similar language such that upon an event of default, the entirety of the mortgage debt becomes payable to IHDA "at the option of Mortgagee." (*See* JX 11, at 9 of 22.)

Moreover, whether the Washington-Taylor Mortgage is considered a "prohibited

transfer" under Paragraph 7(a) of the IHDA Mortgage is within the exclusive discretion of IHDA. (*See* JX11, at 7 of 22 ("Mortgagor shall not, without prior written consent of Mortgagee, create, effect, consent to, suffer or permit any "Prohibited Transfer" which includes any "mortgage, refinancing . . . grant of a security interest . . . affecting the Project . . . or other encumbrance of the Project.").)

The terms of the IHDA Use Agreement and Mortgage give no standing to Settlers' to enforce those restrictions. Because IHDA has released its Mortgage and declared Settlers' to be in compliance with all loan and grant requirements, Settlers' has not shown that it now has standing to enforce those restrictions.

Settlers' attempts to argue that standing exists to protect the inchoate trust rights of the intended beneficiaries of the IHDA grant funded through the federal HOME program. However, the court in *In re West Central Hous. Dev. Org.*, 338 B.R. 482, 491 (Bankr. D. Colo. 2005) held that the government had standing to seek the turnover of funds it granted to the debtor. This aligns with the objective of government trust theory under the doctrine of *parens patriae*, which confers standing for the government to protect the rights of its citizens benefitting from the federal funds from the entities administering such granted funds. IHDA has asserted no violation of its rights in this case, and has in fact declared that all rules and regulations were complied with. Accordingly, Settlers' has not shown that it is enforcing IHDA's rights in this case.

Settlers' reliance on *In re 28th Legislative Dist. Cmty. Dev. Corp.*, 2011 WL 5509140 at *7 (Bankr. E.D. Tenn. 2011) is also not helpful for the same reasons. In *28th Legislative Dist.*, the court permitted the debtor-grantee to assert the government trust theory on behalf of the government and itself to protect the debtor's interest in government funded property. However, in that case, the government was also a party, the federal grant funds continued to be at issue, and the debtor continued to apply for and receive federal grant funds. None of these facts exist here. IHDA is not a party-in-interest, any

46

interest in Settlers' property was extinguished, and Settlers' has admitted that it no longer participates in the HOME federal grant program. Accordingly, Settlers' has not shown an entitlement to assert IHDA's or other federal rights in this case.

Settlers' has failed to meet its burden of showing that the Washington-Taylor Mortgage is void based on illegality and other public policy grounds. Judgment will therefore be entered in favor of Schaumburg Bank on Count 6.

### C. Unjust Enrichment (Count 9)

Count 9 alleges that the Bank has been unjustly enriched through the benefit of having a mortgage on the Washington-Taylor Property. Unjust enrichment is an equitable claim that arises when "the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.'" *Wilson v. Career Educ. Corp.*, 729 F.3d 665, 682 (7th Cir. 2013) (quoting *Health Care Servs., Inc. v. Mt. Vernon Hosp. Inc.*, 545 N.E.2d 672, 679 (Ill. 1989)). For reasons discussed in connection with Count 3, Settlers' has met this standard in this case.

Schaumburg Bank was unjustly enriched by retention of the mortgage on the Washington-Taylor Property, which was fraudulently executed. Retention of any benefit from rights arising from the Washington-Taylor Mortgage would be unequitable in light of the fraud proven by Settlers' in this case.

Judgment will therefore be entered in favor of Settlers' and against Schaumburg Bank on Count 9.

### D. Schaumburg Bank's Secured Claim Will be Partially Disallowed

Pursuant to 11 U.S.C. § 502(b)(1), the claim of Schaumburg Bank, proof of which was filed in the bankruptcy case, will be partially disallowed to the extent that the Bank claims an interest in the Washington-Taylor Property as its collateral. The claim of

47

Schaumburg Bank cannot be secured by Washington-Taylor Property because the Mortgage on that property was void *ab initio* for fraud in the execution. Because the Washington-Taylor Mortgage is unenforceable against the Debtor or its property under applicable state law, the Bank's claim secured by the Washington-Taylor Property will be disallowed.

Defendant, Schaumburg Bank filed a secured claim in Settlers' bankruptcy case asserting liability in the total amount of $4,921,425.97. *See* Claim 12-3. Because the total value of the properties securing the Bank's claim is estimated at $2,721,000.00, the Bank claims to be secured to the extent of the value of its collateral, and unsecured as the remainder of its claim.

The latest appraisal of the Washington-Taylor Property, dated August 21, 2012, estimated the value of the property at approximately $850,000. (*See* JX 92, at 4 of 34.) Accordingly, assuming that the values on Schaumburg Bank's proof of claim are based on that appraisal, the secured claim of Schaumburg Bank will be reduced by that amount.

Therefore, the secured claim of Schaumburg Bank will be disallowed by the value of the Washington-Taylor Property as of the date of filing of the bankruptcy case, or approximately $850,000. That property is held by the estate free and clear of any lien. The Bank's secured claim will be allowed as to the value of its remaining collateral, or $1,871,000.[3] The remainder of the Bank's claim will be allowed as an unsecured claim in the amount of $3,050,425.97.[4]

---

[3] This amount results from subtracting $850,000 from the $2,721,000 secured claim estimated by the Bank in its Proof of Claim (*see* Claim No. 12-3).

[4] This is the resulting amount after subtracting the allowed secured claim of $1,871,000 from the total claim amount of $4,921,425.97 stated in Schaumburg Bank's Proof of Claim (*see* Claim No. 12-3).

## II. EQUITABLE SUBORDINATION

After notice and a hearing, a court may, under principles of equitable subordination:

> [S]ubordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c). "Courts will subordinate a claim under 11 U.S.C. § 510(c) when the claimant creditor engaged in inequitable conduct that injured other creditors or conferred an unfair advantage on the claimant, but not when subordination is inconsistent with the Bankruptcy Code." *In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 669 (7th Cir. 2013); *see also In re Kreisler*, 546 F.3d 863, 866 (7th Cir. 2008) ("Equitable subordination allows the bankruptcy court to reprioritize a claim if it determines that the claimant is guilty of misconduct that injures other creditors or confers an unfair advantage on the claimant." (citing *In re Lifschultz Fast Freight*, 132 F.3d 339, 344 (7th Cir. 1997))). Typically, the misconduct that courts have deemed sufficiently inequitable to merit this remedy has fallen within one of three areas: A "(1) fraud, illegality, breach of fiduciary duties; (2) under-capitalization; [or] (3) claimant's use of the debtor as a mere instrumentality or alter ego." *Lifschultz*, 132 F.3d at 345 (quoting *In re Missionary Baptist Found. of Am.*, 712 F.2d 206, 212 (5th Cir. 1983)).

"Equitable subordination means that a court has chosen to disregard an otherwise legally valid transaction." *Lifschultz*, 132 F.3d at 347. "The result is usually that the claimant receives less money than it otherwise would (or none at all), but that is not the goal. Equitable subordination is remedial, not punitive, and is meant to minimize the effect that the misconduct has on other creditors." *Kreisler*, 546 F.3d at 866 (citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir. 1977)).

49

As noted in the Conclusions of Law as to Jurisdiction, claims based on an asserted fiduciary duty or fraud in the inducement cannot be pursued because *D'Oench* and § 1823(e) preclude Settlers' from relying on unwritten agreements or obligations tied to the assets transferred to Schaumburg Bank by the FDIC. *See D'Oench*, 315 U.S. 447 and its progeny, as discussed in the prior opinions, *Settlers' Hous. Serv., Inc. v. Schaumburg Bank & Trust Co., N.A. (In re Settlers' Hous. Serv., Inc.)*, 514 B.R. 258, 270, 277–278 (Bankr. N.D. Ill. 2014), 520 B.R. 253, 261, 266 (Bankr. N.D. Ill. 2014).

The misconduct proven by Settlers' in this case has already been addressed by entry of Judgment on Count 3, sustaining Settlers' objection to the Bank's secured claim, in part, and concluding that the Washington-Taylor Mortgage was void *ab initio* for fraud in the execution. Even though it has been determined that Schaumburg Bank does not hold a valid secured claim in that respect, voiding such mortgage pursuant to the Court's equitable subordination powers under § 510(c) in connection with that claim is also warranted.

Equitable subordination is appropriate for conduct that rises to the level of "gross and egregious," "tantamount to fraud, misrepresentation, over-reaching or spoliation," or "involving moral turpitude." *See Sentinel Mgmt. Group*, 728 F.3d at 669; *see also Grede v. Bank of New York Mellon Corp. (In re Sentinel Mgmt. Grp.)*, 809 F.3d 958, 965 (7th Cir. 2016) (knowledge of improper conduct may be enough for equitable subordination of outsider). The fraud proven by Settlers' in this case in connection with the execution of the Washington-Taylor Mortgage was sufficiently "gross and egregious" to warrant voidance of that mortgage under principles of equitable subordination. Therefore, Settlers' is entitled to the same relief obtained in connection with Count 3 pursuant to the court's equitable subordination powers in the bankruptcy case.

Settlers' seeks other relief beyond voidance of the Washington-Taylor Mortgage in connection with Count 1. However, Settlers' has proven no other fraud beyond the misconduct remedied by voiding the Washington-Taylor Mortgage, and as previously discussed, has been held to be precluded from doing so in this case. Because "[e]quitable subordination is remedial, not punitive," *Kreisler*, 546 F.3d at 866, and the harm has been remedied in this case, Settlers' has not shown an entitlement to additional relief.

Judgment will be entered in favor of Settlers' and against Schaumburg Bank on Count 1 voiding the Washington-Taylor Mortgage. Further relief will be denied.

### III. CLAIMS BASED ON POST-RECEIVERSHIP CONDUCT

Settlers' has failed to show that it is entitled to damages for post-receivership actions of Schaumburg Bank. Judgment on Counts 8 and 11 will be entered in favor of Schaumburg Bank and Settlers' recovers nothing in connection with these counts.

### A. Tortious Interference with Contract (Count 11)

To establish a claim for tortious interference with a contract under Illinois law, a plaintiff must prove: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." *Voelker v. Porsche Cars North Am., Inc.*, 353 F.3d 516, 527–28 (7th Cir. 2003) (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp.*, 545 N.E.2d 672, 676 (Ill. 1989)).

In support of its claim, Settlers' produced copies of letters allegedly sent by Schaumburg Bank to tenants of Settlers'. *See* Joint Exhibit 83 ("Notice to Pay Letters"). Additionally, KJ speculated Settlers' rental receipts declined by $10,000 in the month subsequent to the date of the alleged Notice to Pay Letters. However, Settlers'

51

presented no rent rolls or other evidence to support KJ's testimony. Nor did Settlers' present any evidence of valid leases between Settlers' and any tenants. Therefore, Settlers' has failed to prove the existence of valid and enforceable contracts between itself and the tenants, which Settlers' was required to do in order to succeed on its tortious interference claim.

Additionally, no evidence was presented to show that the letter allegedly sent by Schaumburg Bank was received by Settlers' tenants. Nor did Settlers present any evidence that its tenants withheld rent payments, or made any direct payments to the Bank after receiving the Notice to Pay Letter. Illinois law provides that a mortgagee's conduct in contacting a mortgagor's tenants directing those tenants to pay rent directly to the mortgagee rather than the mortgagor does not amount to tortious interference with contractual relations absent evidence that the tenants actually paid rent to the mortgagee. *Bank Financial, FSB v. Brandwein*, 36 N.E.3d 421, 431 (Ill. App. Ct. 2015). Absent such evidence, there is no breach of contract from which damages could arise and, therefore, it necessarily follows that no tortious interference could have occurred. *See id.*

Accordingly, Settlers' has failed to establish the elements necessary to prove that Schaumburg Bank tortuously interfered with Settlers' contracts. Settler failed to show the existence of a valid and enforceable contract between Settlers' and its tenants. It also failed to show that Schaumburg Bank intentionally or unjustifiably induced the breach of any alleged contracts, or that the Bank caused the tenants to breach their alleged contracts with Settlers'. Finally, Settlers failed to show that it incurred damages as a result of any action by Schaumburg Bank. Judgment on Count 11 will therefore be entered in favor of Schaumburg Bank.

### B. Setoff (Count 8)

Setoff can be pleaded only where there is an indebtedness from the plaintiff to

the defendant which might be made the subject of an independent suit, and filing a plea of set-off is tantamount to the institution of a cross-action by the defendant against the plaintiff in the same proceeding. *Engstrom v. Olson*, 248 Ill. App. 480, 482 (Ill. App. Ct. 1928). The right of setoff allows parties that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A. *In re Clark Retail Enterprises, Inc.* 308 B.R. 869, 895 (Bankr. N.D. Ill. 2004).

Here, Settlers' claims for tortious interference with contract have not been established, and Settlers' is entitled to no other damages from Schaumburg Bank in connection with other counts tried. Accordingly, no setoff claim can be shown. Judgment will therefore be entered in favor of Schaumburg Bank on Count 8.

## CONCLUSION

For the foregoing reasons, Judgment will be separately entered in favor of Settlers' and against Schaumburg Bank on Counts 3 and 9, sustaining Settlers' objection to the Bank's secured claim in the bankruptcy case. Judgment will also be entered in favor of Settlers' and against Schaumburg Bank on Count 1, entitling Settlers' to the same relief in the bankruptcy case: avoidance of the lien claimed by the Bank on the Washington-Taylor Property.

Judgment on remaining Counts 6, 8 and 11 will be entered in favor of Schaumburg Bank.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this ___ day of May, 2017

MAY 1 9 2017

Case No. 13 A 01328
Settlers' Housing Service, Inc. v. Schaumburg Bank & Trust Co., N.A.
Updated: February 10, 2015

## CERTIFICATE OF SERVICE

I, Dorothy Clay, certify that on May 19, 2017, I caused to be served copies of the foregoing

document to the following by U.S. Mail or by electronic mail to those who have consented to such

service.

_Dorothy Clay_
Judicial Assistant/Deputy Clerk

## SERVICE LIST

**Electronic Service through CM/ECF System**

| | |
|---|---|
| William J Factor | Francisco E Connell |
| David Paul Holtkamp | Miriam R Stein |
| Sara E Lorber | Chuhak & Tecson, P.C. |
| Jeffrey K. Paulsen | 30 South Wacker Drive |
| Law Office of William J. Factor, Ltd. | Suite 2600 |
| 105 W. Madison, Suite 1500 | Chicago, IL 60606 |
| Chicago, IL 60602 | Counsel for Defendant |
| Counsel for Plaintiff | |